**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr., *pro hac vice forthcoming*
   tboutrous@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071
Telephone:  213.229.7000
Facsimile:  213.229.7520

**WATANABE ING LLP**
Melvyn M. Miyagi #1624-0
   mmiyagi@wik.com
Ross T. Shinyama #8830-0
   rshinyama@wik.com
Summer H. Kaiawe #9599-0
   skaiawe@wik.com
999 Bishop Street, Suite 1250
Honolulu, HI 96813
Telephone:  808.544.8300
Facsimile:  808.544.8399
Attorneys for Defendants CHEVRON
CORPORATION and CHEVRON U.S.A., INC.

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| COUNTY OF MAUI,<br><br>            Plaintiff,<br><br>      v.<br><br>SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; SHELL OIL PRODUCTS COMPANY LLC; CHEVRON CORP; CHEVRON USA INC.; BHP GROUP LIMITED; BHP GROUP PLC; BHP HAWAII INC.; BP PLC; BP AMERICA INC.; MARATHON PETROLEUM CORP.; | CASE NO.: 20-cv-00470<br><br>**NOTICE OF REMOVAL BY DEFENDANTS CHEVRON CORPORATION AND CHEVRON U.S.A., INC.; DECLARATION OF MELVYN M. MIYAGI IN SUPPORT OF NOTICE OF REMOVAL; EXHIBITS "1" – "79"; CERTIFICATE OF SERVICE**<br><br>[Removal from the Circuit Court of the Second Circuit, State of Hawai‘i] |

CONOCOPHILLIPS;
CONOCOPHILLIPS COMPANY;
PHILLIPS 66; PHILLIPS 66 COMPANY;
AND DOES 1 through 100, inclusive,

Defendants.

Action Filed:  October 12, 2020

**TO THE CLERK OF THE ABOVE-TITLED COURT AND TO PLAINTIFF THE COUNTY OF MAUI AND ITS COUNSEL OF RECORD:**

PLEASE TAKE NOTICE THAT Defendants Chevron Corp. and Chevron U.S.A. Inc. (collectively, "the Chevron Parties") remove this action—with reservation of all defenses and rights—from the Circuit Court of the Second Circuit, State of Hawai'i, Case No. 2CCV-20-0000283, to the United States District Court for the District of Hawaii, pursuant to 28 U.S.C. §§ 1331, 1367(a), 1441(a), 1442, and 1446, and 43 U.S.C § 1349(b).  All other defendants that have been joined and served (collectively, "Defendants") have consented to this Notice of Removal.

This Court has original federal question jurisdiction pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(b), and the Federal Officer Removal Statute, 28 U.S.C. § 1442.  Removal is also proper under 28 U.S.C. § 1331, because the Complaint necessarily arises under federal laws and treaties and out of federal enclaves and presents substantial federal questions, as well as 28 U.S.C. §§ 1441(a) and 1446.  This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over any claims for which it does not have original federal question jurisdiction because they form part of the same case or controversy as those claims over which the Court has original jurisdiction.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................1

    1.      This case is removable under the Outer Continental Shelf Lands Act. ......................................................................................6

    2.      This case is removable under the Federal Officer Removal Statute.......................................................................................9

    3.      This case is removable because there is federal enclave jurisdiction......................................................................................15

    4.      The Complaint's allegations of "concealment" do not defeat removal. ..................................................................................15

II.     TIMELINESS OF REMOVAL ..................................................24

III.    SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL.................................................................................25

IV.     THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT ...................................32

V.      THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE ............................................40

    A.      The Courts Construe the Federal Officer Removal Statute Broadly in Favor of Removal...........................................41

    B.      Defendants Satisfy All Elements of the Federal Officer Removal Statute ............................................................42

        1.      Defendants Are "Persons" ....................................43

        2.      Defendants "Acted Under" Federal Officers ..........................43

            a.      Defendants acted under federal officers to supply the federal government and the Nation with oil and

i

gas to meet federal national security and economic objectives. ....................................................................44

    b.   Defendants acted under federal officers by exploring for and producing oil and gas on federal lands at the government's direction to implement federal policy mandates and objectives. ........................55

    c.   Defendants acted under federal officers by supplying highly specialized fuels for military use. ......84

   3.   Defendants' Activities Are "Relat[ed] to" Plaintiff's Claims ................................................................................100

   4.   Defendants Have Colorable Federal Defenses .....................103

VI.   THIS ACTION IS REMOVABLE BECAUSE IT ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES ....................................106

VII.   THIS ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW, RAISE DISPUTED AND SUBSTANTIAL FEDERAL ISSUES, AND ARE COMPLETELY PREEMPTED BY FEDERAL LAW ..........111

VIII.   PLAINTIFF'S CONCEALMENT ALLEGATIONS ARE IRRELEVANT AND BASED ON DEMONSTRABLY FALSE PREMISES ...............................................................................120

IX.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER ...................................................................................135

## I.    INTRODUCTION

For many decades, United States policy has expressly recognized the fundamental strategic importance of oil and gas to the Nation's economic well-being and national security.  The United States Government knows these products are vital to the military's mission and success, which is why the United States Department of Defense is the single largest consumer of energy in the United States and one of the world's largest users of petroleum fuels.  Thus, when certain OPEC countries embargoed oil sales to the United States in 1973–74, the U.S. Congress responded by, among other things, creating the Strategic Petroleum Reserve to protect the Nation's economic and security interests.  *See* Energy Policy and Conservation Act of 1975, Pub. L. No. 94-163, 89 Stat. 871 (1975).  For similar reasons, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, 90 Stat. 303, 307-308 (1976), which "authorized and directed" that petroleum from the federal petroleum reserve at Elk Hills, California—which Defendant Chevron Corporation had operated for thirty-one years—"be produced at the maximum efficient rate for up to 6 years."[1]

In fact, for crucial security and economic reasons, every Administration since

---

[1]  *See also* Declaration of Melvyn Miyagi ("Miyagi Decl."), Ex. 2 (Steven Rattner, *Long-Inactive Oilfield is Open—for Now*, N.Y. Times (Oct. 31, 1977)); *id.* Ex. 3 (Robert Lindsey, *Elk Hills Reserve Oil Will Flow Again*, N.Y. Times (July 3, 1976)).

that of Franklin D. Roosevelt has taken active steps to *increase* U.S. oil production, thereby securing our national defense and spurring the economic development that has powered the United States' growth and prosperity over the past century. Notwithstanding the increased focus on alternative sources of energy, petroleum remains the ineluctable backbone of United States energy policy and it is undisputed that complete reliance on renewable energy sources at this time is neither possible nor advantageous.  For this reason, in 2010, President Obama "announc[ed] the expansion of offshore oil and gas exploration—but in ways that balance the need to harness domestic energy resources and the need to protect America's natural resources."[2]  President Obama explained that it was "not a decision that I've made lightly. . . .  But the bottom line is this:  given our energy needs, in order to sustain economic growth, produce jobs, and keep our businesses competitive, we're going to need to harness traditional sources of fuel even as we ramp up production of new sources of renewable, homegrown energy."[3]

Now, however, Plaintiff asks the court to find that this same petroleum production constitutes an unlawful "public nuisance" and "trespass," among other violations of Hawaiʻi state law.  Under various theories, the Complaint seeks to hold

---

[2]  President Barack Obama, Remarks on Energy at Andrews Air Force Base, Maryland, (Mar. 31, 2010), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-energy-security-andrews-air-force-base-3312010.

[3]  *Id.*

Defendants liable for "extract[ing], produc[ing], refin[ing], manufactur[ing], distribut[ing], promot[ing], market[ing], and[] sell[ing] . . . fossil fuel products." *See, e.g.*, Compl. ¶ 4. Plaintiff claims this subjects Defendants to "compensatory" and "punitive damages," as well as an order compelling Defendants to "abate" the alleged nuisance. Compl. at 134, Prayer for Relief. In this way, the Complaint seeks to stop, or at least drastically limit, fossil fuel production and use. Indeed, under Hawai'i law, "abatement" is the functional equivalent of an injunction prohibiting the injurious conduct. *See Haynes v. Haas*, 146 Haw. 452, 460–61 (2020).

Plaintiff's claims expressly target Defendants' nationwide and global activities. Compl. ¶ 54. In fact, Plaintiff's claims sweep even more broadly, depending necessarily on the activities of billions of oil and gas consumers, including not only entities like the U.S. government and military, but also countless hospitals, schools, manufacturing facilities, and individual households around the world—virtually every inhabitant of the planet that uses fossil fuels. Plaintiff does not—and cannot—limit its claims to harms allegedly caused by oil and gas extracted, produced, distributed, sold, marketed, or used in Hawai'i. And Plaintiff itself is a prodigious consumer of fossil fuels, emitting thousands of tons of $CO_2$ through its own consumption. Yet, Plaintiff asks this Court to halt Defendants' production of oil and gas by assessing massive monetary damages and enjoining Defendants' lawful activity.

The scope of this theory is breathtaking—it would reach the sale of oil and gas anywhere in the world, including all past and otherwise lawful sales, such as sales to the federal government and sales directed *by* the federal government. *See, e.g.*, Compl. ¶ 4 ("Defendants' fossil fuel products play[] a direct and substantial role in the unprecedented rise in emissions of greenhouse gas pollution and increased atmospheric $CO_2$ concentrations that have occurred since the mid-20th century. This dramatic increase in atmospheric $CO_2$ and other greenhouse gases is the main driver of the gravely dangerous changes occurring to the global climate and environment."). And because Plaintiff challenges production and combustion over the past several decades, the Complaint necessarily puts at issue longstanding decisions by the federal government regarding, among other things, national security, national energy policy, environmental protection, the maintenance of a national strategic petroleum reserve, development of energy resources on the United States' outer continental shelf lands, mineral extraction on federal lands (which have produced billions of dollars in revenue for the federal government), and the negotiation of international agreements bearing on the development and use of fossil fuels.

The federal issues and implications of Plaintiff's Complaint and requests for relief demand resolution by a federal court under federal law. The determination of how best to address *global* climate change, and the balancing of the costs and

benefits of the use of fossil fuels that goes into that equation, has been and should continue to be made by the federal government through federal policies and international cooperation. As the Ninth Circuit recently explained, "[A]ny effective plan [to reduce greenhouse gas emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches." *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020). A patchwork of 50 different state-law answers to this necessarily global issue would be unworkable and is precluded under our federal constitutional system. "If courts across the nation were to use the vagaries" of state "public nuisance doctrine to overturn the carefully enacted rules governing airborne emissions, it would be increasingly difficult for anyone to determine what standards govern." *North Carolina ex rel. Cooper v. TVA*, 615 F.3d 291, 298 (4th Cir. 2010).

As a consequence, there are multiple bases to remove the Complaint to federal court, including, without limitation: (1) jurisdiction under the Outer Continental Shelf Lands Act (43 U.S.C. § 1349(b)); (2) jurisdiction under the Federal Officer Removal Statute (28 U.S.C. § 1442); and (3) federal enclave jurisdiction, because Plaintiff's claims arise from alleged acts on multiple federal enclaves. The Court must "'credit [Defendants'] theory of the case for purposes . . . of the removal inquiry." *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020) (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999)).

1.     **This case is removable under the Outer Continental Shelf Lands Act.**  In recent decades and continuing through the present, a substantial portion of domestic exploration and production of oil and gas has occurred on the Outer Continental Shelf ("OCS").  The U.S. federal government is the exclusive holder of mineral rights on the OCS and Congress granted federal courts exclusive jurisdiction over claims "in connection with" petroleum operations thereon.  *See* 43 U.S.C. § 1349(b).  Certain Defendants and their affiliates operate a large share of the more than 5,000 active oil and gas leases on nearly 27 million OCS acres that the U.S. Department of the Interior administers under the Outer Continental Shelf Lands Act ("OCSLA").[4]  Oil produced from the OCS has accounted for approximately 30% of all domestic production, and the U.S. Treasury takes in more than $10 billion in average annual revenues from OCS lease bonuses, rental payments, and royalties.[5] Many of the Defendants in this lawsuit and their alleged predecessors, successors, or subsidiaries worked to develop the oil and gas resources on the OCS under federal

---

[4] Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.

[5] U.S. Dep't of Interior, Bureau of Ocean Energy Management, *OCS Oil and Gas Leasing Program: 2012-2017 Final Programmatic Environmental Impact Statement ("2012-2017 EIS")*, OCS EIS/EA BOEM 2012-030, 1-4 (2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Oil_and_Gas_Energy_Program/Leasing/Five_Year_Program/2012-2017_Five_Year_Program/2012-2017_Final_PEIS.pdf.

government supervision.[6]

Plaintiff's claims depend on greenhouse gas emissions that occur if and only if the oil and gas produced, distributed, and/or sold by Defendants is combusted by end users. Plaintiff does not—and cannot—limit its claims to harms allegedly caused by oil and gas extracted, produced, distributed, sold, marketed, or used in Hawaiʻi. As such, Plaintiff's claims of alleged injuries from global climate change "aris[e] out of, or in connection with . . . any operation conducted on the" OCS, and therefore provide this Court with jurisdiction. 43 U.S.C. § 1349(b).

In 1953, Congress passed OCSLA to make these vital national oil and gas resources owned by the federal government available for "expeditious and orderly development." 43 U.S.C. §1332(3). Responding to President Nixon's urging to "increase the acreage leased on the Outer Continental Shelf" to meet the federal government's goal for energy independence from foreign oil by 1980,[7] Congress in

---

[6] The Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates. Although Defendants reject Plaintiff's erroneous attempt to attribute the actions of predecessors, subsidiaries, and affiliates to the named Defendants, for purposes of this notice of removal only, Defendants describe the conduct of certain predecessors, subsidiaries, and affiliates of certain Defendants to show that Plaintiff's Complaint, as pleaded, can and should be removed to federal court.

[7] *See* Special Message to the Congress on the Energy Crisis, 1 Pub. Papers 29 (Jan. 23, 1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001?rgn=main;view=fulltext.

1974 amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs.  Congress increased federal control over lessees in order to promote the national energy agenda and protect the environment, with amendments "intended to result in expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *California ex rel. Brown v. Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981) (quoting 43 U.S.C. § 1802).

In order to vindicate the substantial federal interests in the OCS leasing program, Congress established original federal court jurisdiction over "the *entire range of legal disputes* that it knew would arise relating to resource development on the Outer Continental Shelf." *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1228 (5th Cir. 1985) (emphasis added).  OCSLA is "a sweeping assertion of federal supremacy over the submerged lands outside of the three-mile SLA boundary" and is to be interpreted broadly in favor of removal.  *Ten Taxpayer Citizens Grp. v. Cape Wind Assocs., LLC*, 373 F.3d 183, 188 (1st Cir. 2004). Plaintiff's alleged injuries are directly connected to Defendants' substantial operations on the OCS, since the Complaint ascribes those injuries to Defendants' production of fossil fuels and their combustion by innumerable third-parties, including the United States Government.  Jurisdiction is also proper because the

relief sought by Plaintiff "threatens to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS." *Amoco Prod. Co. v. Sea Robin Pipeline Co.*, 844 F.2d 1202, 1210 (5th Cir. 1988).

       **2.     This case is removable under the Federal Officer Removal Statute.**

Defendants' exploration and production of oil and gas, including production on the OCS and on other federal lands, have been conducted substantially under the direction, supervision, and control of officers of the federal government. Therefore, this action is removable under the Federal Officer Removal Statute, 28 U.S.C. § 1442. Indeed, the OCS leases the government required Defendants to sign include terms and conditions that mandate that Defendants develop the leaseholds to achieve national energy objectives and provide for continued federal oversight and control. Among other things, these terms:

- require Defendants to produce oil and gas,
- control the methods of production, and
- direct how the oil and gas is sold to benefit the national economy.

For example, the leases require Defendants to "maximize the ultimate recovery of the hydrocarbons from the leased area"; require that drilling take place "in accordance with a government approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"; and specify that the federal government retains the

right to oversee the lessee's rate of production from its leases.[8]

By producing oil and gas from the OCS, Defendants help the government meet the national interests it has, by statute and regulation, identified, and the goals the federal government has set.  As President Obama emphasized in 2010, the U.S. Government has required Defendants to do so in the ways that the federal government has concluded best address national climate change objectives by balancing national security, economic, and environmental concerns.  *See supra* note 2.  Indeed, one of the Federal Energy Administration's first undertakings in 1974 was to propose significantly expanding the OCS leasing program, because "[r]ecent world events have spotlighted the growing dependence of the United States on imported crude oil and petroleum products," and "[i]nterruptions in oil imports impose severe costs on the United States due to the pervasive economic role of petroleum in almost every sector of the economy."[9]  This increased OCS leasing represented a crucial federal policy, because "the Outer Continental Shelf represents one of the most important potential sources of increased domestic energy production, [and so] the President has called for an accelerated leasing program as a mechanism

---

[8] *See generally* Miyagi Decl. Exs. 4–7; Adam Vann, Congressional Research Service, RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multi-step process for approval of development plans and BOEM oversight procedures).

[9] Miyagi Decl. Ex. 8, at App'x 2 (H.R. Doc. No. 93-406 (1974)).

to [e]nsure that the most favorable OCS exploration prospects become available for near-term development." *Id.*

As the Supreme Court has explained, removal is appropriate where private companies have "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 154 (2007).  It is thus significant that, to implement this policy directive, Congress considered creating a national oil corporation to develop the oil and gas resources on the OCS, as many other countries seeking to exploit their domestic petroleum resources have done.  Ultimately, Congress decided that the best and most efficient way to meet the enumerated national objectives was to contract with private energy companies, including many of the Defendants here, to produce oil and gas from these federal lands.  The result was a closely monitored leasing program supervised by the Department of the Interior and providing the federal government with control over the production sufficient to protect the national interests.[10]

And these national interests are profound and imperative.  As noted above, the United States military depends upon oil and gas produced by Defendants and other industry members to effect its security objectives.  For more than a century,

---

[10]  *See* Miyagi Decl. Ex. 9 (Cong. Rec. S903-11 (Jan. 27, 1975))

"these products [have been] used for the war effort," including "many 'ordinary' products [that are] *crucial* to the national defense, such as . . . fuel and diesel oil used in the Navy's ships; and lubricating oils used for various military machines." *Exxon Mobil Corp. v. United States*, 2020 WL 5573048, at *31 (S.D. Tex. Sept. 16, 2020) (emphasis added); *see also id.* at *47 (noting the "value of [the] petroleum industry's contribution to the nation's military success"). In fiscal year 2019 alone, the Department of Defense purchased 94.2 million barrels of petroleum in compliance with military specifications, totaling $12.1 billion in procurement actions.[11]

The fundamental importance of petroleum for the military meant that, starting at least as early as World War II, officers of the federal government directed and controlled Defendants' production, extraction, and development of fossil fuel products as required to meet the military's needs. Federal agencies were formed for the war effort, including the War Production Board and the Petroleum Administration for War, and these ordered the oil and gas industry to maximize production of fuel for the military and directed the allocation of pivotal resources. *See, e.g.*, *United States v. Shell Oil Co.*, 294 F.3d 1045, 1049–50 (9th Cir. 2002)

---

[11] Def. Logistics Agency Energy, Fiscal Year 2019 Fact Book (2019), https://www.dla.mil/Portals/104/Documents/Energy/Publications/FactBookFiscalYear2019_highres.pdf?ver=2020-01-21-103755-473. This Fact Book also provides details of the types of fuels purchased by the military, the military standards governing the fuels purchased from Defendants, and the military's research efforts related to petroleum fuels.

("*Shell I*"). "The government exerted substantial control and direction over the refineries' actions, including decisions on how to use raw materials and labor." *Exxon Mobil Corp.*, 2020 WL 5573048, at *1.

In the decades after World War II, and continuing up to the present, the federal government has consistently relied on energy companies, including Defendants, to increase domestic oil production to bolster the nation's military and economic security. In the midst of a series of national energy crises, Congress passed the Trans-Alaska Pipeline Authorization Act of 1973, determining that it was in the "national interest" to deliver oil and gas from Alaska's North Slope "to domestic markets . . . because of growing domestic shortages and increasing dependence upon insecure foreign sources." Trans-Alaska Pipeline Authorization Act, Pub. L. No. 93-153, § 202(a), 87 Stat. 576, 584 (1973). Defendants in this lawsuit, as well as their alleged predecessors and subsidiaries, have been contributors to the approximately 18.4 billion barrels of oil produced in Alaska since November 1973—when the Trans-Alaska Pipeline Authorization Act was signed into law—to the present.[12] Similarly, in the 2000s, the Bush administration opened up approximately 8 million additional acres of OCS lands for leasing in the Gulf of Mexico, stating: "By developing these domestic resources in a way that protects the environment, we

---

[12] *See* Alaska Oil and Gas Conservation Commission, Data Miner 3: Production, http://aogweb.state.ak.us/DataMiner3/Forms/Production.aspx.

will help address high energy prices, protect American jobs, and reduce our dependence on foreign oil." [13]

Through these actions and numerous others, the United States government has repeatedly pushed for energy companies, including Defendants, to develop the nation's domestic oil resources, both for its own use and for the use of millions of American consumers, including Plaintiff here.  By seeking to hold Defendants liable for actions taken under the direction of federal officers to fulfill the needs of the federal government and in pursuit of federal government policies, Plaintiff's Complaint thus asserts claims "for or relating to" acts taken by Defendants under color of federal office.  Removal under the Federal Officer Removal Statute requires only "a 'connection' or 'association' between the act in question and the federal office."  *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Philadelphia*, 790 F.3d 457, 474 (3d Cir. 2015) ("*Def. Ass'n of Philadelphia*"); *see also Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 258 (4th Cir. 2017) (holding same); *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (en banc) (same).  While Plaintiff may try to dispute Defendants' showing, that is beside the point for removal purposes.  Defendants' federal officer

---

[13] *Statement By President George W. Bush Upon Signing [H.R. 6111]*, 2 Pub. Papers 2218 (Dec. 20, 2006), https://books.google.com/books?id=o2ei8yOphboC&printsec=frontcover#v=onepage&q&f=false.

removal allegations are more than "facially plausible," which is all that is required for "removal under the federal pleading standards." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 941 (7th Cir. 2020); *id.* at 945 (a defendant receives "the benefit of all reasonable inferences from the facts alleged" in the notice of removal). Defendants have asserted a reasonable basis for removal, which is dispositive: Even if both sides "have reasonable theories of th[e] case," the court "credit[s] only the [defendant's] theory." *Id.* at 947.

**3.     This case is removable because there is federal enclave jurisdiction.** Plaintiff's claims necessarily depend upon pinning liability on Defendants for their oil and gas operations, and Defendants have produced and sold oil and gas on federal enclaves, including military bases in Hawaiʻi and elsewhere. *See infra* Section VI. Despite Plaintiff's purported disclaimer, Compl. ¶ 14, Plaintiff cannot differentiate between emissions occurring as a result of Defendants' oil and gas operations on federal enclaves and those resulting from operations elsewhere, *see* Compl. ¶ 220. The climate change phenomena at the heart of Plaintiff's claims occurs as a result of global, cumulative emissions. In addition, Plaintiff challenges Defendants' conduct in the District of Columbia, *see* Compl. ¶¶ 97–113, 126–30, a federal enclave. The allegations in the Complaint therefore establish federal enclave jurisdiction. *See*, *e.g.*, *Reed v. Fina Oil & Chem. Co.*, 995 F. Supp. 705, 713 (E.D. Tex. 1998).

**4.     The Complaint's allegations of "concealment" do not defeat**

**removal.**  Perhaps recognizing that its claims related to fossil fuel production and combustion are removable on multiple federal law grounds, Plaintiff's Complaint tries, at times, to recast the claims as concerning "concealment" or "misinformation" rather than production.  For example, the Complaint alleges that Defendants have "engaged in a coordinated, multi-front effort to conceal and deny their own knowledge of [the threats of climate change]."  Compl. ¶ 1.  But these allegations are both unfounded and implausible:  The scientific research relating to a potential link between fossil fuel consumption and global climate change has been voluminous and prominent in the public domain for decades, and no actions by Defendants could have possibly "concealed" this information.  And there is no dispute that, to this day, the federal government, and many state governments, continue to encourage oil and gas production despite being well aware of the potential effects it may have on global climate change—for reasons that President Obama, among others, has explained.  *See Juliana*, 947 F.3d at 1164 ("A substantial evidentiary record documents that the federal government has long promoted fossil fuel use despite knowing that it can cause catastrophic climate change.").

Recognizing the concealment allegations are implausible, the Complaint is careful not to rely exclusively on allegations of "deception," but rather consistently lumps these claims together with production and sales.  *See, e.g.*, Compl. ¶ 4 ("Defendants  are  extractors,  producers,  refiners,  manufacturers,  distributors,

promoters, marketers, and/or sellers of fossil fuel products."); *id.* ¶ 147 (alleging that Defendants should have "reduced use of fossil fuel products, reduced global greenhouse gas pollution, and/or mitigated the harms associated with the use and consumption of such products"); *id.* ¶ 228 ("The County already has incurred, and will foreseeably continue to incur, injuries and damages due to Defendants' conduct, their contribution to the climate crisis, and the environmental, physical, social, and economic consequences of the climate crisis's impact on the environment."). Plaintiff's allegations about deception do not, and cannot, defeat removal because its claims are also based on the production, sale and use of fossil fuels. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 559, 563 (2005) (holding that removal is proper so long as jurisdiction exists over a single claim); *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 463 (5th Cir. 2016) (same), overruled on other grounds by *Latiolais*, 951 F.3d at 296.

The remedies Plaintiff seeks confirm that this case is not—and cannot be—about alleged "concealment" or misrepresentations divorced from Defendants' production and sales activities. The Complaint seeks compensatory damages for all injuries suffered as a result of global climate change, and an order compelling Defendants to abate the alleged nuisance (*i.e.*, global climate change) and thereby *enjoin* Defendants from all activities that may potentially contribute to global climate change (*i.e.*, the production and sale of oil and gas). These claimed remedies

do not, and cannot, flow from any misrepresentations or omissions. A misrepresentation cannot cause climate change, hurricanes, or a rise in sea level. Rather, according to the Complaint, those events and Plaintiff's alleged injuries are caused by the combustion of fossil fuels—and the numerous other recognized sources of global greenhouse gases, like agriculture, waste management, deforestation and other land use decisions by countless third parties, including by Plaintiff itself. If Plaintiff's claims were, in fact, based exclusively on alleged concealment and misrepresentations, its asserted damages would necessarily be limited to, at most, any harms attributable to the marginal increase in oil and gas consumption (if any) suffered by the misled consumers and caused by the alleged concealment and misrepresentations. But that is not the relief the Complaint demands.

Contrary to Plaintiff's baseless assertions, Defendants' production, marketing and sale of oil and gas is nothing like that of the tobacco industry. *See, e.g.*, Compl. ¶ 125. For starters, oil and gas have enabled the Industrial Revolution and serve a critical public need. Indeed, "tobacco is habit, while oil and gas are enablers of modern life."[14] As David Swensen, the head of the Yale endowment, explained: "If we stopped producing fossil fuels today, we would all die . . . We wouldn't have

---

[14] Miyagi Decl. Ex. 79 (Daniel Yergin, The New Map) at 387.

food.  We wouldn't have transportation.  We wouldn't have air conditioning.  We wouldn't have clothes."[15]  And Hawai'i itself studied and reported the link between fossil fuels, climate change, and sea level rise more than 35 years ago, issuing a report in 1985 on the "Effects on Hawaii of a Worldwide Rise in Sea Level Induced by the 'Greenhouse Effect,'" which stated that "[t]he situation continues to be aggravated by the use of fossil fuels for energy generation."  Miyagi Decl. Ex. 74, at 4 (Hawaii Coastal Zone Management Program, *Effects on Hawaii of a Worldwide Rise in Sea Level Induced by the "Greenhouse Effect,"* 1985).  Nevertheless, Hawai'i has maintained its view that oil and gas are "essential to the health, welfare, and safety of the people of Hawaii."  Haw. Rev. Stat. Ann. § 125C-1 (1975).

Thus, on its "merits," Plaintiff's claim that Defendants had exclusive, unique, or superior knowledge about the potential link between fossil fuel use, greenhouse gas emissions, and climate change is implausible.  Indeed, it is demonstrably false.  The vast public record of media articles, scientific journals, and government reports over the course of the past fifty-plus years makes clear that any claim of "concealment"—actionable or otherwise—is absurd.  The world has known for decades that the combustion of oil and gas releases greenhouse gases into the atmosphere, which may contribute to global warming and climate change.  Scientists

---

[15]  Miyagi Decl. Ex. 79 at 386.

have reported these effects since the nineteenth century.  In fact, Svante Arrhenius noted in 1896 that "if the quantity of carbonic acid increases in geometric progression, the augmentation of the temperature will increase nearly in arithmetic progression."[16]

Nor was discussion of this connection confined to academic journals.  By the early 1950s, the potential link between oil and gas use and climate change had been publicly reported in the popular media.  *The New York Times*, *The Washington Post*, *Time Magazine*, and *Popular Mechanics* all reported research concluding that "Earth's ground temperature is rising 1½ degrees a century as a result of carbon dioxide discharged from the burning of about 2,000,000,000 tons of coal and oil yearly."[17]  And local Hawai'i media also reported on the link between carbon dioxide emissions and climate change at least as early as 1955.  *See, e.g.*, Miyagi Decl. Ex. 14 (*Warming up the World*, The Honolulu Advertiser, A4 (Sept. 29, 1955)) ("[T]he carbon dioxide content in the atmosphere is increasing, and this in turn *may well have a 'greenhouse' effect* on the temperature of the air around us."); *id.* Ex. 15

---

[16]  Svante Arrhenius, *On the Influence of Carbonic Acid in the Air upon the Temperature of the Ground*, 41 Phil. Mag. & J. Sci. 237, 267 (1896), https://www.rsc.org/images/Arrhenius1896_tcm18-173546.pdf.

[17]  Miyagi Decl. Ex. 11 (Popular Mechanics, *Growing Blanket of Carbon Dioxide Raises Earth's Temperature* (Aug. 1953)); *see also id.* Ex. 12 (W.K., *How Industry May Change Climate*, N.Y. Times (May 24, 1953); *id.* Ex. 13 (Time Magazine, *Invisible Blanket* (May 25, 1953)); *id.* Ex. 70 (Wash. Post, *Industrial Gases Warming Up Earth*, Physicist Notes Here (May 5, 1953)).

(*Carbon Dioxide May Vary Climate,* The Honolulu Advertiser, A2 (July 16, 1956)) ("'It has been estimated that during the next 50 years industrial burning of coal, oil and gas will produce 1,700 billion tons of new carbon dioxide.'").

National and Hawai'i newspapers similarly reported the specific risk of potential sea level rise from global warming as early as the 1950s. In 1957, the Washington *Post* ran a front-page article entitled, "Teller Sees World-Flooding Peril Due to Industrial Overheating," reporting that prominent nuclear physicist Edward Teller had noted that "increase[s] in carbon dioxide [are] the result of the ever mounting uses of fuel energy such as coal, oil and derivatives during the industrial age."[18] As a result, Teller concluded, "the *ice caps on the poles will begin to melt* and the amount of water on the earth will increase . . . [and] '[s]uch places as *New York and Holland would be inundated*.'"[19]

And the U.S. government was well aware of the potential link between fossil fuel use and global climate change since at least the 1950s, but nonetheless actively encouraged and promoted domestic oil and gas production. Indeed, the Complaint acknowledges that in 1965 President Lyndon B. Johnson's Science Advisory

---

[18]  Miyagi Decl. Ex. 16 (Wash. Post, at A1 (Dec. 8, 1957).

[19]  *Id*. (emphasis added) (internal quotation marks omitted)). The Post reported this two years *before* the Teller speech to the American Petroleum Institute that the complaint references as some sort of smoking gun of secret information. *See* Compl. ¶ 58.

Committee reported that "a 25% increase in carbon dioxide concentrations could occur by the year 2000, that such an increase could cause significant global warming, that melting of the Antarctic ice cap and rapid sea level rise could result, and that fossil fuels were the clearest source of the pollution."  Compl. ¶ 60.  This is more than 20 years before Plaintiff alleges Defendants began their purported campaign of deception.

Despite this knowledge of potential adverse climate impacts, the United States—like the rest of the world—has continued to rely on and use oil and gas at ever-increasing rates.  In fact, the federal government reports that world energy consumption is expected to grow 50% by 2050 and will be focused in regions where strong economic growth is driving demand.[20]  Plaintiff cannot plausibly portray this as the result of Defendants' alleged "concealment"; rather it is a reasonable reflection of the country's fundamental need for abundant, affordable, and reliable sources of energy.  Indeed, the State of Hawaiʻi expressly recognizes petroleum and fossil fuels as "critical products and industries" during the coronavirus pandemic.[21]

\* \* \* \* \*

---

[20]  *See* U.S. Energy Info. Admin., *International Energy Outlook 2019* 24–26 (2019), https://www.eia.gov/outlooks/ieo/pdf/ieo2019.pdf.

[21]  *See* Governor David Ige, Eighth Supplementary Proclamation Related to the COVID-19 Emergency, 8 (May 18, 2020), https://governor.hawaii.gov/wp-content/uploads/2020/05/2005088-ATG_Eighth-Supplementary-Proclamation-for-COVID-19-distribution-signed.pdf.

This case is about the global production, sale, and consumption of vital products that virtually every person on the planet uses every day.  Oil and gas power our national defense; keep our homes, offices, factories, hospitals and other essential facilities illuminated, powered, cooled, and ventilated; and transport people and products, including virtually every consumer good—from food to medicine to clothing—across the nation and around the world.  By means of this lawsuit, Plaintiff seeks to overturn decades of federal energy policy and threatens the reliable, affordable supply of energy on which this country, and the world, depends.

As the Ninth Circuit has recently concluded, policy decisions surrounding the use of fossil fuels and the threat of climate change "require consideration of competing social, political, and economic forces," as well as "economic [and] defense considerations."  *Juliana*, 947 F.3d at 1172 (internal quotation marks and citations omitted).  This is the purview of federal policy and legislation, not improvised and ad hoc state-law tort claims, because "any effective plan [to reduce fossil fuel emissions] would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches" of the federal government.  *Id.* at 1171.  And it is federal law, rather than state law, that must serve as the exclusive source of governing law for such inherently interstate and international policy matters, because "the basic scheme of the Constitution so demands."  *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421

(2011) ("*AEP*").   Accordingly, and because Plaintiff's Complaint relates to and seeks substantial relief from Defendants' production of oil and gas on federal lands and under the direction of federal officers, Plaintiff's Complaint should be heard in this federal forum.

## II.   TIMELINESS OF REMOVAL

1.   Plaintiff, the County of Maui, filed a Complaint against the Chevron Parties and other named Defendants in the Circuit Court of the Second Circuit, State of Hawai'i, Case No. 2CCV-20-0000283, on October 12, 2020.   A copy of all process, pleadings, or orders in the possession of the Chevron Parties is attached as Exhibit 1 to the Declaration of Melvyn M. Miyagi ("Miyagi Decl."), filed concurrently herewith.

2.   This Notice of Removal is timely under 28 U.S.C. § 1446(b) because it is filed less than 30 days after service.   28 U.S.C. § 1446(b).   The Chevron Parties were served on October 12, 2020.   Miyagi Decl. ¶ 3.   The consent of the other Defendants is not required because removal does not proceed "solely under section 1441(a)."   28 U.S.C. § 1446(b)(2)(A).   The Chevron Parties remove this action to federal court on several bases, including, for example, 28 U.S.C. § 1442(a)(1).   Nevertheless, all properly joined and served Defendants have consented to removal.   Miyagi Decl. ¶ 4.   Consent is not required from any

Defendant that has not been served.  *See* 28 U.S.C. § 1446(b)(2)(A).[22]

## III.   SUMMARY OF ALLEGATIONS AND GROUNDS FOR REMOVAL

3.    Plaintiff is the County of Maui.  Plaintiff brings claims against Defendants for alleged injuries relating to global climate change, undertaken individually and together, as part of a "conspiracy," including damages and equitable relief from injuries it claims to have suffered or allegedly will suffer from "climate crisis-related injuries," such as sea level rise, extreme weather, and other natural phenomena.  *See, e.g.*, Compl. ¶¶ 37, 55, 210.  Plaintiff asserts the following claims: public nuisance, private nuisance, strict liability for failure to warn, negligent failure to warn, and trespass.  In addition to compensatory and punitive damages, in its Prayer for Relief, Plaintiff seeks "disgorgement of profits," as well as "[e]quitable relief, including abatement of the nuisances complained of" in the Complaint. Compl. at 134, Prayer for Relief.  It is thus clear that Plaintiff brought this action to

---

[22]  In filing this Notice of Removal, the Chevron Parties, and all other Defendants, do not waive, and expressly preserve, any right, defense, affirmative defense, or objection, including, without limitation, lack of personal jurisdiction, insufficient process, and/or insufficient service of process.  A number of Defendants contend that personal jurisdiction in Hawaiʻi is lacking over them, and these Defendants intend to preserve that defense and move to dismiss for lack of personal jurisdiction at the appropriate time.  *See, e.g.*, *Carter v. Bldg. Material & Constr. Teamsters' Union Local 216*, 928 F. Supp. 997, 1001 (N.D. Cal. 1996) ("A petition for removal affects only the forum in which the action will be heard; it does not affect personal jurisdiction.") (citing *Morris & Co. v. Skandinavia Ins. Co.*, 279 U.S. 405, 409 (1929) (removal to federal court does not waive right to object to lack of personal jurisdiction)).

restrict and ultimately end Defendants' production of oil and gas because of their alleged connection to climate change.

4. The Chevron Parties deny that any Hawaiʻi court has personal jurisdiction over them and further deny any liability as to Plaintiff's claims. The Chevron Parties expressly reserve all rights in this regard. For purposes of meeting the jurisdictional requirements for removal only, however, the Chevron Parties submit that removal is proper on at least three independent and alternative grounds.

5. *First*, this Court has original jurisdiction over this lawsuit and removal is proper pursuant to OCSLA. The allegations in the Complaint make clear that this action "aris[es] out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, or the subsoil and seabed of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *see also Tenn. Gas Pipeline v. Houston Cas. Ins. Co.*, 87 F.3d 150, 155 (5th Cir. 1996).

6. *Second*, Defendants are authorized to remove this action under the Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1). Despite Plaintiff's purported disclaimer, *see* Compl. ¶¶ 14, 198 n.156, multiple Defendants: (1) were "acting under" a federal officer; (2) assert colorable federal defenses; and (3) have claims against them that relate to acts under color of federal office. *See Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245

(9th Cir. 2017) ("*Goncalves*"); *Leite v. Crane Co.*, 749 F.3d 1117 (9th Cir. 2014). The Complaint expressly alleges that the cumulative impact of Defendants' *global* extraction and production activities over the past several decades—which necessarily include Defendants' substantial operations on the OCS—contributed to the global greenhouse gas emissions that Plaintiff claims caused its alleged injuries. *See, e.g.*, Compl. ¶ 4.

7. *Third*, removal is authorized under 28 U.S.C. §§ 1441(a) and 1331 because—despite Plaintiff's purported disclaimer, *see* Compl. ¶¶ 14, 198 n.156— the Complaint makes clear that Plaintiff's claims are based on alleged injuries and conduct occurring on federal enclaves. As such, Plaintiff's claims are removable to this Court under federal-question jurisdiction. *See* U.S. Const. art. I, § 8, cl. 17; *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) ("Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'") (citation omitted); *Lake v. Ohana Military Cmtys., LLC*, 2017 WL 11515424, at *13 (D. Haw. Mar. 15, 2017) (Kobayashi, J.) (denying plaintiffs' motion to remand because "there is federal enclave jurisdiction over Plaintiffs' state law claims in this case").

8. The Chevron Parties will address each of these grounds in additional detail below. Should Plaintiff challenge this Court's jurisdiction, Defendants reserve the right to further elaborate on these grounds and will not be limited to the specific

articulations in this Notice.  *Cf., e.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014–16 (7th Cir. 2018) (holding that district court erred by requiring evidentiary submissions by defendant to support removal in advance of ruling on jurisdiction).

9.     *Finally,* this Court has jurisdiction over Plaintiff's claims because this action is removable on the following three additional grounds:  They arise under federal law, necessarily depend on the resolution of disputed and substantial federal questions, and are completely preempted by federal law.  Plaintiff's claims arise under federal law because federal law exclusively governs claims for interstate and international pollution, as well as claims implicating the foreign affairs and navigable waters of the United States.  *See*, *e.g.*, *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972) ("*Milwaukee I*"); *City of Milwaukee v. Illinois*, 451 U.S. 304 (1981) ("*Milwaukee II*"); *AEP*, 564 U.S. at 421–23.  Plaintiff's claims also raise and depend on the resolution of disputed, substantial federal questions relating to the federal government's exclusive control over the navigable waters of the United States, issues of treaty interpretation involving international climate accords, and the federal government's exclusive authority over foreign relations.  *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005) ("*Grable*").  Plaintiff's claims are also completely preempted by the Clean Air Act ("CAA") and other federal statutes, treaties and international agreements, and the United States Constitution.  Although the Ninth Circuit rejected similar arguments regarding these

28

grounds in *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020) ("*Oakland*"), the defendants in that case intend to file a petition for a writ of certiorari to request review by the Supreme Court of the United States and Defendants raise these grounds here to preserve them for review.

(a) This action is removable under 28 U.S.C. §§ 1441(a) and 1331. Despite the state-law labels Plaintiff attaches to its claims, those claims directly impact important federal interests and are interstate in nature such that under Supreme Court precedent they are governed exclusively by federal law. *See Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 847, 850 (1985) ("*National Farmers*"). Federal law applies in those few areas of the law that so implicate uniquely federal interests—including, without limitation, interstate and ambient pollution, foreign affairs, navigable waters, and national security—that application of state law would be inappropriate. *AEP*, 564 U.S. at 422 ("[B]orrowing the law of a particular State would be inappropriate."); *Milwaukee I*, 406 U.S. at 99 ("[P]ollution of interstate or navigable waters creates actions arising under the 'laws' of the United States within the meaning of [28 U.S.C. § 1331].").

Under the two-step approach that the Supreme Court established in *United States v. Standard Oil*, whether a federal court has jurisdiction over a claim does not depend on whether that claim is ultimately viable. 332 U.S. 301, 307 (1947); *see also United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 42–45 (1st Cir. 1999)

("*Swiss American*").  Rather, only the first question—whether the source of law is federal or state based on the nature of the issues at stake—is relevant for jurisdictional purposes.  *Standard Oil*, 332 U.S. at 307; *Swiss American*, 191 F.3d at 42–45.  Because Plaintiff's claims necessarily arise exclusively under federal law—no matter how Plaintiff characterizes them—they are properly removed to this Court under its federal question jurisdiction.  *See, e.g.*, *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 928–29 (5th Cir. 1997).

(b)    Removal is authorized under 28 U.S.C. §§ 1441(a) and  1331 because this action necessarily raises disputed and substantial federal questions that a federal forum may entertain without disturbing a congressionally approved balance of responsibilities between the federal and state judiciaries.  *See Grable*, 545 U.S. at 314.  The issues of greenhouse gas emissions, global climate change, hydrologic cycle disruption, and sea level rise are not unique to the County of Maui, the State of Hawai'i, or even the United States.  Yet the Complaint attempts to supplant decades of national energy, economic, and environmental policies by prompting a Hawai'i state court to take control over an entire industry and its interstate commercial activities, and impose massive damages and injunctive relief contrary to long-standing federal regulatory schemes and systems.

*First*, Congress has struck a careful balance between energy production and environmental protection by enacting federal statutes such as the CAA, 42 U.S.C.

§ 7401(c), and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses, *see AEP*, 564 U.S. at 426–27.

*Second*, Plaintiff's claims impede the foreign-affairs power by seeking to regulate global climate change, which has been and continues to be the subject of major international treaties.

*Third*, Plaintiff alleges a causation theory that depends on proof that federal policymakers would have adopted different energy and climate policies absent the alleged conduct.

*Fourth*, the Plaintiff's claims raise the issue whether a state may, by lawsuit, assert control over the navigable waters of the United States.

*Fifth*, the Plaintiff's claims require interpretation of international climate treaties, which is the exclusive province of the federal courts.

 *Sixth*, the Complaint's reliance on injuries allegedly suffered by way of navigable waters provides an additional basis for the exercise of federal jurisdiction under *Grable*.

*Seventh*, as explained above, federal common law exclusively governs Plaintiff's claims because they implicate three areas that our constitutional structure does not allow state or municipal law to control: transboundary pollution, navigable waters, and foreign relations.

*Eighth*, this action raises important constitutional issues regarding the relationship between states and the division of authority between the federal government and the states.  For the same reasons, the exercise of federal jurisdiction is fully consistent with the principles of federalism—state courts are neither the traditional nor appropriate forum for litigation regarding the intersection of national energy and foreign policy.

(c)    Removal is authorized under 28 U.S.C. § 1441(a) and § 1331 on the further ground that Plaintiff's claims are completely preempted by the CAA and other federal statutes, treaties and international agreements, and the United States Constitution, which provide the exclusive federal remedy for addressing interstate greenhouse gas emissions that, under Plaintiff's theory, necessarily are the but-for cause of Plaintiff's alleged injuries.

10.    Defendants do not waive and expressly reserve all rights to argue that this action is properly removable on these grounds.

## IV.    THE ACTION IS REMOVABLE UNDER THE OUTER CONTINENTAL SHELF LANDS ACT

11.    This Court has original jurisdiction pursuant to OCSLA.  43 U.S.C. § 1349(b); *see Tenn. Gas Pipeline*, 87 F.3d at 155.  In OCSLA, Congress granted federal courts original jurisdiction over all actions "arising out of, or in connection with . . . any operation conducted on the outer Continental Shelf which involves exploration, development, or production of the minerals, of the subsoil and seabed

of the outer Continental Shelf, or which involves rights to such minerals." 43 U.S.C. § 1349(b); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014) ("[T]h[e] language [of § 1349(b)(1)] [i]s straightforward and broad."). The OCS includes all submerged lands that belong to the United States but are not part of any State. 43 U.S.C. §§1301, 1331. Plaintiff's claims encompass *all* of Defendants' worldwide "exploration, development, extraction . . . and . . . production" of fossil fuels. Compl. ¶ 19(a); *see also id.* ¶ 21(a). Therefore, Plaintiff's claims necessarily encompass all such activities by Defendants on the OCS and fall within the "broad . . . jurisdictional grant of section 1349." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994).

12. OCSLA makes clear that oil and gas activities on the OCS can be governed only by federal law. As the Supreme Court recently confirmed, "OCSLA defines the body of law that governs the OCS." *Parker Drilling Management Services, Ltd. v. Newton*, 139 S. Ct. 1881, 1887 (2019). In particular, OCSLA extends "[t]he Constitution and laws and civil and political jurisdiction of the United States" to the OCS. 43 U.S.C. § 1333(a)(1). Federal law applies "to the same extent as if the [OCS] were an area of exclusive Federal jurisdiction located within a State." *Id.* Disputes under OCSLA may borrow from the law of adjacent states, but such claims remain creatures of federal law. "[T]he civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of

the subsoil and seabed of the [OCS]." *Id.* § 1333(a)(2)(A).

13.     As *Parker Drilling* explains, "The OCSLA makes apparent that federal law is exclusive in its regulation of [the OCS], and that state law is adopted only as surrogate federal law." 139 S. Ct. at 1889 (quotation marks omitted, alteration in original). Plaintiff's attempt to affix a state-law label to its claims thus cannot defeat removal. Courts have affirmed removal jurisdiction where plaintiff's claims, "though ostensibly premised on [state] law, arise under the 'law of the United States' under [43 U.S.C.] § 1333(a)(2)" such that "[a] federal question . . . appears on the face of [plaintiff's] well-pleaded complaint." *Ten Taxpayer Citizens Grp*, 373 F.3d at 193. Accordingly, Plaintiff's claims are removable under OCSLA.[23]

14.     The breadth of OCSLA federal jurisdiction reflects the Act's "expansive substantive reach." *See id.* Congress passed OCSLA "to establish federal ownership and control over the mineral wealth of the OCS and to provide for the development of those natural resources." *Id*. at 566. "[T]he efficient exploitation of the minerals of the OCS . . . was . . . a primary reason for OCSLA." *Amoco Prod. Co.*, 844 F.2d at 1210. Indeed, OCSLA declares it "to be the policy of the United States that . . . the [OCS] . . . should be made available for expeditious and orderly development." 43 U.S.C. § 1332(3). The statute further provides that "since

---

[23] Under *Parker Drilling*, Plaintiff's claims related to operations on the OCS are also removable under 28 U.S.C. § 1331 because they arise under federal law.

exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States . . . such States, and through such States, affected local governments, are entitled to an opportunity to participate, *to the extent consistent with the national interest*, in the policy and planning decisions made by the Federal Government relating to exploration for, and development and production of, minerals of the outer Continental Shelf." *Id.* § 1332(4) (emphasis added).

15. Consistent with Congress's intent, courts repeatedly have found OCSLA jurisdiction where the claims involved conduct that occurred on the OCS or where resolution of the dispute foreseeably could affect the efficient exploitation of minerals from the OCS. *See, e.g.*, *EP Operating*, 26 F.3d at 569–70; *United Offshore v. S. Deepwater Pipeline*, 899 F.2d 405, 407 (5th Cir. 1990).

16. OCSLA jurisdiction exists even where a complaint pleads no substantive OCSLA claims. *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163 (finding OCSLA jurisdiction and denying motion to remand despite complaint's failure to plead any substantive OCSLA claims). Although the Complaint here attempts to "disclaim[] injuries arising on federal property," *see* Compl. ¶¶ 14, 198 n.156, Plaintiff's claims and injuries necessarily arise out of and are connected with production and exploration on the OCS. As Plaintiff concedes elsewhere in its Complaint, emissions from the combustion of fossil fuels cannot be traced to their

sources and Plaintiff's alleged injuries are caused by undifferentiated "global greenhouse gas pollution" generally. *Id.* ¶ 2. Indeed, the Complaint directly alleges that "it is not possible to determine the source of any particular individual molecule of $CO_2$ in the atmosphere attributable to anthropogenic sources because such greenhouse gas molecules do not bear markers that permit tracing them to their source, and because greenhouse gasses quickly diffuse and comingle in the atmosphere." *Id.* ¶ 220.

17.    Under OCSLA, the U.S. Department of the Interior administers an extensive federal leasing program that aims to develop and exploit the oil and gas resources of the federal OCS. 43 U.S.C. § 1334 *et seq.* Under this authority, the Interior Department "administers more than 5,000 active oil and gas leases on nearly 27 million OCS acres. In FY 2015, production from these leases generated $4.4 billion . . . in leasing revenue . . . [and] provided more than 550 million barrels of oil and 1.35 trillion cubic feet of natural gas, accounting for about sixteen percent of the Nation's oil production and about five percent of domestic natural gas production." Statement of Abigail Ross Hopper, Director, Bureau of Ocean Energy Management, Before the House Committee on Natural Resources (Mar. 2, 2016), https://www.boem.gov/FY2017-Budget-Testimony-03-01-2016.[24] In 2019, OCS

---

[24] The Court may look beyond the facts alleged in the Complaint to determine that OCSLA jurisdiction exists. *See, e.g.*, *Plains Gas Solutions, LLC v. Tenn. Gas*

leases supplied more than 690 million barrels of oil, a figure that has risen substantially in each of the last six years, together with 1.034 trillion cubic feet of natural gas.  Bureau of Safety and Environmental Enforcement, Outer Continental Shelf Oil and Gas Production (Oct. 6, 2020), https://www.data.bsee.gov/Production/OCSProduction/Default.aspx.

18.    Certain Defendants (or their predecessors, subsidiaries, or affiliates) participate in the federal OCS leasing program.  For example, from 1947 to 1995, Chevron U.S.A. Inc. produced 1.9 billion barrels of crude oil and 1.1 trillion cubic feet of natural gas from the federal OCS in the Gulf of Mexico alone.  Miyagi Decl. Ex. 17 (Production by Operator Ranked by Volume for the Gulf of Mexico Region, 1947-1995, MMS).  In 2016, Chevron U.S.A. produced more than 49 million barrels of crude oil and more than 49 billion cubic feet of natural gas from the OCS in the Gulf of Mexico.  U.S. Dep't of Interior, *Bureau of Safety & Envtl. Enf't, Gulf of Mex. Region, Prod. by Operator Ranked by Vol.* (2016), https://www.data.boem.gov/ Production/Files/Rank%20File%20Gas%202016.pdf.  According to data published by the U.S. Bureau of Ocean Energy Management ("BOEM"), numerous other Defendants conduct, and have conducted for decades, similar oil and gas operations on the federal OCS.  According to data published by the Department of Interior for

---

*Pipeline Co., LLC*, 46 F. Supp. 3d 701, 703 (S.D. Tex. 2014); *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 2011 A.M.C. 2624, 2640 (D. Del. 2011) (citing *Amoco Prod. Co.*, 844 F.2d at 1205).

the period 1947 to 1995, sixteen of the twenty largest—including the five largest—OCS operators in the Gulf of Mexico, measured by oil volume, were a Defendant (or predecessor of a Defendant) or one of their subsidiaries.[25]  Also according to the Department of the Interior, in every subsequent year, from 1996 to the present, at least three of the top five OCS operators in this area have been a Defendant (or a predecessor) or one of their subsidiaries.[26]   Indeed, Defendants (and their subsidiaries or affiliates) presently hold, in whole or in part, approximately 22.1% of all OCS leases.  *See Bureau of Ocean Energy Management, Lease Owner Informatio*n, https://www.data.boem.gov/Leasing/LeaseOwner/Default.aspx.[27]

19.    The Complaint itself makes clear that a substantial part of Plaintiff's claims "arise[] out of, or in connection with," Defendants' "operation[s] conducted on the outer Continental Shelf" that involve "the exploration and production of minerals."  *Deepwater Horizon*, 745 F.3d at 163.  Plaintiff, in fact, challenges *all of* Defendants' "extraction" of "oil, coal, and natural gas."  Compl. ¶ 2.  And a substantial quantum of those activities arise from OCS operations.  *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and

---

[25]  U.S. Dep't of Interior, *Bureau of Ocean Energy Mgmt., Ranking Operator by Oil,* https://www.data.boem.gov/Main/HtmlPage.aspx?page=rankOil.

[26]  *Id.*

[27]  As explained in note 8 above, the Complaint improperly conflates the activities of Defendants with the activities of their separately organized predecessors, subsidiaries, and affiliates.

Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432 (recounting that, historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production).  Plaintiff also alleges that emissions have risen due to increased OCS extraction technologies. *See, e.g.*, Compl. ¶¶ 132–35 (discussing Arctic offshore drilling equipment and patents potentially relevant to conduct near Alaskan OCS).  And while Plaintiff identifies certain additional energy projects that occurred in Canadian waters, *id.* ¶ 89, Defendants conduct similar activity in American waters.

20.    Even if Plaintiff's claims were based solely on allegedly deceptive promotion of oil and gas by Defendants (which they are not, as explained above and below), that would not prevent removal based on OCSLA.  For example, Plaintiff alleges that Defendants "funded . . . think tanks, front groups, and dark money foundations pushing climate change denial,"  Compl. ¶ 127, and supposedly misled regulators and public officials, *id.* ¶¶ 1, 223.  Even if this were true, Plaintiff's claims would be removable under OCSLA because, as explained above and below, its theory of causation includes the increased production of oil and gas leading to increases in greenhouse gas emissions, which has caused changes to the climate and Plaintiff's alleged injuries.  Thus, production of oil and gas—a substantial portion of which occurred on the OCS—is a direct and necessary link in the alleged causal

chain upon which Plaintiff's claims depend.  Moreover, Defendants' alleged concealment and misrepresentations would have had the alleged effect of "evad[ing] regulation" and convincing policy makers to continue production on the OCS and elsewhere.  *Id.* ¶ 126.

21.  Jurisdiction is also proper under OCSLA for the separate and independent reason that the *relief* sought by Plaintiff is unquestionably "in connection with" an OCS operation because it would affect Defendants' OCS extraction and development operations.  *See, e.g.*, Compl. at 134, Prayer for Relief (seeking abatement and damages that would inevitably affect exploration and production on the OCS).  Under Hawai'i law, a request for abatement is functionally the same as seeking to *enjoin* Defendants' production of oil and gas.  *See Haynes*, 146 Haw. at 460–61 (using abatement and injunction interchangeably).  Plaintiff's desired remedies would clearly "alter[] the progress of production activities on the OCS" and "threaten[] to impair the total recovery of the federally-owned minerals from the reservoir or reservoirs underlying the OCS.  Such a dispute was intended by Congress to be within the grant of federal jurisdiction contained in § 1349." *Amoco Prod. Co.*, 844 F.2d at 1210.

## V.   THE ACTION IS REMOVABLE UNDER THE FEDERAL OFFICER REMOVAL STATUTE

22.  The Federal Officer Removal statute allows removal of an action against "any officer (or any person acting under that officer) of the United States or

of any agency thereof . . . for or relating to any act under color of such office."  28

U.S.C. § 1442(a)(1).  A party seeking removal under section 1442 must show that:

(1) it is a "person" within the meaning of the statute; (2) plaintiff's claims are based

upon the defendants' conduct "acting under" the United States, its agencies, or its

officer; (3) plaintiff's claims are "for or relating to" an act under color of federal

office; and (4) the party raises a colorable federal defense.  *Def. Ass'n of

Philadelphia*, 790 F.3d at 467.  So long as federal officer jurisdiction can be

exercised as to one Defendant, the entire action is properly removed.  *See* 28 U.S.C.

§ 1367.  Defendants easily meet these criteria.

### A.   The Courts Construe the Federal Officer Removal Statute Broadly in Favor of Removal

23.   The Ninth Circuit has repeatedly held that "defendants enjoy much

broader removal rights under the federal officer removal statute than they do under

the general removal statute."  *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir.

2014); *see also Goncalves*, 865 F.3d at 1244 ("Throughout our analysis, we pay heed

to our duty to 'interpret Section 1442 broadly in favor of removal.'") (quoting *Acker*,

527 U.S. at 431).  At this stage, a defendant's allegations "in support of removal"

need only be "facially plausible," and the defendant receives the "benefit of all

reasonable inferences from the facts alleged."  *Baker*, 962 F.3d at 941, 945.  The

courts "credit the defendant's theory of the case," *Leite*, 749 F.3d at 1124, and

"construe the facts in the removal notice in the light most favorable to the" existence

41

of federal jurisdiction. *Def. Ass'n of Philadelphia*, 790 F.3d at 471, 474 ("[W]e must accept the [defendant's] theory of the case at this juncture."); *see also Baker*, 962 F.3d at 947 ("Our role at this stage of the litigation is to credit only the [defendant's] theory."). Defendants need not, at this juncture, affirmatively prove that they will prevail on the merits of any federal issue, because the sole issue is *where* such merits will be adjudicated. In *Acker*, for example, the Supreme Court "credit[ed] the [Defendants'] theory of the case for purposes of both elements of [the] jurisdictional inquiry and conclude[d] that the [Defendants] made an adequate threshold showing that the suit is 'for a[n] act under color of office.'" 527 U.S. at 432.

### B.    Defendants Satisfy All Elements of the Federal Officer Removal Statute

24.    The Chevron Parties and many other Defendants have engaged in activities pursuant to the directions of federal officers that, at a minimum, "relate to" Plaintiff's claims and otherwise meet all the elements of the Federal Officer Removal Statute. Among other things, Defendants have performed critical and necessary functions for the U.S. military to further national defense policy and have acted pursuant to government mandates, leases, and contracts under which they assisted the federal government in achieving federal policy goals under federal direction, oversight, and control. And "in the absence of [these] contract[s] with [] private firm[s], the Government itself would have had to perform" these essential tasks. *Watson*, 551 U.S. at 154.

### 1.   Defendants Are "Persons"

25.   Defendants are "persons" within the meaning of the statute.  The Complaint alleges that Defendants are corporations, Compl. ¶¶ 20–26, which qualify as "persons" under the statute.  *See Leite*, 749 F.3d at 1122 n.4.

### 2.   Defendants "Acted Under" Federal Officers

26.   Defendants "acted under" a federal officer because the government exerted extensive "subjection, guidance, or control" over Defendants' fossil fuel production and because Defendants engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 143, 152.  Both the Supreme Court and Ninth Circuit made clear that "the statute must be 'liberally construed'" and, in particular, "[t]he words 'acting under' are broad." *Id.* at 147; *see also Goncalves*, 865 F.3d at 1244.  Where, as here, a private party has specifically contracted with "the Government to produce an item that [the Government] needs," such assistance "goes beyond simple compliance with the law" and satisfies the "acting under" prong. *Baker*, 962 F.3d at 942.  "The words 'acting under' describe 'the triggering relationship between a private entity and a federal officer.' The 'triggering relationship' encompasses a broad range of relationships, including, but not limited to, agent-principal, *contract or payment*, and employer-employee relationships."  *Doe v. UPMC*, 2020 WL 5742685 at *3 (W.D.Pa. Sept. 25, 2020) (emphasis added and internal citations omitted).

27.     Defendants acted under federal officers in three key respects.  *First*, Defendants supplied the U.S. military and the nation at large with necessary oil and gas products at the direction and supervision of the federal government.  *Second*, Defendants produced oil and gas on federal lands under ongoing supervision of federal officers.  *Third*, Defendants produced and supplied highly specialized oil and gas products for the U.S. military that were critical to wartime efforts.  Defendants' grounds for federal officer removal span decades and cover multiple federal programs and contracts.  But at their core, each directly stems from the U.S. government's policies designed to meet the vital national interest in assuring adequate energy sources for the national defense and economic well-being.[28]

> **a.     Defendants acted under federal officers to supply the federal government and the Nation with oil and gas to meet federal national security and economic objectives.**

28.     Defendants have played major roles in meeting the federal government's requirements for petroleum products to power the Nation's economy, but even more decisively to keep the country safe in a dangerous world.  The connection between oil and national security began in the early 1900s, when the

---

[28]  The examples provided in this section, and other sections, of this Notice of Removal are meant only to provide illustrative examples.  These examples are by no means an exhaustive collection of the factual bases that support the grounds for removal asserted herein.  Defendants expressly reserve all rights to include additional support for any and all grounds for removal in any further briefing should Plaintiff challenge removal.

world's leading navies switched from coal to oil as the preferred energy source for ships.  President Taft recognized the national interest in developing domestic oil sources in his address to Congress on December 6, 1910:  "As not only the largest owner of oil lands, but as a propsective [sic] large consumer of oil by reason of the increasing use of fuel oil by the Navy, the Federal Government is directly concerned both in encouraging rational development and at the same time insuring the longest possible life to the oil supply."[29]  This national security concern led to the September 2, 1912 executive order creating the Naval Petroleum Reserve at Elk Hills, California, which was intended to preserve oil in the ground for national emergencies.  Miyagi Decl. Ex. 19.

29.    The increasing use of tanks, aircraft, and submarines in the later stages of World War I brought about a further drastic increase in the importance of adequate oil supplies.  Oil became the lifeblood pumping through the veins of all war machines.[30]  As Cabinet Minister Walter Long expressed in an address to the House

---

[29]  Miyagi Decl. Ex. 18 (*Hearings Before Committee on Naval Affairs of the House of Representatives on Estimates Submitted by the Secretary of the Navy*, 64th Cong. 761 (1915)).

[30]  Miyagi Decl. Ex. 20 at 170–77 (Daniel Yergin, *The Prize: The Epic Quest for Oil, Money & Power* 399 (1991)); Miyagi Decl. Ex. 21 at 42 (Ian O. Lessor, *Resources and Strategy: Vital Materials in International Conflict 1600 – The Present* (1989)) ("With the mechanization of armies, 'oil and its products began to rank as among the principal agents by which the Allies would conduct war and by which they could win it.'").

of Commons in 1917:

> Oil is probably more important at this moment than anything else. You may have men, munitions, and money, but if you do not have oil, which is today the greatest motive of power that you use, all your other advantages would be of comparatively little value.[31]

30.     In 1917, with Germany focusing efforts on blocking Allied tankers, American oil became vital for war efforts.  As the Admiralty Director of Stores stated: "[W]ithout the aid of oil from America our modern oil-burning fleet cannot keep the sea."[32]  In response to a cry for help, the United States provided over 80 percent of the Allied requirements for petroleum products and greatly influenced the outcome of the war.[33]

31.     Following World War I, the United States continued to explore for and develop its own domestic resources, while other nations pursued policies to maintain access and to develop oil resources in the Middle East, Venezuela, and Mexico. Although the United States produced a significant amount of the world's oil in the interwar years, it also began to push European powers to open Middle East oil

---

[31]  Miyagi Decl. Ex. 20 at 177 (Yergin, *The Prize*).

[32]  Miyagi Decl. Ex. 21, at 43 (Lessor, *Resources and Strategy*).

[33]  *Id.* ("A failure in the supply of petrol would compel the immediate paralysis of our armies, and might compel us to a peace unfavorable to the Allies. . . .  The safety of the Allied nations is in the balance.  If the Allies do not wish to lose the war, then, at the moment of the great German offensive, they must not let France lack the petrol which is as necessary as blood in the battles of tomorrow" (quoting Clemenceau's letter to President Wilson)).

reserves for American companies.[34]

32.     World War II confirmed petroleum's role as a key American resource and underscored the government's interest in maintaining and managing it.  *See* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36, at 4 (Nov. 28, 1945) ("Our overseas forces required nearly twice as many tons of oil as arms and armament, ammunition, transportation and construction equipment, food, clothing, shelter, medical supplies, and all other materials together.  In both essentiality and quantity, oil has become the greatest of all munitions"); Miyagi Decl. Ex. 23 (National Petroleum Council, *A National Oil Policy for the United States* at 1 (1949) ("A prime weapon of victory in two world wars, [oil] is a bulwark of our national security.").  As the United States prepared for war in 1941, its need for large quantities of oil and gas to produce high-octane fuel for planes ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped the nation's current capacity. The government created agencies to control the petroleum industry, including Defendants, *see infra* ¶¶ 93–94; it built refineries; it directed the production of certain petroleum products; and it managed scarce resources for the war effort.  "No one who knows even the slightest bit about what the *petroleum industry* contributed

---

[34]  *See generally* Miyagi Decl. Ex. 20 at 399 (Yergin, *The Prize*).

to the war can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government* . . . in bringing about a victory."  Miyagi Decl. Ex. 24 at 1 (Statement of Senator O'Mahoney, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36 (Nov. 28, 1945)).

33.     The court in *Exxon Mobil Corp. v. United States* acknowledged the long history of federal government control over Defendants' lawful oil production related activities in finding that the government was responsible for certain environmental response costs under CERCLA:  "By controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry."  2020 WL 5573048, at *11.   The *Exxon Mobil* court rejected the argument that private refiners "voluntarily cooperated" and instead found that they had "no choice" but to comply with the federal officer's direction.  *Id.* at *11.   In fact, the federal government "insiste[d] on having the plants operate 24 hours a day, 7 days a week, year round."  *Id*. at *8.  Put simply, the federal government "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials."  *Id*. at *14.  Certain Defendants or their predecessors or subsidiaries also produced toluene, a component of the explosive

TNT, under "direct contract with the Army Ordnance Department."[35]

34.     The controls placed on the production of petroleum during World War II extended through the Korean War. *See id.* at *27 (detailing the government's use of the Defense Production Act of 1950 "to force" the petroleum industry to "increase [its] production of wartime . . . petroleum products"). The United States government also authorized the full development of its own energy resources by directing large-scale oil production at the Naval Petroleum Reserve at Elk Hills, which was operated by Chevron Corp.'s predecessor Standard Oil of California under contract with the U.S. Navy.

35.     During the Cold War, the U.S. military continued to purchase and consume large amounts of avgas and jet fuel and participated in the development of innovative military fuels. For example, Shell Oil Company developed and produced specialized high-altitude fuels for the federal government's U-2 and SR-71 Blackbird overhead reconnaissance programs.[36]

36.     During the 1960s, U.S. domestic oil consumption increased 51%, compared to only 36% during the previous decade.[37] Demand continued to climb

---

[35] Miyagi Decl. Ex. 10 at 222 (Frey & Ide, *A History of the Petroleum Administration for War* 1946); *see Exxon Mobil Corp.*, 2020 WL 5573048, at *13, Harold Nockolds, *The Engineers*, 28 (1949).

[36] *See infra* notes 158 and 159.

[37] Miyagi Decl. Ex. 25, at 17 (Jay Hakes, *A Declaration of Energy Independence* (2008)).

into the early 1970s, and domestic supply failed to keep pace, so the United States soon found itself facing a precarious shortage of oil. The United States increasingly turned to foreign countries, particularly in the Middle East, for oil. In fact, the amount of oil that the United States imported doubled from 3.2 million barrels per day in 1970 to 6.2 million barrels per day in 1973.[38] By April 1973, President Nixon warned Congress of an impending energy crisis:

> As America has become more prosperous and more heavily industrialized, our demands for energy have soared. Today, with 6 per cent of the world's population, we consume almost a third of all the energy used in the world. Our energy demands have grown so rapidly that they now outstrip our available supplies, and at our present rate of growth, our energy needs a dozen years from now will be nearly double what they were in 1970. . . . If recent trends continue unchecked, we could face a genuine energy crisis. But that crisis can and should be averted, for we have the capacity and the resources to meet our energy needs if only we take the proper steps—and take them now.[39]

37. To avert a national energy crisis, President Nixon ordered a dramatic increase in possible production on the OCS:

> Approximately half of the oil and gas resources in this country are located on public lands, primarily on the Outer Continental Shelf [OCS]. The speed at which we can increase our domestic energy production will depend in

---

[38]  Miyagi Decl. Ex. 20 at 591 (Yergin, *The Prize*).

[39]  Excerpts From Nixon Message, N.Y. Times, Apr. 19, 1973, https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html.

large measure on how rapidly these resources can be developed.  I am therefore directing the Secretary of the Interior to take steps which would triple the annual acreage leased on the Outer Continental Shelf by 1979, beginning with expanded sales in 1974 in the Gulf of Mexico and including areas beyond 200 meters in depth under conditions consistent with my oceans policy statement of May, 1970.[40]

38.    Before the nation's precarious energy balance could stabilize, events abroad would exacerbate the crisis.  The 1973 Arab Oil Embargo "led to nationwide shortages of petroleum, a $60 billion drop in GNP, [and] more rapid inflation," among other harms.[41]   The government called upon the oil and gas industry, including Defendants, to address this shortage. *See infra* ¶ 104.  The nation's energy woes continued to mount in the mid-late 1970s, with a natural gas shortage caused by an abnormally cold winter in 1976–77, a national coal strike in 1978, and a substantial reduction in crude oil supplies following the Iranian Revolution of 1979.[42]   Yet the nation's dependency on imported oil continued to increase.  By 1977, the United States was importing up to 8.8 million barrels per day—fully half of the nation's total domestic oil consumption.[43]   The growing influence of OPEC,

---

[40]  *Id.*

[41]  U.S. Dep't of Energy, National Energy Plan II, at 1 (1979), https://books.google.com/books?id=VR7PpPbRKFgC&printsec=frontcover#v= onepage&q&f=false.

[42]  *Id.*

[43]  *Id.* at Table IV-1.

the quadrupling of oil prices during the energy crises of the 1970s, the staggering loss in GNP, and the now-infamous gas lines, price controls, and rationing that accompanied these energy crises spurred the U.S. government to take action over the ensuing decades to quickly and dramatically increase domestic oil production.

39.   In 1973, President Nixon established the goal of energy independence for the U.S. by 1980.  President Nixon dubbed this plan "Project Independence 1980" and, among other things, ordered the Secretary of the Interior "to increase the acreage leased on the [OCS] to 10 million acres beginning in 1975, more than tripling what had originally been planned."[44]  President Nixon explained:

> Let me conclude by restating our overall objective.  It can be summed up in one word that best characterizes this Nation and its essential nature.   That word is "independence."   From its beginning 200 years ago, throughout its history, America has made great sacrifices of blood and also of treasure to achieve and maintain its independence.   In the last third of this century, our independence will depend on maintaining and achieving self-sufficiency in energy. . . .  What I have called Project Independence 1980 is a series of plans and goals set to [e]nsure that by the end of this decade, Americans will not have to rely on any source of energy beyond our own.[45]

---

[44]   Annual Message to the Congress on the State of the Union, 1 Pub. Papers 56, 94 (Jan.                            23,                            1974), https://quod.lib.umich.edu/p/ppotpus/4731948.1974.001/134?rgn=full+text;view=image.

[45]   Address to the Nation about National Energy Policy, 1 Pub. Papers 973, 976 (Nov.                            25,                            1973), https://quod.lib.umich.edu/p/ppotpus/4731942.1973.001/1030?rgn=full+text;view=image.  After the Arab Oil Embargo, there was immense public pressure for

40.     For decades, the federal government has promoted the production of oil and gas for decades to meet this goal, even as the public and the world increasingly recognized and understood the potential link between greenhouse gas emissions and global climate change.[46]  Although the Nation did not meet President Nixon's goal of energy independence by 1980, it did so in 2019:  Total U.S. energy exports were greater than total energy imports in that year, and the United States became a net

---

Washington to "do something"— to return prices to what they had been before the embargo and, at the same time, ensure adequate domestic supplies.  Miyagi Decl. Ex. 20, at 660 (Yergin, *The Prize*). *See also* Meg Jacobs, *America's Never-Ending Oil Consumption*, Atlantic (May 15, 2016), https://www.theatlantic.com/politics/archive/2016/05/american-oil-consumption/482532/.

[46]  The federal government took a number of other actions to promote the domestic production of oil and gas to protect important state actions.  These include the Energy Petroleum Allocation Act of 1973, Pub L. No. 93-159, 87 Stat. 627 (1973) and the Federal Energy Administration ("FEA") Act of 1974, Pub. L.No. 93-275, 88 Stat. 96 (1974).  The report published pursuant to the FEA stated, "Prospects for large, new discoveries of onshore oil and gas deposits in the lower 48 States are small. For this reason, it is proposed that leasing of the Federal OCS be accelerated, to include frontier areas of Alaska, the Atlantic and Pacific coasts, and the Gulf of Mexico."  Miyagi Decl. Ex. 8, 1012 (H.R. Doc. No. 93-406).  The report further noted that "there would be strategic foreign policy and national security advantages in having energy sources which are not susceptible to interruption by a foreign power."  *Id.*  More recent administrations have continued to promote the development of oil and gas on the OCS through, *e.g.*, the Energy Policy Act of 2005 which, among other things, sought "to promote oil and natural gas production from the [OCS] and onshore Federal lands under lease by providing royalty incentives to use enhanced recovery techniques."  Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

total energy exporter for the first time since 1952.[47]

41.    The United States Department of Defense is the United States' single largest consumer of energy, and one of the world's largest users of petroleum fuel. *See* Lengyel, Colonel, USAF, Gregory J., *Department of Defense Energy Strategy: Teaching an Old Dog New Tricks* (August 2007), http://military-gospel.tygae.org.za/pdf/2007-08_USAF-B_DoD-EnergyStrat-OldDogNewTricks-LengyelCol.pdf.  In fiscal year 2019 alone, the Department of Defense purchased 94.2 million barrels of fuel products in compliance with military specifications, totaling $12.1 billion in procurement actions.[48]

42.    The federal government continues the active promotion of domestic production of fossil fuels through a variety of lease programs, grants, loan guarantees, tax provisions, and contracts.  For example, the Office of Fossil Energy states that the government seeks American energy dominance, which "promotes U.S. domestic homegrown energy development to achieve energy security and jobs in energy and technology around the world."[49]

43.    For decades, Defendants have acted under the direction of federal

---

[47]  U.S. Energy Info. Admin., U.S. energy facts explained (Apr. 27, 2020), https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php.

[48]  Def. Logistics Agency Fact Book, supra note 11.

[49]  U.S. Dep't of Energy, Office of Fossil Energy, 2018-2022 Strategic Vision, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf.

officers and have assisted them in securing domestic energy independence and meeting the requirements of the U.S. military and the national economy. Under these circumstances, 28 U.S.C. § 1442(a)(1) affords Defendants a right to insist that any claims based on this "special relationship" may be heard in federal court. *Baker*, 962 F.3d at 941–42 (holding that "[t]he crux of the ['acting under'] inquiry . . . is whether there was a special relationship between the defendant and the federal government," which exists where an entity "provide[s] the federal government with materials that it need[s]"—particularly during wartime).

> **b.   Defendants acted under federal officers by exploring for and producing oil and gas on federal lands at the government's direction to implement federal policy mandates and objectives.**

44.   Pursuant to statutory and other policy mandates, the federal government has enrolled Defendants to assist the government in developing the Nation's fossil fuel resources by exploring for and producing oil, gas, and other minerals on federal lands under the direction and control of the federal government. *See, e.g.*, Miyagi Decl. Exs. 4–7. For example: (1) Defendants produced oil and gas on federally owned lands pursuant to leases governed by OCSLA and the Mineral Leasing Act of 1920, 30 U.S.C. § 181 *et seq.* ("MLA"); (2) Defendant Chevron Corp. operated the Elk Hills Naval National Petroleum Reserve for the U.S. Navy for 31 years; and (3) Defendants supplied oil directly to and managed the Strategic Petroleum Reserve.

45.   ***OCSLA and MLA Leases***.   As noted above, Congress first passed OCSLA in 1953, providing federal control over the OCS to ensure the "expeditious and orderly development" of what it recognized to be a "vital national resource" in "a manner which is consistent with . . . national needs."  43 U.S.C. § 1332(3).  In 1978, Congress amended OCSLA to further encourage the leasing of the OCS to meet national energy and security needs created by the oil embargoes of the 1970s. Congress's express purpose in amending the OCS law was to foster "expedited exploration and development of the Outer Continental Shelf in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments."[50] Congress expressly underscored the national public interest in "develop[ing] oil and natural gas resources in the Outer Continental Shelf in a manner which is consistent with the need . . . to make such resources available to meet the Nation's energy needs as rapidly as possible."  *Id.*

46.   During the debate over the 1978 amendments, Senator Fritz Hollings

---

[50] 43 U.S.C. § 1802 (1) & (2); *see Watt*, 668 F.2d 1290, 1296 (D.C. Cir. 1981); *see also* S. Rep. No. 93-1140, at 4937 (1974) ("During the next decade, development of conventional oil and gas from the United States Outer Continental Shelf can be expected (a) to provide the largest single source of increased domestic energy, (b) to supply this energy at a lower average cost to the U.S. economy than any alternative and (c) to supply it with substantially less harm to the environment than almost any other source.").

proposed that the federal government create a national oil company to facilitate the development of oil and gas on the OCS: "My bill authorizes and directs the Secretary of the Interior to initiate a major program of offshore oil exploration— including deep drilling—in frontier areas of the Outer Continental Shelf. . . . The Federal Government can conduct this program by using the same drilling and exploration firms that are usually hired by oil companies. The taxpayers of the United States—rather than the oil companies—would be the clients for these drilling companies, and the information received would pass directly into the public domain."[51] The proposal to create a government agency to develop the OCS was ultimately rejected—instead, the government decided to contract with private energy companies to perform these essential tasks on its behalf with expanded oversight and control by the government.

47.   Around this time, it was necessary to spur production of oil and gas on the OCS because alternatives were not feasible. In the lead-up to the 1978 amendments, the Ad Hoc Select Committee on the OCS published a report stating that "alternative sources of energy will not be commercially practical for years to come," and thus, "a healthy economy remains dependent on supplies of oil and gas."[52] The Committee concluded that "[d]evelopment of our OCS resources will

---

[51] *See* Miyagi Decl. Ex. 9 (121 Cong. Rec. S903-11 (1975)).

[52] Miyagi Decl. Ex. 26, at 254 (H.R. Rep. No. 94-1084 (1976)).

afford us needed time—as much as a generation—within which to develop alternative sources of energy."[53]

48.     The 1978 OCSLA amendments greatly increased the Secretary of the Interior's control over the OCS leasing program to align production with national goals.[54]  The amendments instructed the Secretary of the Interior to create an oil and gas leasing program on a five-year review cycle that provides as precisely as possible the size, timing, and location of leasing activities "which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval."  43 U.S.C. § 1344(a)-(e).  Since 1977, several federal statutes have further expanded the OCS leasing program to promote the development of national energy supplies, including reductions in royalty payments to increase participation by Defendants to explore and develop deepwater resources.[55]

49.     In the 1990s, the Clinton Administration amended OCSLA to permit the Secretary of the Interior to grant certain royalty relief payments aimed at "reduc[ing] America's dependence on unreliable sources of imported oil by helping

---

[53]  Miyagi Decl. Ex. 27 at 1460 (H.R. Rep. No. 95-590 (1977)).

[54]  *See id.* at 173 (recognizing that the amendments provided the federal government with the power and oversight capability to "expedite the systematic development of the OCS, while protecting our marine and coastal environment").

[55]  *See, e.g*., Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. No. 104-58, 109 Stat. 557 (1995); Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (2005); Gulf of Mexico Energy Security Act of 2006, Pub. L. No. 109-432, 120 Stat. 2922 (2006).

unlock an estimated 15 billion barrels of oil in the central and western Gulf of Mexico" for energy companies' exploration and production.  Press Secretary, White House Office of Communications, Statement on North Slope Oil Bill Signing (Nov. 28, 1995), 1995 WL 699656, at *1.

50.    As a major federal action, authorization of each five-year OCS leasing program is subject to environmental review under the National Environmental Policy Act, requiring the preparation of an Environmental Impact Statement ("EIS") to support the Record of Decision approving the scope of the program.  The EIS approving each five-year leasing program is massive and includes details regarding the national need for oil and gas and how the leasing program meets those needs.[56]

51.    These environmental analyses confirm that the OCS leasing program exists to fulfill Congress's mandate to manage and encourage production of oil and natural gas from the OCS in order to further the national interest, not merely the commercial interests of the lessees.  In 2009, for example, oil produced from the OCS accounted for 30% of all domestic production.  The U.S. treasury averages more than $10 billion per year from OCS bonuses, rental payments, and royalties. In evaluating alternatives that could replace OCS leases or the required "no action" alternative (*i.e.*, no OCS leases), the EIS concludes that such alternatives would not

---

[56] *See, e.g.*, 2012-2017 EIS.

meet the federal government's purpose and need because any reduction in production would be replaced mostly by foreign imports of oil and gas, frustrating congressional intent.[57]

52.   The Record of Decision approving the 2017–2022 OCS Leasing Programs recognizes that the Secretary of Interior must develop schedules of OCS oil and gas leasing that "best meet national energy needs for the 5-year period following its approval or re-approval."[58] Although the federal government identified the no-lease alternative as the most environmentally preferred alternative, the government rejected it because it did "not meet the purpose and need for the action . . . as it leaves a void in planning for national energy needs."[59]

53.   Companies that agree to the OCS exploration and development leases, including Defendants, must develop the OCS areas identified diligently, including carrying out exploration, development, and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate

---

[57] *See id.* at 1–4, 4-606, 4-643 (projecting changes in oil markets if OCS production was halted).

[58] 43 U.S.C. § 1344(a)-(e).

[59] U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program (Jan. 17, 2017), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-Record-of-Decision.pdf.

recovery of hydrocarbons from the leased area."[60]  BOEM maintains oversight over the lessees as they operate on federal land.  Prior to exploration, development, or production, lessees must prepare and comply with detailed plans that are subject to comment and amendment by BOEM, state reviewer, or other agencies.[61]

54.    Under these requirements, OCS lessees are subject to exacting oversight by BOEM and Bureau of Safety and Environmental Enforcement ("BSEE") over each stage in developing the leasehold property.[62]  At all stages— from exploration, to preparation for developing and producing oil and gas reserves that have been discovered, to actual drilling and production—OCS lessees must submit exhaustive operational plans demonstrating how they will comply with the complex and detailed technical requirements imposed by these agencies.  The relevant agency must then find, complete, and approve these plans before any such work can begin.  BSEE then carefully monitors compliance with the approved plan and must approve any significant modification thereof.

55.    The federal government supervises and controls the oil and gas

---

[60]  *See* Miyagi Decl. Ex. 5 § 10.

[61]  *See generally* Adam Vann, Cong. Rsch. Serv., RL33404, Offshore Oil and Gas Development: Legal Framework (2018), RL33404, Offshore Oil and Gas Development: Legal Framework (2018), https://fas.org/sgp/crs/misc/RL33404.pdf (describing the multi-step process for approval of development plans and oversight procedures).

[62]  *E.g.*, 30 C.F.R. §§ 250.101-115, §§ 250.130-146, §§ 250.168-295, §§ 250.400-463 (BSEE) & §§ 550.101-147 (BOEM).

development and production activities of its lessees, like Defendants, in myriad and extensive ways.  Many of these requirements and reserved authorities are for the purpose of assisting the federal government in furthering public purposes.

56.    OCS leases obligate lessees like Defendants to "develop[] . . . the leased area" diligently, including carrying out exploration, development, and production activities approved by Interior Department officials for the express purpose of "maximiz[ing] the ultimate recovery of hydrocarbons from the leased area."[63] Indeed, for decades, Defendants' OCSLA leases have instructed that "[t]he Lessee *shall comply* with all applicable regulations, orders, written instructions and the terms and conditions set forth in this lease" and that "[a]fter due notice in writing, the Lessee *shall conduct* such OCS mining activities at such rates as the Lessor may require in order that the Leased Area or any part thereof may be properly and timely developed and produced in accordance with sound operating principles."[64]   All drilling must take place "in accordance with an approved exploration plan (EP), development and production plan (DPP) or development operations coordination document (DOCD) [as well as] approval conditions"—all of which must undergo extensive review and approval by federal authorities, and all of which further must

---

[63]  Miyagi Decl. Ex. 4 § 10; *see* 30 C.F.R. § 250.1150 ("[Lessees] must produce wells and reservoirs at rates that provide for economic development while maximizing ultimate recovery without adversely affecting correlative rights.").

[64]  Miyagi Decl. Ex. 4 § 10 (emphases added).

conform to "diligence" and "sound conservation practices."[65]

57.     The federal government retains the right to control a lessee's rate of production on the OCS from its lease.[66]   In particular, BSEE, within the Interior Department, may set the Maximum Efficient Rate ("MER") for production from a reservoir—that is, a cap on the production rate from all of the wells producing from a reservoir.[67]   This requirement has existed since 1974,[68] and the government adopted this "significant burden" to control production from its leases for the purpose of responding to "a period of oil shortages and energy crises."[69]   Capping production levels to serve the public policy of ensuring sufficient petroleum reserves for the country is not a feature of a typical commercial lease, *see* Miyagi Decl. Ex. 28 (Commercial Lease – Texas Association of Realtors, Form TAR-2101), and is another example of how the OCS leases are not merely commercial transactions, but rather are used to further federal objectives.

58.     For onshore operations, the Interior Department's Bureau of Land

---

[65]  Miyagi Decl. Ex. 5 §§ 9, 10; *see* Miyagi Decl. Ex. 7 (MLA leases grant rights subject to terms and conditions of the lease, federal laws, and the Interior Secretary's orders).

[66]  *See* Miyagi Decl. Ex. 4 § 10; 43 U.S.C. § 1334(g) (The lessee "shall produce any oil or gas, or both, . . . at rates consistent with any rule or order issued by the President in accordance with any provision of law.").

[67]  30 C.F.R. § 250.1159.

[68]  *See* 39 Fed. Reg. 15885 (May 6, 1974) (approving OCS Order No. 11).

[69]  75 Fed. Reg. 20271, 20272 (Apr. 19, 2010).

Management ("BLM") leases similarly provide that the United States "reserves the right to specify rates of development and production in the *public interest*."[70]

59.     The federal government also maintains certain controls over the disposition of oil, gas, and other minerals extracted from federally owned property. The government conditions OCS leases with a right of first refusal to purchase all minerals "[i]n time of war or when the President of the United States shall so prescribe."[71]  The government also reserves the right to purchase up to 16⅔ percent of lease production, less any royalty share taken in-kind.[72]  The Secretary of the Interior may direct a lessee to deliver any reserved production to the General Services Administration (government civilian operations), the Department of Defense (military operations), or the Department of Energy (*e.g.*, Strategic Petroleum Reserve).[73]

60.     For onshore leases, the Secretary may take any royalty owed on oil and gas production in-kind and "retain the same for the use of the United States."[74]  BLM leases also provide that "Lessor reserves the right to ensure that production is sold

---

[70]  Miyagi Decl. Ex. 7 § 4 (emphasis added).

[71]  Miyagi Decl. Ex. 4 § 14; Miyagi Decl. Ex. 5 § 15(d); *see* 43 U.S.C. § 1341(b).

[72]  43 U.S.C. § 1353(a)(2).

[73]  *Id.*

[74]  30 U.S.C. § 192.

at reasonable prices and to prevent monopoly."[75]   In addition, the Secretary may compel a lessee to offer a percentage of lease production "to small or independent refiners" (*e.g.*, in shortage situations where independent refiners may not have access to production to the same extent as integrated producers/refiners).[76]

61.   The federal government also uniquely reserves the authority to determine the value of production for purposes of determining how much royalty a lessee owes.[77]   The standard BLM lease for onshore minerals in effect for decades has a similar provision.[78]   A typical commercial private (*i.e.*, fee) lease would never reserve similar unilateral authority to one contracting party to control a material economic term of the lease contract.   *See* Miyagi Decl. Ex. 28 (Commercial Lease – Texas Association of Realtors, Form TAR-2101).   This would be akin to an apartment rental lease providing that the landlord has sole discretion to specify the rent owed.

62.   Through   federal   leases,   the   government   balances   economic

---

[75]  Miyagi Decl. Ex. 7 § 10.

[76]  Miyagi Decl. Ex. 5 § 15(c); *see* 43 U.S.C. § 1337(b)(7) (OCS leases); 30 U.S.C. § 192 (onshore leases).

[77]  *See* Miyagi Decl. Ex. 5 § 6(b) ("The value of production for purposes of computing royalty shall be the reasonable value of the production *as determined by the Lessor*.") (emphasis added).

[78]  *See* Miyagi Decl. Ex. 7 § 2 ("Lessor reserves the right . . . to establish reasonable minimum values on products . . . .").

development with environmental considerations.  The Secretary may reduce or eliminate the United States' royalty share, and thus provide the lessee an additional economic incentive to produce oil and gas.[79]  The Secretary may also suspend production from an OCS lease "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment."[80]  For onshore federal leases, the Secretary may similarly direct or grant suspensions of operations.[81]  The standard BLM onshore lease also requires the lessee to cease any operations that would result in the destruction of threatened or endangered species or objects of historic or scientific interest.[82]

63.    Through federal leases, the government retains supervision and control over the use of federal property.  The mineral leasing laws, including OCSLA and the MLA, are an exercise of Congress's power under the Property Clause of the

---

[79]  43 U.S.C. § 1337(a)(3) ("The Secretary may, in order to promote increased production on the lease area, through direct, secondary, or tertiary recovery means, reduce or eliminate any royalty or net profit share set forth in the lease for such area.") (OCS leases); 43 C.F.R. § 3103.4-1(a) ("[T]he Secretary . . . may waive, suspend or reduce . . . the royalty on an entire leasehold, or any portion thereof.") (MLA leases).

[80]  43 U.S.C. § 1334(a)(1); *see* 43 U.S.C. § 1334(a)(2) (authority to cancel any lease for similar reasons); Miyagi Decl. Ex. 5 § 13 (offshore lease provision governing suspension or cancellation).

[81]  *See* 30 U.S.C. § 226(i); 43 C.F.R. § 3103.4-4.

[82]  Miyagi Decl. Ex. 7 § 6.

Constitution.  U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States.").  The government issues onshore and offshore leases for a primary term of five to 10 years, with a habendum clause under which the lessee retains the lease for so long after the primary term as the lease produces oil and gas in paying quantities.  30 U.S.C. § 226(e) (onshore); 43 U.S.C. § 1337(b)(2) (OCS); Miyagi Decl. Ex. 5 § 3.  But when the lease terminates, the property interest reverts to the United States; the lessee cannot acquire fee title interest.  Nor may a federal lessee assign its lease to another person without express government approval.   30 U.S.C. § 187; 43 C.F.R. § 3106 (onshore leases); 30 C.F.R. §§ 556.701(a), 556.800 (OCS leases).

64.    The United States controls federal mineral lessees like Defendants in other ways.  An OCS lessee does not have an absolute right to develop and produce; rather, it has only an exclusive right to seek approval from the United States to develop and produce under the lease.  *See Sec'y of the Interior v. California*, 464 U.S. 312, 337–39 (1984); *Vill. of False Pass v. Clark*, 733 F.2d 605, 614–16 (9th Cir. 1984).  The MLA limits the onshore federal oil and gas lease acreage that may be held by any one person, enforceable by an action in federal court.  30 U.S.C. § 184(d), (h).  The government has the right to obtain "prompt access" to facilities and records.  *See* Miyagi Decl. Ex. 4 § 11, *id.* Ex. 5 § 12; 30 U.S.C. § 1713.  And

the United States also reserves the right to all helium produced from federal leases, which the lessee produces solely for the government's benefit. *See* 43 U.S.C. § 1341(f); Miyagi Decl. Ex. 5 § 6(a) (OCS leases); 30 U.S.C. § 181 (onshore leases).

65.   As the above statutory and lease provisions demonstrate, a federal oil and gas lease is a contract to develop federal minerals on the government's behalf, and the government retains extensive supervision and control over the lessees for many purposes, including in some cases solely to further public policy or achieve purely governmental objectives. These are activities that the federal government would itself have to undertake unless the Defendants did it for the government through the obligations of federal leases on federal lands. Under *Watson*, this is not run-of-the-mill regulation. On the contrary, it is the kind of "special relationship" that supports federal officer removal. *Watson*, 551 U.S. at 157.

66.   In 2019, oil production by private companies, including some Defendants, from federal offshore and onshore leases managed by the Interior Department was nearly one billion barrels. Historically, annual oil and gas production from federal leases has accounted for as much as 36% of domestic oil production and 25% of domestic natural gas production.[83] The federal government

---

[83] *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 3, 5 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

has reaped enormous financial benefits from the ongoing policy decision to contract for the production of oil and gas from federal lands in the form of royalty regimes that have resulted in billions of dollars of revenue to the federal government. Moreover, the activities of lessees (including Defendants) pursuant to these leases further Congress's directives to the Executive Branch to facilitate and manage the production of oil and natural gas from the OCS in order to achieve the federal government's policy objectives. If not for these activities of lessees under the direction and control of federal resource-management agencies, the federal government would have needed to perform those activities itself in order to implement Congress's directives regarding production of oil and gas from the OCS.

67.    The federal government's control over oil and gas production is thus fundamentally different from the government's regulation of tobacco products, which the Supreme Court addressed in *Watson*. There, the Court recognized that a private party does not come within the scope of the federal officer removal statute "simply [by] *complying* with the law." *Watson*, 551 U.S. at 152. Accordingly, "a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone," even "if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 153. This is because mere regulation does not indicate that the federal government would undertake the regulated activity if private actors did not—the government regulates tobacco

products because of their health risks, not because tobacco production is a federal imperative.  Plaintiff's claims, by contrast, seek to punish Defendants for their efforts to effectuate national energy policy and support the national defense, activities conducted under the close supervision of the federal government. Plaintiff's claims thus implicate precisely the type "special relationship" that supports federal officer removal.  *Id*. at 157.

68.  ***Naval Petroleum Reserve at Elk Hills***.  At the turn of the twentieth century, government lands in the West were being rapidly turned over to private owners.  At the same time, there was a growing realization of the importance of oil for the Navy, which was then changing its ships from coal- to oil-burning.  In response to arguments that the government should preserve oil for Naval purposes, President Taft withdrew large portions of land in California and Wyoming from eligibility for private ownership, and in 1912 set aside Naval Petroleum Reserve No. 1 at Elk Hills by an Executive Order.  The establishment of the Reserve, however, was expressly made subject to preexisting private ownership.  There are approximately 46,000 acres within the Reserve, and Standard Oil of California ("Standard Oil") (Chevron's predecessor) owned approximately one-fifth and the Navy owned the remainder.  The Standard Oil lands are not in one block, but are

checker-boarded throughout the Reserve.[84]

69.    "The Elk Hills Naval Petroleum Reserve (NPR-1) . . . was originally established in 1912 to provide a source of liquid fuels for the armed forces during national emergencies."[85]  "Congressional intent was to retain the oil [at the Reserve] in the ground except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil."[86]  In other words, Congress's policy objective was to take those steps necessary to maintain and preserve the fields exclusively for federal defense purposes.  Standard Oil and the Navy eventually developed an understanding that neither would drill additional wells or produce oil inside the Reserve without providing six months' notice to the other.[87]  In doing so, Standard Oil agreed to maintain the Reserve for national security purposes.  The maintenance of the Reserve itself under the direction of the federal government in furtherance of federal policy gives rise to federal officer removal.[88]  Standard Oil's

---

[84]  The history of Elk Hills is recounted in *United States v. Standard Oil Co. of Cal.*, 545 F.2d 624 (9th Cir. 1976).

[85]  U.S. Gov't Accountability Off., GAO/RCED-87-75FS, Naval Petroleum Reserves: Oil Sales Procedures and Prices at Elk Hills, April Through December 1986, at 3 (1987) ("GAO Fact Sheet"), http://www.gao.gov/assets/90/87497.pdf.

[86]  U.S. Gov't Accountability Off., *Naval Petroleum Reserve No. 1: Efforts to Sell the Reserve*, GAO/RCED-88-198 at 15 (July 1988) ("GAO Report"), https://www.gao.gov/assets/220/210337.pdf.

[87]  *See Standard Oil of California*, 545 F.2d at 627.

[88]  *See generally* GAO Report.

efforts ensured that the Reserve was ready to produce oil for the U.S. war efforts in World War II.

70. World War II marked a new phase. "Shortly after the entrance of the United States into the war, it became apparent that additional crude oil production would be required on the West Coast."[89] Standard Oil and the Navy began negotiations for production on the Reserve. On March 1, 1942, President Roosevelt "stated that if satisfactory arrangements could not be promptly concluded with [Standard Oil], the Secretary of the Navy was authorized to start condemnation proceedings through the Department of Justice to acquire the property" for the federal government.[90]

71. The Navy and Standard Oil entered into a Unit Plan Contract ("UPC") that President Roosevelt approved on June 28, 1944. The UPC "governed the joint operation and production of the oil and gas deposits . . . of the Elk Hills Reserve." *Chevron U.S.A., Inc. v. United States*, 116 Fed. Cl. 202, 205 (Fed. Cl. 2014). It provided that the Elk Hills Reserve "was to be operated as a single property (a unit) and granted the Navy, subject to the provisions of the contract, *absolute control* over (1) the time and rate of exploration and development and (2) the quantity and rate of

---

[89] *Id.* at 14.

[90] *Id.*

production."[91]  The UPC shows the federal government's "full and absolute" power and "complete control" over fossil fuel exploration, production, and sales at the reserve.  *See* Miyagi Decl. Ex. 29 (Statement of Gerald D. Morgan, Special Counsel to the Committee on Naval Affairs, Hearing on Amendment Proposed to Unit Plan Contract Governing Development and Operation of Naval Reserve Petroleum No. 1 (Elk Hills), U.S. House of Representatives, Committee on Naval Affairs, at 3737–38 (Sept. 9, 1946)) ("It must be recognized that although Navy and Standard entered into a unit-plan contract . . . the interests of each are conflicting.  It is to Navy's interest to conserve as much oil as possible in the ground . . . [and] it is to Standard's interests to produce its oil as rapidly as is consistent with maintaining a balance between economical production and greatest ultimate recovery.  The conflict of interest between Navy and Standard was decided in Navy's favor upon the execution of the unit-plan contract, for absolute control over the time, manner, and rate of production is vested in the Secretary of the Navy subject to the control of Congress.").

72.     The plan was designed to "[a]fford [the] Navy a means of acquiring *complete control over* the development of the entire Reserve *and the production of oil therefrom*."[92]   *See* Miyagi Decl. Ex. 30 (Statements of Commodore W.G.

---

[91]  *Id.* at 15 (emphasis added).

[92]  Miyagi Decl. Ex. 6, Recitals § 6(d)(i) (emphases added).

Greenman, U.S. Navy, Director, Naval Petroleum Reserves, Hearing Records at 3693–94) ("[The] agreement between Navy and Standard . . . placed the control of production from both Standard and Navy lands under the absolute control of the Secretary of the Navy.").

73.     "[The] Navy shall, subject to the provisions hereof, have the *exclusive control* over the exploration, prospecting development and operation of the Reserve."[93]

74.     "[The] Navy shall have *full and absolute power* to determine from time to time the rate of prospecting and development on, and the quantity and rate of production from, the Reserve, and may from time to time shut in wells on the Reserve if it so desires."[94]

75.     "[A]ll exploration, prospecting, development, and producing operations on the Reserve" occurred "under the supervision and direction of an Operating Committee" tasked with "supervis[ing]" operations and "requir[ing] the use of sound oil field engineering practices designed to achieve the maximum economic recovery of oil from the reserve."[95]  In the event of disagreement, "such matter shall be referred to the Secretary of the Navy for determination; and his

---

[93]  *Id.* § 3(a) (emphasis added).

[94]  *Id.* § 4(a) (emphasis added).

[95]  *Id.* § 3(b).

decision in each such instance shall be final and binding upon Navy and Standard."[96]

76.     The Navy retained ultimate and even "absolute" discretion to suspend production, decrease the minimum amount of production per day that Standard was entitled to receive, or increase the rate of production.[97]

77.     Standard Oil and later Chevron) could participate in an Operating Committee, which was responsible for production decisions such as the number, design, and location of wells and facilities.  Both the Navy and Standard Oil had an equal vote on the Committee, but in the event of a tie the Secretary of Navy held the tiebreaker.[98]

78.     The "*Navy chose to operate the reserve through a contractor rather than with its own personnel*" and opened the contract to competitive bidding.[99] Standard Oil "bid for the operator's contract in 1944, was awarded the contract, and continued to operate NPR-1 [for the Navy] for the next 31 years."[100]  Although the Navy could have developed the resources on the Reserve itself, it decided to use a third-party contractor to maximize production as quickly as possible.  This is reflected in government documents explaining the decision to hire Standard Oil to

---

[96] *Id.* § 9(a).

[97] *Id.* §§ 4(b), 5(d)(1).

[98] *See id.*

[99] *Id.*

[100] *Id.*

operate the Reserve, which also noted that Standard Oil offered to perform the work

without making a profit:

> A substantial increase in production at the earliest possible
> date was urgently requested by the Joint Chiefs of Staff to
> meet the critical need for petroleum on the West Coast to
> supply the armed forces in the Pacific theatre. . . . The
> Standard Oil Company of California was chosen as
> operator because it was the only large company capable of
> furnishing the facilities for such a development program
> and partially because it was the largest private owner of
> lands in the Reserve. The Navy has expressed its
> appreciation of the patriotism of the Standard Oil
> Company in undertaking such a project at cost with no
> profit to be received by the Company.[101]

79.    "Shortly after the unit plan contract was signed, the Congress,

according to DOE, authorized the production at [the Elk Hills Reserve] at a level of

65,000 B/D [barrels per day] to address fuel shortages and World War II military

needs."[102]  Production reached this "peak of 65,000 barrels per day in 1945."[103]

80.    Standard Oil's production and operations of the Reserve for the Navy

in furtherance of the government's war effort were subject to substantial and

continued oversight and inspections by Navy officers.  The Operating Agreement

between the U.S. Navy and Standard Oil directs that "OPERATOR [Standard Oil]

is in the employ of the Navy Department and is responsible to the Secretary thereof

---

[101] *See* Miyagi Decl. Ex. 31 at 1 (Elk Hills Historical Documents).

[102] GAO Report at 15.

[103] GAO Fact Sheet at 3.

through the Officer in Charge and the Director, Naval Petroleum and Oil Shale Reserves."[104]  In November 1974, for example, when a dispute arose concerning whether it was possible to produce 400,000 barrels per day to meet the unfolding energy crisis, the Navy directed the Unit Operator (Standard Oil) to prepare a plan, rejecting objections and advising Standard Oil that "since you are in the employ of the Navy and have been tasked with performing a function which is within the exclusive control of the Secretary of Navy to order accomplished, the approval of the Operating Committee is not to be considered a prerequisite to the initiation of the above action on your part."[105]

81.    Accordingly, for at least 31 years, Standard Oil operated Elk Hills under the "subjection, guidance or control" of federal Navy officers.  *Watson*, 551 U.S. at 151; *see id.* at 153–54 (noting that removal was proper where company "fulfilled the terms of a contractual agreement by providing the Government with a product that it used to help conduct a war").  At a minimum, Defendants' theory, which must be credited for purposes of removal, *see Def. Ass'n of Philadelphia*, 790 F.3d at 474, is that Standard Oil's relationship with the federal government was "an unusually close one involving detailed regulation, monitoring, or supervision," *id.* at 468.

82.    After the OPEC oil embargo in 1973–74, Congress authorized

---

[104] *See* Miyagi Decl. Ex. 32 (Contract No. Nod-9930).

[105] *See* Miyagi Decl. Ex. 6.

preliminary activity to develop Elk Hills and other National Reserves to their full economic potential. *See* Supplemental Appropriation Act of 1974, Pub. L. No. 93-245 (1974). In 1975, Standard Oil chose to withdraw from operating Elk Hills to concentrate on other federal objectives:

> [T]he current domestic energy situation is so serious that all oil companies are devoting their available resources to the discovery and production of new oil reserves. The President has requested that every effort be made to increase domestic production of petroleum, and Standard is focusing its attention on this objective.[106]

83. A year later, Congress enacted the Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976), which reopened the Elk Hills Reserve and "authorized and directed that [the Reserve] be produced at the *maximum efficient rate for 6 years*."[107] Congress directed production at Elk Hills to be significant. Indeed, Commander Roger Martin, the naval officer in charge of the facility explained: "We expect to reach a level of about 100,000 barrels daily in a few months, and 300,000 by the end of the [1970s]."[108] Production of 100,000 barrels would amount to about 5% of then-current imports and result in a cost saving

---

[106] *See* Miyagi Decl. Ex. 33 (letter from J.R. Grey, Standard, to Jack L. Bowers, Acting Secretary of the Navy, requesting to terminate its position as Operator of the Elk Hills Reserve).

[107] Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258 (1976); *see also* Miyagi Decl. Ex. 2; Miyagi Decl. Ex. 3.

[108] Miyagi Decl. Ex. 3.

to the federal government of approximately $1 billion annually.

84.   In 1977, Congress transferred the Navy's interests and management obligations to the Department of Energy ("DOE"), and Chevron continued its interest in the joint operation until 1997, when the reserve was sold.  From 1976 to 1998, Elk Hills generated over $17 billion for the United States Treasury.[109]

85.   Although other prime contractors operated Elk Hills for the Navy following 1975, Standard Oil and later Chevron were still actively involved in the operations, both through their role on the Operating Committee *and* as subcontractors.[110]   Under the Navy's direction and control, Chevron conducted exploration and drilling activities on the Reserve to fulfill the government's demand for significant production from the Reserve.  Accordingly, Chevron's activities under federal officers went far beyond its role as co-owner under the auspices of the UPC or simple compliance with the law as a participant in a regulated industry.

86.   ***Strategic Petroleum Reserve***.  In response to the Oil Embargoes of the 1970s, Congress created the Strategic Petroleum Reserve ("SPR") in the 1975

---

[109] *See* U.S. Dep't of Energy, *Naval Petroleum Reserves*, https://www.energy.gov/fe/services/petroleum-reserves/naval-petroleum-reserves (last visited Oct. 7, 2020).

[110] *See* Miyagi Decl. Ex. 34, at 192–93 (History of Naval Petroleum Reserve No. 1) (describing the June 13, 1978 contract between Chevron and Williams Brothers for 60 million cubic feet of gas to be processed by Chevron's 17Z McKittrick plant, and an agreement with Chevron and Atlantic Richfield to acquire pipeline capacity of 220,000 barrels per day).

Energy Policy Conservation Act, Pub. L. No. 94-163, 89 Stat. 871, to protect the country's energy security. The SPR was a "stockpile of government-owned petroleum managed by the Department of Energy [created] as a response to gasoline supply shortages and price spikes . . . to reduce the impact of disruptions in supplies of petroleum products and to carry out U.S. obligations under the 1974 Agreement on an International Energy Program."[111] Several Defendants "acted under" federal officers in producing oil for the SPR and managing it for the federal government.

87.   The Act "declar[ed] it to be U.S. policy to store up to 1 billion barrels of petroleum products, provid[ed] for an early reserve, to contain at least 150 million barrels by December 1878 [sic], and for an eventual storage system of at least 500 million barrels by December 1982. It [was] estimated that a 500 million barrel reserve, combined with conservation measures, [could] essentially replace lost imports, for a period of 6 months for the most likely interruptions." Miyagi Decl. Ex. 35 (Statement of Hon. John F. O'Leary, Administrator, Federal Energy Administration, Hearing before the Committee on Interior and Insular Affairs, U.S. Senate, on FEA's Strategic Petroleum Reserve Plan, at 30 (Feb. 4, 1977)).

88.   Under 43 U.S.C. § 1353(a)(1), "all royalties . . . accruing to the United

---

[111] *See* H.R. Rep. No. 115-965, at 3 (2017), https://www.congress.gov/congressional-report/115th-congress/house-report/965/1.

States under any oil and gas lease [under OCSLA] . . . shall, on demand of the Secretary [of the Interior], be paid in oil and gas."   For example, after the September 11 attacks, President George W. Bush ordered that the SPR, "an important element of our Nation's energy security," "will be filled . . . principally through royalty-in-kind transfers to be implemented by the Department of Energy and the Department of the Interior."[112]   From 1999 to December 2009, the U.S. government's "primary means of acquiring oil for the [SPR]" was by taking its royalties from oil produced from federal offshore leases as royalties "in kind" as part of the so-called Royalty In Kind ("RIK") program.[113]   During that time, "the Strategic Petroleum Reserve received 162 million barrels of crude oil through the RIK program" valued at over $6 billion.[114]

89.    The federal government also required certain Defendants (and/or their predecessors, subsidiaries, or affiliates), as lessees of federal offshore leases on the OCS, to pay royalties "in kind," which the government used for its strategic

---

[112] Statement on the Strategic Petroleum Reserve, 2 Pub. Papers 1406 (Nov. 13, 2001),   https://www.govinfo.gov/content/pkg/PPP-2001-book2/pdf/PPP-2001-book2.pdf.

[113] U.S. Dep't of Energy, *Filling the Strategic Petroleum Reserve*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/filling-strategic-petroleum-reserve (last visited Oct. 7, 2020).

[114] U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2010, at 18 (2011) ("SPR 2010 Report"); *see id.* at 39 (Table 13).

stockpile, a crucial element of U.S. energy security and treaty obligations.[115]  The federal government also contracted with some of the Defendants (including predecessors, subsidiaries, or affiliates) to deliver to the SPR millions of barrels of oil under the RIK program.[116]

90.    Finally, some of the Defendants acted under federal officers by operating the SPR infrastructure for the government.  For example, from 1997 to 2019, DOE leased to Defendant Shell Oil Company affiliates the Sugarland/St. James Terminal and Redstick/Bayou Choctaw Pipeline in St. James, Louisiana. "Under the lease agreement, Shell provide[d] for all normal operations and maintenance of the terminal and [wa]s required to support the Strategic Petroleum

---

[115] *See, e.g.*, Miyagi Decl. Ex. 36 (Dear Operator Letter) (invoking OCSLA and royalty provisions in federal leases operated by certain Defendants, and/or their predecessors, subsidiaries, or affiliates, "to use royalties in kind (RIK) to replenish the Strategic Petroleum Reserve (SPR)").

[116] *See, e.g.,* Miyagi Decl. Ex. 37 (U.S. Dep't of Interior, Minerals Management Service, *MMS RIK Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007)) (describing such contracts "to transport Royalty in Kind (RIK) crude oil that will be used to resume filling the nation's Strategic Petroleum Reserve (SPR)"); Minority Staff of the Permanent Subcomm. On Investigations of the Comm. on Governmental Affairs, S. Prt. 108-18, U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Cost to Consumers But Not Overall U.S. Energy Security, (1st Sess. 2003) (describing government contract with a predecessor affiliate of Defendant Shell Oil Company to deliver nearly 19 million barrels of oil to the Strategic Petroleum Reserve as part of the RIK program), https://www.govinfo.gov/content/pkg/CPRT-108SPRT85551/html/CPRT-108SPRT85551.htm.

Reserve as a sales and distribution point in the event of a drawdown."[117]   Starting

January 2020, the DOE leased the St. James facilities to an affiliate of Defendants

Exxon Mobil Corporation and ExxonMobil Oil Corporation (ExxonMobil Pipeline

Company).[118]   Similarly, "[u]nder the lease agreement, Exxon Mobil [Pipeline

Company] . . . *must support the SPR as a sales and distribution point in the event of*

*an SPR drawdown*."[119]   And the DOE has leased to the same ExxonMobil affiliate

two government-owned pipelines that are part of the SPR near Freeport, Texas.[120]

91.     The SPR subjects Defendants to the federal government's supervision

and control in the event of the President's call for an emergency drawdown.[121]   The

United States has exercised this control, including as a result of President Bush's

---

[117]  *See* SPR 2010 Report at 16.

[118]  *See* U.S. Dep't of Energy, *Department of Energy Awards Strategic Petroleum Reserve Lease to ExxonMobil* (Oct. 28, 2019), https://www.energy.gov/articles/department-energy-awards-strategic-petroleum-reserve-lease-exxonmobil.

[119]  U.S. Dep't of Energy, Strategic Petroleum Reserve Annual Report for Calendar Year 2018, at 15 (Jan. 2020) (emphasis added) https://www.energy.gov/sites/prod/files/2020/01/f70/2018%20SPR%20Report%20to%20Congress.pdf.

[120]  *See* SPR 2010 Report at 25, 49; U.S. Dep't of Energy, *DOE Signs Major Agreement with Exxon Pipeline to Lease Idle Pipelines at Strategic Reserve* (Jan. 14, 1999), https://fossil.energy.gov/techline/techlines/1999/tl_bmlse.html.

[121]  *See* 42 U.S.C. § 6241(d)(1) ("Drawdown and sale of petroleum products from the Strategic Petroleum Reserve may not be made unless the President has found drawdown and sale are required by a severe energy supply interruption or by obligations of the United States under the international energy program.").

Executive Order to draw down the reserve in response to Hurricane Katrina in 2005 and President Obama's Executive Order to draw down the reserve in response to disruptions to oil supply in Libya in 2011.[122]   Thus, the hundreds of millions of barrels of oil flowing through these facilities—the sale and combustion of which are part of the causal chain leading to Plaintiff's alleged injuries—were subject to federal government control and supervision.[123]

### c.   Defendants acted under federal officers by supplying highly specialized fuels for military use.

92.   Many of the Defendants have produced and supplied to the U.S. military highly specialized petroleum products required for national defense and wartime efforts.  Federal officer removal precisely "covers situations, like this one, where the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete."  *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012).

93.   During World War II, the federal government asserted substantial control over Defendants, directing the development and production of high-octane

---

[122] *See* U.S. Dep't of Energy, *History of SPR Releases*, https://www.energy.gov/fe/services/petroleum-reserves/strategic-petroleum-reserve/releasing-oil-spr (last visited Oct. 7, 2020).

[123] *See* U.S. Dep't of Energy, *Strategic Vision*, https://www.energy.gov/sites/prod/files/2019/12/f69/FE%20Strategic%20Vision.pdf (last visited Oct. 23, 2020).

aviation fuels ("avgas").[124]  Because avgas was "the most critically needed refinery product during World War II and was essential to the United States' war effort," *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014) ("*Shell II*"), the United States government "exercised significant control" over the means of its production during World War II in order to maximize production, *Shell I*, 294 F.3d at 1049.   In 1942, President Roosevelt established several agencies to oversee wartime production.   Among those with authority over petroleum production were the War Production Board ("WPB") and the Petroleum Administration for War ("PAW").  The WPB established a nationwide priority ranking system to identify scarce goods, prioritize their use, and facilitate their production; it also limited the production of nonessential goods.    The PAW centralized the government's petroleum-related activities.    It made policy determinations regarding the construction of new facilities and allocation of raw materials, had the authority to issue production orders to refineries and contracts that gave extraordinary control to federal officers, and "programmed operations to meet new demands, changed conditions, and emergencies."  *See generally Shell I*, 294 F.3d at 1049 (discussing federal control).  The "PAW told the refiners what to make, how much of it to make,

---

[124] During the war, more than 80 percent of the seven billion barrels of crude oil needed to support the U.S. war effort was produced in this country.  Miyagi Decl. Ex. 10, at 1, 169 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945* (1946)).

and what quality."[125]   *See* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945) ("The supply of crude to each refinery, the finished and intermediate products to be made in each plant, and the disposition of the products were all closely scheduled, by daily telegraphic directives when necessary."); Miyagi Decl. Ex. 38 (Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 212 (Nov. 28, 1945)) ("PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available.").  The Office of the Petroleum Coordinator for National Defense stated that "[i]t is *essential*, in the national interest that the supplies of all grades of aviation gasoline for military, defense and essential civilian uses *be increased immediately to the maximum*."[126]

94.    The PAW's directives to Defendants were often coercive.  The PAW's message to the oil and gas industry was clear:  it would "get the results" it desired, and if "we can't get them by cooperation, then we will have to get them some other

---

[125] *Shell II*, 751 F.3d at 1286 (quoting John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War, 1941-1945*, at 219 (1946)).

[126] *Shell II*, 751 F.3d at 1286 (quoting Office of Petroleum Coordinator for National Defense Recommendation No. 16).

way."[127]   The PAW also maintained "disciplinary measures" for non-compliance, including "restricting transportation, reducing crude oil supplies, and withholding priority assistance."[128]   In sum, the federal government deployed an array of threats and sanctions to ensure Defendants assented to PAW's production directives.

95.   In addition, the government's need for highly specified fuels necessitated changes to Defendants' refining equipment and operations.[129]   And the impacts of the government's particular fuel specifications on Defendants' operations were typically long lasting.[130]   For example, JP-4 was developed in 1951 and was the most heavily used Air Force fuel until it was phased out around 1998.[131]

96.   The federal government entered into contracts with predecessors or affiliates of Defendants Chevron and Shell Oil Company, as well as ExxonMobil, to

---

[127] Miyagi Decl. Ex. 39 (Secretary Harold Ickes, Conference of Petroleum Industry Chairmen, 8 (Aug. 11, 1941)).

[128] Miyagi Decl. Ex. 22 (Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams (Aug. 12, 1942)).

[129] *See* Miyagi Decl. Ex. 40 (W. J. Sweeney, Aircraft Fuels and Propellants, Report for the Army Air Force Scientific Advisory Group (1946)).

[130] Miyagi Decl. Ex. 41 (I. Waitz, S. Lukachko, & J. Lee, Military Aviation and the Environment: Historical Trends and Comparison to Civil Aviation, 42 J. of Aircraft 2 (2005)).

[131] Miyagi Decl. Ex. 42 (Coordinating Research Council, Handbook of Aviation Fuel Properties, CRC Report No. 635 (2004)).

obtain "vast quantities of avgas."[132]  These contracts provided federal officers with the power to direct the operations of Defendants.  For example, the government's contract with Shell Oil Company's predecessor or affiliate specified that it "*shall use its best efforts*" and work "*day and night*" to expand facilities producing avgas "*as soon as possible* and not later than August 1, 1943."[133]  To maximize production of this critical product, "[t]he Government directed [those companies] to undertake extraordinary modes of operation which were often uneconomical and unanticipated at the time of the refiners' entry into their [avgas] contracts."  *Shell Oil Co. v. U.S.*, 751 F.3d 1282, 1287 (Fed. Cir. 2014) ("*Shell II*").  At the direction of the federal government, the oil companies, which include certain Defendants here, increased avgas production "over twelve-fold from approximately 40,000 barrels per day in December 1941 to 514,000 barrels per day in 1945, [which] was crucial to Allied success in the war."[134]

97.    With respect to Exxon Mobil's affiliates, the government exerted substantial control over the refineries' actions, including decisions on how and when to use raw materials and labor.  *Exxon Mobil Corp.*, 2020 WL 5573048, at *1, *8.

--------

[132] Several prior decisions discuss these contracts, and the power that the federal government held over Defendants to control production of oil and gas.  *See, e.g. Shell II*, 751 F.3d at 1286; *Exxon Mobil Corp.*, 2020 WL 5573048, at *31.

[133] JA002, JA027, *Shell Oil Co. v. United States*, No. 1:06-cv-00141-SGB (Fed. Cl. Nov. 20, 2012), ECF No. 106-1 (emphases added).

[134] *Shell II*, 751 F.3d at 1287.

Courts have concluded that "[b]y controlling the nation's crude oil supply, the federal government controlled the nation's petroleum industry," and that it "exerted significant control over the operations of refinery owners or operators that contracted to manufacture avgas, synthetic rubber, and other war materials." *Id*. at *8, *14.

98.    Defendants also acted under the federal government as agents in constructing and operating pipelines transporting oil for war. During World War II, oil transportation by tankers "experienced major disruption as a result of attacks by German submarines."[135]

99.    "To [e]nsure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfield and the Atlantic seaboard, two large pipelines, commonly known as the 'Big Inch' and the 'Little Big Inch,' respectively" (together, the "Inch Lines"). *Schmitt v. War Emergency Pipelines, Inc.*, 175 F.2d 335, 335 (8th Cir. 1949) ("*WEP II*"). War Emergency Pipelines, Inc. ("WEP"), "a Delaware corporation created by eleven of the major oil companies," including predecessors or affiliates of Defendants,[136]

---

[135] Miyagi Decl. Ex. 43, at 3 (National Park Service, Historic American Engineering Record No. TX-76, War Emergency Pipeline (Inch Lines) Inch Lines Historic District (1968)).

[136] The eleven companies that constituted WEP were Shell Oil Company, Inc., Standard Oil Company (New Jersey), The Texas Company, Gulf Refining Company, Pan American Petroleum & Transport Company, Cities Service Company, Atlantic Pipe Line Company, Sinclair Oil Corporation, Sun Pipe Line Company (Texas), Socony-Vacuum Oil Company, Inc. and Tidal Pipe Line

constructed and operated the Inch Lines "under contracts" and "as agent" for the federal government. *WEP II*, 175 F. 2d at 335; *Schmitt v. War Emergency Pipelines, Inc.*, 72 F. Supp. 156, 157 (E.D. Ark. 1947) ("*WEP I*").[137]

100.   Federal officers exerted operational control over the Inch Pipelines and Defendants' affiliates. WEP operated wholly on capital from the government, and "received no fee or profit." *See, e.g.*, *WEP I*, 72 F. Supp. at 157; *WEP II*, 175 F.2d at 336. The government also required approval and set the salaries of all personnel that WEP employed. *See WEP II*, 175 F.2d at 336.

> After completion of the pipe lines, [WEP], in the name of, and acting as agent for [the government], purchased petroleum or petroleum products at the origins of the respective pipe lines, at OPA prices, and as such agent delivered and sold the through-put at the respective termini. The sales price was cost plus a sum specified by Defense Supplies Corporation. The Petroleum Administration for War issued directives to . . . [WEP], which, among other things, designated from whom products should be purchased and to whom they should be sold.

*WEP I*, 72 F. Supp. at 158.

---

Company. Several of these companies are predecessors or affiliates of current Defendants. *See* Miyagi Decl. Ex. 44 (Certificate of Dissolution of War Emergency Pipelines, Inc. 1-2 (Aug. 28, 1947)); *id.* Ex. 10, at 108 (John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War: 1941-1945* (1946)).

[137] These decisions provide details of the construction contracts under which the government "delegat[ed] operating function to [WEP]" "by a document called 'Agency Agreement.'" *WEP I*, 72 F. Supp. at 157.

101. Petroleum Directives 63 and 73 governed the Big Inch and Little Big Inch pipelines, respectively, and exerted substantial control over WEP, and thus Defendants. The government required WEP to prepare and file "daily reports" and a monthly "forecast" regarding its operation of the Inch Lines. The government had power to "direct such affirmative action as may be necessary to accomplish the purposes" of the Inch Lines—namely, "relieving shortages" and "augmenting supplies for offshore shipments" while replacing "tankers normally engaged in the transportation of petroleum products from the United States Gulf Coast to the Atlantic ports" that were "los[t] through enemy action." The goal was to ensure "maximum operating capacity for the prosecution of the war and most effective utilization of petroleum."[138] *See* Miyagi Decl. Ex. 45, at 25–26 (Statement of W. Alton Jones, Chairman, Committee on Postwar Disposal of Pipe Lines, Refineries, and Tankers, Hearings before the Special Committee Investigating Petroleum Resources (Nov. 15, 1945)) ("Under wartime operation, the oil business operated under directives of the Petroleum Administration for War. . . . [Oil companies] w[ere] ordered to divert oil and deliver at the receiving terminals of the big lines sometimes by expensive means to keep these lines running to capacity, and that was

---

[138] Utilization of War Emergency Pipeline, 8 Fed. Reg. 1068-69 (Jan. 20, 1943) (Petroleum Directive 63); War Emergency Petroleum Products Pipeline, 8 Fed. Reg. 13343 (Sept. 30, 1943) (Petroleum Directive 73).

done in the interest of the war effort because we needed every barrel of oil we could deliver to the East.").

102.   The government controlled all oil WEP moved through the pipelines on its behalf.[139]  During their operation by WEP, the Inch Lines provided "life lines to the east," delivering "379,207,208 barrels of crude oil and refined products" and serving "military necessity" for "the cross-Atlantic fronts."[140]  The Inch Lines "were built for a single purpose, to meet a great war emergency. . . .  [T]hey helped to win a war that would have taken much longer to win without them."  Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, S. Res. 96 at 11 (Nov. 28, 1945).  Without Defendants as contractors and agents (via WEP), "the Government itself would have had to perform" these essential wartime activities.  *Watson*, 551 U.S. at 154.

103.   At the advent of the Korean War in 1950, President Truman established the Petroleum Administration for Defense ("PAD") under authority of the Defense Production Act of 1950, Pub. L. No. 81–774 ("DPA").  The PAD issued production orders to Defendants and other oil and gas companies, including to ensure adequate

---

[139] 8 Fed. Reg. at 1069, § (e)(4) ("No petroleum or petroleum products shall be transported through the facilities of the War Emergency Pipeline System except in pursuance of this Directive or amendments and supplements thereto."); *id.* at 13343, § (d)(3) (same).

[140] Miyagi Decl. Ex. 10 at 104–05, 108.

quantities of avgas for military use.[141]

104.   The government also invoked the DPA immediately after the 1973 Oil Embargo to address "immediate and critical" petroleum shortages by the military.[142] Interior Priority Regulation 2 authorized "directives" to ensure "normal supply of petroleum products required by the Department of Defense" and provided companies that complied with immunity from "damages or penalties."[143]  The Interior Department subsequently "issued directives to 22 companies [including Defendants or their predecessors or subsidiaries[144]] to supply a total of 19.7 million barrels of petroleum during the two-month period from November 1, 1973, through

---

[141] *See* Miyagi Decl. Ex. 46 (Fourth Annual Report of the Activities of the Joint Committee on Defense Production, H. Rep. No. 84-1, at 122 (Jan. 5, 1955, 1st Sess.)).  *See also Exxon Mobil Corp.*, 2020 WL 5573048, at *15 (detailing the government's use of the DPA "to force" the petroleum industry to "increase their production of wartime . . . petroleum products").

[142] *See* Miyagi Decl. Ex. 47 (Twenty-Fourth Annual Report of the Activities of the Joint Committee on Defense Production, S. Rep. No. 94-1, Pt. 1, at 442 (Jan. 17, 1975, 1st Sess.)).

[143] Petroleum Products Under Military Supply Contracts, 38 Fed. Reg. 30572 §§ 1, 3 (Nov. 6, 1973).

[144] The companies included Amoco Oil Co., Exxon Co., U.S.A., Mobil Oil Corp., Marathon Oil Co., Standard Oil Co. of California, and Shell Oil Co.  Miyagi Decl. Ex. 48 (*Naval Petroleum Reserve Numbered 1, Elk Hills, Calif.: Hearing Before the Subcommittee On National Stockpile and Naval Petroleum Reserve of the Committee on Armed Services on S.J. Res. 176*, 93d Cong. 73-74 (1st Sess. 1973)) (reprinting Department of Interior, Office of Oil and Gas, *News Release: Companies Directed to Supply the Needs of Defense Department* (Nov. 28, 1973) (listing companies and quantities)).  *Id.* Ex. 49 (John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973) (reporting on directives)).

December 31, 1973, for use by the DOD."[145]

105.    During the Cold War, Shell Oil Company developed and produced for the federal government specialized jet fuel to meet the unique performance requirements of the U-2 spy plane and later the OXCART and SR-71 Blackbird programs.[146] Shell Oil Company produced millions of gallons of "Processing Fluid (PF-1)" under government contracts with specific testing and inspection requirements, as well as packaging that mandated "no other identification."[147] Shell Oil Company also constructed "special fuel facilities" to handle and store PF-1,

---

[145] *See* Miyagi Decl. Ex. 49.

[146] *See* Miyagi Decl. Ex. 50, at 61–62 (Gregory W. Pedlow & Donald E. Welzenbach, The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954-1974 (1992), https://www.archives.gov/files/declassification/iscap/pdf/2014-004-doc01.pdf ("Gen. James H. Doolittle (USAF, Ret.) . . . arranged for Shell to develop a special low-volatility, low-vapor-pressure kerosene fuel for the craft.  The result was a dense mixture, known as LF-1A, JP-TS (thermally stable), or JP-7, with a boiling point of 300ºF at sea level.  Manufacturing this special fuel required petroleum byproducts."); *id.* Ex. 51 (CIA Doc. No. CIA-RDP90B00170R000100080001-5, Clarence L. Johnson, Development of the Lockheed SR-71 Blackbird (Aug. 3, 1981)) ("The Government stated that the need for the 'Blackbird' was so great that the program had to be conducted despite the risks and the technological challenge. . . . The extreme environment presented a severe cooling problem. . . .  A new fuel and a chemical lubricant had to be developed to meet the temperature requirements. . . . Shell, and [other] [c]ompanies[,] took on the task of developing these fluids."); *see also id.* Ex. 52 (Ben Rich & Leo Janis, Skunk Works 127, 205 (1994)).

[147] Miyagi Decl. Ex. 53 (CIA Doc No. CIA-RDP67B00074R000500400016-2, Contract No. AF33(657)-8577 (SH-511) (Aug. 14, 1962)); *see id.* Ex. 54 (CIA Doc. No. CIA-RDP67B00074R000500400012-6, Amendment No. 2 to Contract No. AF33(657)-5577 (SH-511) (Aug. 26, 1963)).

including a hangar, pipelines, and storage tanks at air force bases at home and abroad, and "agreed to do this work without profit" under special security restrictions per detailed government contracts for the OXCART program.[148]  Under the OXCART program, Shell Oil Company also "tested" "refinery procedures" to ensure fuels were "up to standard."[149]  In providing specialized fuel and facilities under contracts for the federal government's overhead reconnaissance programs, Shell Oil Company was helping the government to produce an item that it needed for national defense purposes.  *See Watson*, 551 U.S. at 153.

106.   To this day, Defendants supply the Department of Defense with highly specialized fuels to meet its need to power planes, ships, and other vehicles, and to satisfy other national defense requirements.  Defendants Shell Oil Company, BP, and ExxonMobil (or their predecessors, subsidiaries, or affiliates), for example, have

---

[148] Miyagi Decl. Ex. 55 (CIA Doc. No. CIA-RDP67B00074R000500440005-0, Concurrence in Contract No. SH-515 with Shell Oil Company, Project OXCART (Sept. 20, 1963)); *see id.* Ex. 56 (CIA Doc. No. CIA-RDP67B00074R000500450004-0, Contract No. AF33(657)-13272 (SH-516) (June 30, 1964)); *id.* Ex. 57 (CIA Doc. No. CIA-RDP67B00074R000500440006-9, Contract No. AF33(657)-12525 (SH-515) (Sept. 20, 1963)); *id.* Ex. 58 (CIA Doc. No. CIA-RDP67B00074R000500430003-3, Concurrence in Contract No. SH-514 with Shell Oil Company, New York, N.Y. (June 28, 1963)); *id.* Ex. 59 (CIA Doc. No. CIA-RDP67B00074R000500420006-1, Contract No. AF33(657)10449 (SH-513) (Feb. 25, 1963)); *id.* Ex. 60 (CIA Doc. No. CIA-RDP67B00074R000500410006-2, Contract No. AF33(657)-8582 (SH-512) (Sept. 13, 1962)).

[149] Miyagi Decl. Ex. 61 (CIA Doc. No. CIA-RDP63-00313A000500130031-9, Summary of OSA Activities for Week Ending 21 August 1963 (Aug. 23, 1963)).

been three of the top four suppliers of fossil fuel products to the United States military, whose energy needs are coordinated through the Defense Energy Support Center ("DESC").[150]  DESC procures a range of military-unique petroleum-based products from Defendants, including JP-8 fuel (MIL-DTL-83133) for the U.S. Air Force and Army, JP-5 fuel (MIL-DTL-5624 U) for the U.S. Navy, and a variety of other alternative fuels.  Several other Defendants have also produced these critical products for the U.S. military.

107.  For example, Marathon Petroleum subsidiary Tesoro Corporation entered into at least fifteen contracts with the Department of Defense's Defense Logistics Agency between 1983 and 2011 to supply highly-specialized military jet fuels, such as JP-4, JP-5, and JP-8.[151]  The Department of Defense exerted significant control over Tesoro's actions in fulfilling the contracts with the Department of Defense, seeking to ensure that the unique jet fuels (1) ignite, but do not freeze, at low temperatures from high altitudes; (2) rapidly dissipate accumulated static charge so as not to produce sparks or fires during rapid refueling (such as on an aircraft carrier where such a fire would be devastating); (3)  efficiently combust to allow for

---

[150] *See* Anthony Andrews, Cong. Rsch. Serv., R40459, Department of Defense Fuel Spending, Supply, Acquisition, and Policy 10 (2009), https://fas.org/sgp/crs/natsec/R40459.pdf.

[151] The contracts were executed by various Tesoro subsidiaries, such as Tesoro Refining and Marketing Company and Tesoro Alaska Petroleum Company.  For a list of the Tesoro contract numbers and dates, *see* Miyagi Decl. Ex. 62.

longer flights on less fuel; and (4) maintain the integrity of the fuel handling systems over a long period of time.[152]

108.  To meet its unique operational needs, the Department of Defense required that Tesoro supply each fuel in accordance with highly specialized, Department of Defense-mandated specifications.  As one would expect when dealing with highly specialized military equipment, these fuel contracts are far more specialized and prescriptive than for fuel intended for consumer-type vehicles.

109.  In particular, the specifications require express amounts of "military unique additives that are required by military weapon systems," such as static dissipator additive ("SDA"), fuel system icing inhibitor ("FSII"), and corrosion inhibitor/lubricity improver ("CI/LI").[153]  "[T]his [additive] requirement is unique to military aircraft and engine designs," *id.* at 10, and each additive served a vital role in allowing the Department of Defense to fulfill its mission safely and

---

[152] Miyagi Decl. Ex. 63 § 1.2.2 (MIL-HDBK-510A); *id.* Ex. 66, Table 1, 2–9 (Air Force Wight Aeronautical Lab., *Military Jet Fuels, 1944-1987,* AFWAL-TR-87-2062 (Dec. 1987)) [hereinafter "Air Force Lab, *Military Jet Fuels*"]; NREL, *Investigations of Byproduct Application to Jet Fuel,* NREL/SR-510-30611, at 4-6 (Oct. 2001), https://www.nrel.gov/docs/fy02osti/30611.pdf.

[153] Miyagi Decl. Ex. 64, at 5, 7, 10 (DLA, *Detail Specifications, Turbine Fuels, Aviation Kerosene Types, NATO F-34(JP-8), NATO F-35, AND JP-8+100, MIL-DTL-83133E* (April 1, 1999)).  Tesoro Alaska Petroleum Company's September 5, 2007 contract with DLA Defense Energy Supply Center to supply JP-8 required that Tesoro meet the specifications of MIL-DTL-83133E.  *See* Miyagi Decl. Ex. 62.

efficiently.

110.   The Department of Defense *required* Tesoro to use SDA, a conductivity improver additive, to dissipate static charge created during military jet distribution and refueling.  If the charge is not dissipated, refueling could result (and has resulted) in a spark or fire, especially when rapid refueling is necessary during combat with hot military engines.[154]

111.   The Department of Defense *required* Tesoro to use FSII to depress the freezing point of military jet fuels.  FSII ensures that the fuels' natural water content does not freeze at low temperatures encountered by military jets at high altitudes, which would result in slush or ice crystal formation causing blockages of fuel filters, pumps, or lines and could ultimately cause engine flameout.[155]

112.   The Department of Defense *required* Tesoro to use CI/LI to (1) improve

---

[154] Miyagi Decl. Ex. 63 § 1.4.1.2 (MIL-HDBK-510A); *id.* Ex. 66 at 28, 35 (Air Force Lab, *Military Jet Fuels*); Air Force Wright Aeronautical Laboratories, *Effect of Corrosion Inhibitors on Conductivity of Avian Turbine Fuel,* ARWAL-TR-85-2076, at 1 ("The Air Force and Navy have reported numerous incidents in the [1980s] solely related to electrostatic discharge."), https://apps.dtic.mil/dtic/tr/fulltext/u2/b100948.pdf.

[155] Miyagi Decl. Ex. 65 (Dep't of Defense, FSII Specifications, MIL-DTL-85470B (June 1999)); *id.* Ex. 63 § 1.4.1.1; *id.* Ex. 66, at 30, 41–44) (Air Force Lab, *Military Jet Fuels*); *id.* Ex. 67 (Department of Army Technical Manual, *Petroleum Handling Operations for Aviation Fuel,* TM 10-1107 at 6 (Feb. 1960)) ("The jet aircraft is subject to wider and more rapid changes of temperature. . . . Consequently, any water present may freeze before it can reach the sumps of jet aircraft.  When this happens, ice particles may clog the fuel screen and cause fuel starvation.").

lubricity, which reduces friction and ensures that the military engines do not seize during operation; and (2) prevents corrosion in military fuel handling, transportation, and storage equipment, primarily constructed of uncoated steel.[156]

113.   In addition, the Department of Defense specifications required Tesoro to conform the fuels to specific chemical and physical requirements, such as enumerated ranges for conductivity, heat of combustion, thermal stability, and freezing point, specifications which are essential to performance of the military function.[157]  The specifications also required adherence to specific testing methods for the various additives and chemical and physical requirements in accordance with enumerated American Society for Testing and Materials ("ASTM") standards, such as ASTM D2624 for conductivity and ASTM D3241 for thermal stability.[158]

114.   If the fuels did not conform to the exact specifications, the Department of Defense exerted control over Tesoro by requiring it to either repair or replace the products at no increase in contract price.

115.   The Department of Defense's detailed specifications for the makeup of

---

[156] Miyagi Decl. Ex. 68 (Dep't of Defense, Performance Specification, Inhibitor, Corrosion / Lubricity Improver Fuel Soluble, MIL-PRF-25017H); *id.* Ex. 63 § 1.4.1.3 (MIL-HDBK-510A); *id.* Ex. 66, at 28, 30, 38–39(Air Force Lab, *Military Jet Fuels*).

[157] Miyagi Decl. Ex. 64, at 6 (MIL-DTL-83133E); *id.* Ex. 66, at 17–35 (Air Force Lab, *Military Jet Fuels*) (describing the necessity for specific physical and chemical requirements in military jet fuels).

[158] Miyagi Decl. Ex. 64, at 6 (MIL-DTL-83133E).

the military jet fuels and "the compulsion to provide the product to the government's specifications" demonstrate the necessary "acted under" special relationship between Tesoro and the government.  *See Baker*, 962 F.3d at 943 (holding that the government's detailed specifications for the makeup of materials and the compulsion to provide the product to the government's specifications demonstrated the necessary "acted under" relationship to support federal officer removal).

### 3.     Defendants' Activities Are "Relat[ed] to" Plaintiff's Claims

116.   Plaintiff's claims are "for or relating to" acts Defendants performed under color of federal office.  To meet this prong, there need only be "a 'connection' or 'association' between the act in question and the federal office."  *Def. Ass'n of Philadelphia*, 790 F.3d at 471.  The Removal Clarification Act of 2011 inserted the words "or relating to" into the statute, which "broaden[ed] the universe of acts that enable Federal officers to remove to Federal court."  *Id.* at 467 (quoting H.R. Rep. 112-17, at 6, 2011 U.S.C.C.A.N. 420, 425).   But even before the Removal Clarification Act, a removing party was required only to "'demonstrate that the acts for which they [we]re being sued' occurred *at least in part* '*because of* what they were asked to do by the Government.'"  *Id.* (quoting *Isaacson v. Dow Chemical Co.*, 517 F.3d 129, 137 (2d Cir. 2008)) (emphasis added).  The Act, however, "broadened federal officer removal to actions, not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office."  *Latiolais*, 951 F.3d

at 292; *see also Baker*, 962 F.3d at 943.

117.   It is, therefore, not necessary "that the complained-of conduct *itself* was at the behest of a federal agency"; rather, it is "sufficient" if Plaintiff's "allegations are directed at the relationship between the [Defendants] and the federal government" for at least *some* of the time frame relevant to Plaintiff's claims. *Baker*, 962 F.3d at 944–45; *accord Def. Ass'n of Philadelphia*, 790 F.3d at 470–71; *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805 (3d Cir. 2016).   For instance, in *Baker*, an analogous case, the federal officer removal statute applied where certain products that allegedly contributed to plaintiff's purported pollution-based harms had, at times, been "critical wartime commodities" subject to "price controls," detailed federal oversight, and mandatory orders "setting aside" a portion of the defendants' products for the government's own use.   *Id.* at 940–41, 945.[159]   Similarly, in *Defenders Association of Philadelphia*, the "for or relating to" element was satisfied even though the Federal Community Defender was *not* directed by the government in the specific conduct at issue in the suit (representing defendants in state post-conviction proceedings) because that conduct was "related to" acts that were done

---

[159] *See also Williams v. Todd Shipyards Corp.*, 154 F.3d 416, 1998 WL 526612, at \*1, \*6 (5th Cir. 1998) (per curiam) (federal officer removal was proper where the plaintiff was exposed to asbestos while working for the defendant, even though the defendant "did both commercial work for private parties" and worked under government contract on ships owned or operated by the federal government).

under federal direction (representing defendants in federal habeas proceedings).  790 F.3d at 471–72.

118.   Numerous federal activities are encompassed in Plaintiff's Complaint and relate to Plaintiff's causes of action, especially when construed "in the light most favorable to the" existence of federal jurisdiction, *Def. Ass'n of Philadelphia*, 790 F.3d at 471, 474, giving Defendants the "benefit of all reasonable inferences from the facts alleged," *Baker*, 962 F.3d at 941, 945.

119.   Plaintiff alleges that Defendants' drilling operations and other activities led to the combustion of oil and gas—including by the federal government—which led to the release of greenhouse gases by end-users—also including the federal government.  Furthermore, the oil and gas upon which Plaintiff bases its claims is the very same oil and gas that Defendants extracted and produced under the control and supervision of the federal government and which the federal government, in furtherance of federal policy:

- Reserved the right to buy in total in the event of a time of war or whenever the President so prescribed;

- Directed the development of unique products for military operations and purchased those products; and

- Has promoted through its leasing and other subsidy programs.

120.   Plaintiff seeks to hold Defendants liable for the very activities Defendants performed in the implementation of federal policy initiatives under

federal direction and control.  This is more than enough to satisfy the nexus element of the Federal Officer Removal Statute, which requires only "a connection or association between the act in question and the federal office."  *Sawyer*, 860 F.3d at 258; *Def. Ass'n of Philadelphia*, 790 F.3d at 474 (holding same).  At a minimum, under Defendants' reasonable theory of the case, which the Court must credit in assessing whether the nexus element is satisfied, *Acker*, 527 U.S. at 432; *Def. Ass'n of Philadelphia,* 790 F.3d at 474, a clear connection or association exists between Defendants "acting under" federal officers by extracting and producing oil and gas pursuant to federal contracts and specifications, and Plaintiff's attempt to impose liability on Defendants for that very same conduct.  *See also Leite*, 759 F.3d at 1124 ("In assessing whether a causal nexus exists, we credit the defendant's theory of the case.").

### 4.    Defendants Have Colorable Federal Defenses

121.   Defendants intend to raise several meritorious federal defenses, including the government-contractor defense, *see Boyle v. United Techs. Corp*., 487 U.S. 500 (1988); *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67, 70 (3d Cir. 1990); preemption, *see Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); federal immunity, *see Campbell-Ewald v. Gomez*, 136 S. Ct. 663 (2016); and others.  In addition, Plaintiff's claims are barred by the United States Constitution, including the Interstate and Foreign Commerce Clauses and Due Process Clauses, as well as

the First Amendment and the foreign affairs doctrine. These and other federal defenses are more than colorable, and thus satisfy the test for federal officer removal under the statute. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (defendant invoking § 1442(a)(1) "need not win his case before he can have it removed"). Accordingly, removal under Section 1442 is proper.

122.   Plaintiff attempts to disclaim "injuries arising on federal property and those that arose from Defendants' provision of fossil fuel products to the federal government." Compl. ¶ 14. This disclaimer is a transparent—and ineffective— attempt to artfully plead around removal. Courts consistently reject plaintiffs' attempts to frustrate federal removal with disclaimers where, as here, Defendants' federal officer defenses are still applicable to one or more of Plaintiff's claims. *See Rhodes v. MCIC, Inc.*, 210 F. Supp. 3d 778, 786 (D. Md. 2016) ("[Plaintiffs] have cited no authority that allows such language to bar the assertion of the federal officer defense where it is otherwise applicable. . . . [T]hey are clearly keeping in play a claim against Defendants who could legitimately assert the federal officer defense."); *see also, e.g.*, *Ballenger v. Agco Corp.*, 2007 WL 1813821, at *1 n.2, *4 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective where the plaintiff waived claims for exposure committed at the direction of a federal officer but nonetheless sought relief for exposure aboard Navy vessels). Moreover, the disclaimer is absurd in the present case, because, as the Supreme Court has recognized, and Plaintiff

acknowledges, greenhouse gases cannot be traced to one particular source in one particular jurisdiction. *See AEP*, 564 U.S. at 422 ("[g]reenhouse gases once emitted become well mixed in the atmosphere"); *see* Compl. ¶ 220.  Plaintiff's claims are based on *global* emissions that are impossible to trace to any particular source. Accordingly, Plaintiff has no basis on which to carve out fuel extraction and production on federal lands and at the direction of the federal government, or anywhere else for that matter.

123. Nor can Plaintiff's allegations regarding Defendants' purported "deceptive" marketing change any of the above facts showing the federal government's substantial control over an enormous amount of Defendants' production and sale of petroleum products.  Plaintiff's claims, as pleaded, depend on the premise that Defendants' production of fossil fuels caused Plaintiff's alleged injuries. *See, e.g.*, Compl. ¶ 219.  This case is therefore removable to federal court because Defendants acted under federal officers in producing fossil fuels.  Moreover, Defendants deny that they misrepresented their knowledge of the science or effects of climate change.  In any event, as discussed above, any public statements by Defendants with respect to climate change had no material effect on consumer demand for petroleum products, due to, among other things, the widespread public knowledge about climate change and the many other factors that have caused the consistent worldwide growth of oil and gas consumption over the course of many

decades.

## VI.   THIS ACTION IS REMOVABLE BECAUSE IT ARISES FROM ACTS ON MULTIPLE FEDERAL ENCLAVES

124.   This Court has original jurisdiction under the federal-enclave doctrine. The Constitution authorizes Congress to "exercise exclusive legislation in all cases whatsoever" over all places purchased with the consent of a state "for the erection of forts, magazines, arsenals, dock-yards, and other needful buildings." U.S. Const., art. I, § 8, cl. 17. "A suit based on events occurring in a federal enclave . . . must necessarily arise under federal law and implicates federal question jurisdiction under § 1331." *Jones v. John Crane-Houdaille, Inc.*, 2012 WL 1197391, at *1 (D. Md. Apr. 6, 2012).

125.   The "key factor" in determining whether federal enclave jurisdiction exists "is the location of the plaintiff's injury or where the specific cause of action arose." *Sparling v. Doyle*, 2014 WL 2448926, at *3 (W.D. Tex. May 30, 2014). The "[f]ailure to indicate the federal enclave status and location of the exposure will not shield plaintiffs from the consequences" of "federal enclave status." *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992). Federal jurisdiction is available if "some" of the events or damages alleged in the complaint occurred on a federal enclave. *See, e.g.*, *Durham*, 445 F.3d at 1250 (finding defendant was permitted "to remove to federal court" because "some of [plaintiff's] claims arose on federal enclaves"); *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315, 1336 (N.D. Ala. 2010)

(holding jurisdiction will lie where at least "some of the events alleged . . . occurred on a federal enclave").

126.   In targeting Defendants' oil and gas operations, Plaintiff necessarily sweeps in those activities that occur on military bases and other federal enclaves. *See, e.g.*, *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372–74 (1964) (noting that the United States exercises exclusive jurisdiction over certain oil and gas rights within Barksdale Air Force Base in Louisiana); *see also Miss. River Fuel Corp. v. Cocreham*, 390 F.2d 34, 35 (5th Cir. 1968) (on Barksdale Air Force Base, "the reduction of fugitive oil and gas to possession and ownership[] takes place within the exclusive jurisdiction of the United States").  Indeed, as of 2000, approximately 14% of the National Wildlife Refuge System "had oil or gas activities on their land," and these activities were spread across 22 different states.  U.S. Gov't Accountability Off., GAO-02-64R, U.S. Fish & Wildlife Service:  Information on Oil and Gas Activities in the National Wildlife Refuge System 1 (Oct. 31, 2001), http://www.gao.gov/new.items/d0264r.pdf.   Furthermore, Chevron and its predecessor companies for many years engaged in production activities on the Elk Hills Reserve—a strategic oil reserve maintained by the Naval Department— pursuant to a joint operating agreement with the Navy.  *See supra* ¶¶ 68–86; *Chevron U.S.A. Inc. v. United States*, 116 Fed. Cl. 292, 205 (2014).

127.   In addition, the Complaint relies upon conduct occurring in the District

of Columbia, which is itself a federal enclave.  *See, e.g.*, *Collier v. District of Columbia*, 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014); *Hobson v. Hansen*, 265 F. Supp. 902, 929 n.42 (D.D.C. 1967).  Plaintiff claims that the Defendants, and certain industry trade associations, including American Petroleum Institute—which Plaintiff concedes is "based in the District of Columbia," Compl. ¶ 29—misled federal regulators and caused them to adopt policies that did not adequately curtail the production and use of fossil fuels.  *Id.* ¶¶ 97–113.  This alleged lobbying activity, the misleading of federal regulators, and the resulting "under-regulation" of fossil fuels, could *only* occur in the District of Columbia, where the EPA, the Department of the Interior, the Department of Energy, the Department of Transportation, the Department of State, Congress, and other departments of the federal government are located.

128.  Moreover, Plaintiff complains that Defendants' supposedly wrongful conduct included their memberships in various "trade association[s]," and providing funding to "think tanks," which allegedly had the effect of "evad[ing] regulation" of fossil fuel products by "deceiv[ing]" policymakers about "the role of fossil fuel products in causing global warming."  Compl. ¶¶ 125–30.  The Complaint also points to Defendants' purported funding of "lobbyist[s]" to influence legislation and legislative priorities.  *Id.*  Here, too, "some of the[] locations" giving rise to Plaintiff's claims "are federal enclaves," further underscoring the presence of federal

jurisdiction.  *Bell v. Arvin Meritor, Inc.*, No. 12-cv-00131, 2012 WL 1110001, at *2 (N.D. Cal. Apr. 2, 2012).  As the Ninth Circuit has contemplated, free speech placed at issue in a federal enclave falls under the jurisdiction of the federal courts. *Jacobsen v. U.S. Postal Serv.*, 993 F.2d 649, 657 (9th Cir. 1992) (observing that newspaper vendors were required to obtain permits pursuant to a federal statute to sell newspapers in front of U.S. post office locations, which the Court deemed to be "within the federal enclave").  Because Plaintiff claims that Defendants' speech within the federal enclave of the District of Columbia was, among other alleged causes, a basis of its injury, and because Plaintiff complains of damages allegedly occurring on federal enclaves, state court is not the appropriate forum to adjudicate the merits of this dispute.

129.   Additionally and/or alternatively, the exercise of federal enclave jurisdiction is proper because:  (1) Plaintiff's claims allegedly occurred on a federal enclave in Hawaiʻi, *i.e.*, military bases and reservations in Hawaiʻi that were acquired by declaration of taking, Presidential executive order, purchase, or otherwise for military purposes; (2) the United States has broad concurrent jurisdiction with the State of Hawaiʻi over the enclaves pursuant to the Admission Act of 1959; and (3) Plaintiff's claims involve substantial federal interests such that a federal question is presented.  *Lake*, 2017 WL 11515424, at *13.

130.   Plaintiff alleges, for instance, that Defendant Marathon Petroleum

Corporation is "successor-in-interest" to a Tesoro entity that "owned and operated the largest petroleum refinery in Hawai'i, which was capable of refining 94,000 barrels of fossil fuel per day."  Compl. ¶ 25(b); (j).[160]  This refinery supplied a significant portion of the United States military's fuel requirements in Hawai'i pursuant to indefinite delivery contracts.  On information and belief, much of that fuel was transported via underground pipeline to the Red Hill Bulk Fuel Storage Facility ("Red Hill Facility"), where it was stored and/or distributed for military operations originating on Oahu.  The Red Hill Facility has historically played a crucial role in the nation's defense, including by supplying fuel for the military's Pacific fleet.

131.   The facility has 20 underground fuel tanks, each of which is the size of a 20-story building and can hold 12.5 million gallons of fuel.  As Major General Susan A. Davidson of the United States Army's Indo-Pacific Command stated:

> The Red Hill facility holds a significant percentage of petroleum war reserves required to defend national security interests in the Indo-Pacific region.  As our strategic reserve, it supports all U.S. military forces throughout the theater, including those stationed in and transiting through Hawai'i.  It also supports the Hawai'i Army and Air National Guard and is available to support civil authorities, should circumstances dictate.  Its hardened, underground, cyber-protected, gravity-fed system to Joint Base Pearl Harbor-Hickam is unique, and there is no comparable U.S. owned facility anywhere from India to mainland USA.

---

[160]   Defendant Marathon Petroleum Corporation does not concede the veracity of this allegation in the Complaint and reserves all rights to contest it in this litigation.

Testimony on Resolution 19-270.CD1 Reaffirming the Council's Position as set forth in Resolution 18-266.CD1, adopted on March 8, 2019, Relating to the Red Hill Bulk Fuel Storage Facility Upgrade Alternative Options, Honolulu City Council (Nov. 6, 2019), https://www.cnic.navy.mil/content/dam/cnic/cnrh/pdfs/redhill/Navy%20DLA%20Testimony%20for%206%20NOV%202019%20City%20Council%20Resolution%2019-270.pdf (statement on behalf of Navy Region Hawaiʻi).

132.    While Plaintiff attempts to disclaim injury arising from acts occurring on federal property, *see* Compl. ¶ 14, emissions from the combustion of oil and gas cannot be traced to their source, *see AEP*, 564 U.S. at 422; *Kivalina I*, 663 F. Supp. 2d at 880; Compl. ¶ 220, and thus there is no rational way for Plaintiff to distinguish between the harms allegedly resulting from conduct on federal enclaves from those allegedly resulting from conduct at any other location.  As such, because Plaintiff's claims derive from conduct on or in federal enclaves, they do not belong in state court.

## VII.  THIS ACTION IS REMOVABLE BECAUSE PLAINTIFF'S CLAIMS NECESSARILY ARISE UNDER FEDERAL LAW, RAISE DISPUTED AND SUBSTANTIAL FEDERAL ISSUES, AND ARE COMPLETELY PREEMPTED BY FEDERAL LAW

133.    Removal is proper on three additional grounds:  (1) Plaintiff's claims necessarily "arise under" federal law, (2) Plaintiff's claims necessarily raise disputed and substantial federal questions, and (3) Plaintiff's claims are completely

preempted by federal law.  Defendants recognize that the Ninth Circuit rejected similar arguments raised in a different climate-change related action.  *Oakland*, 969 F.3d at 906.  As noted above, defendants in that case intend to file a petition for a writ of certiorari to the Supreme Court, and Defendants here assert these grounds for removal to preserve their arguments.

134.  **Plaintiff's Claims Necessarily Arise Under Federal Law.**  This action is removable because, as a matter of federal constitutional law and structure, Plaintiff's claims necessarily arise under federal, not state, law.  The issues presented by the Complaint are exclusively federal in nature; state law simply has no role to play.  Under 28 U.S.C. § 1331, federal courts have original jurisdiction over "claims founded upon federal common law as well as those of a statutory origin."  *Nat'l Farmers*, 471 U.S. at 850 (quoting *Milwaukee I*, 406 U.S. at 100).  This jurisdictional grant encompasses actions that arise under federal common law, because "a cause of action . . . 'arises under' federal law if the dispositive issues stated in the complaint require the application of federal common law."  *Milwaukee I*, 406 U.S. at 100.

135.  Federal common law governs when "a federal rule of decision is 'necessary to protect uniquely federal interests.'"  *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981).  The Supreme Court has confirmed repeatedly that when, as here, "we deal with air and water in their ambient or

interstate aspects, there is a federal common law." *AEP*, 564 U.S. at 421 (quoting *Milwaukee I*, 406 U.S. at 103); *accord, e.g., AEP*, 564 U.S. at 421 ("Environmental protection is undoubtedly an area 'within national legislative power,' one in which federal courts may fill in 'statutory interstices,' and, if necessary, even 'fashion federal law.'").  Because federal law governs in order to protect uniquely federal interests, state law *cannot* apply to such claims: "if federal common law exists, it is because state law cannot be used." *Milwaukee II*, 451 U.S. at 313 n.7.  The Supreme Court put the point succinctly in *International Paper Co. v. Ouellette*, observing that "interstate . . . pollution is a matter of federal, *not state*, law."  479 U.S. 481, 488 (1987) (emphasis added).The two-step analysis the Supreme Court established in *Standard Oil* for determining whether a claim arises under state or federal law for jurisdictional purposes makes clear that this threshold question does *not* depend on the answer to the distinct substantive question of whether the plaintiff has stated a viable claim under federal law.  Under the applicable two-step approach, courts must (1) determine for jurisdictional purposes whether the source of law is federal or state based on the nature of the issues at stake; and (2) if federal law is the source, determine the substance of the federal law, including whether the plaintiff has stated a viable federal claim. *Swiss American*, 191 F.3d at 42–45 (citing *Standard Oil*, 332 U.S. 301).

136.   Adhering to the "two-part approach" articulated in *Standard Oil*, the

First Circuit in *Swiss American* recognized the key distinction between the "source question and the substance question." 191 F.3d at 43, 45. The Court explained that the "source question" asks whether "the source of the controlling law [should] be federal or state." *Id*. at 43. The substance question, on the other hand, "which comes into play only if the source question is answered in favor of a federal solution," asks whether the governing rule should be borrowed from state law or instead be a "uniform federal rule." *Id*. Whether a claim "arises under" federal law "turns on the resolution of the source question." *Id*. at 44. Only that first question—what law applies—is relevant in addressing whether removal is proper and, as such, it must be resolved by a federal court. As the Supreme Court explained, this "choice-of-law task is a federal task for federal courts." *Milwaukee II*, 451 U.S. at 349 (quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592 (1973)).

137. Plaintiff's claims also arise under federal law because they seek to regulate the production and sale of oil and gas abroad and, therefore, implicate the federal government's foreign affairs power and the Constitution's Foreign Commerce Clause. The federal government has exclusive authority over the nation's international policy on climate change and relations with foreign nations. *United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."). Accordingly, "our federal system does not permit the controversy to be resolved

under state law," "because the authority and duties of the United States as sovereign are intimately involved" and "because the interstate [and] international nature of the controversy makes it inappropriate for state law to control." *Texas Indus.*, 451 U.S. at 641; *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964) (noting that issues involving "our relationships with other members of the international community must be treated exclusively as aspects of federal law"); *Republic of Philippines v. Marcos*, 806 F.2d 344, 352 (2d Cir. 1986) (explaining that "there is federal question jurisdiction over actions having important foreign policy implications" under federal common law).

138.   Because federal common law governs this "transboundary pollution" and climate change suit regardless of how Plaintiff *labeled* its claims, this action is within this Court's original jurisdiction. *Sam L. Majors Jewelers*, 117 F.3d at 922.

139.   **Plaintiff's Claims Necessarily Raise Disputed and Substantial Federal Issues.**  Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  The Supreme Court has held that suits alleging only state law causes of action nevertheless "arise under" federal law, even if not exclusively governed by federal law, if the "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."

*Grable*, 545 U.S. at 314.   Applying this test "calls for a common-sense accommodation of judgment to [the] kaleidoscopic situations that present a federal issue." *Id.* at 313 (internal quotation marks omitted) (alteration in original).

140.   Plaintiff's Complaint attempts to undermine and supplant federal regulation of greenhouse gas emissions and hold an international industry responsible for the alleged consequences of rising ocean levels and hydrologic cycle disruptions such as drought, extreme precipitation, heat waves, and wildfires that are allegedly caused by global climate change.   Plaintiff's claims raise "federal issue[s], actually disputed and substantial," for which federal jurisdiction would not upset "any congressionally approved balance of federal and state judicial responsibilities." *Grable*, 545 U.S. at 313.

141.   The issues of greenhouse gas emissions, global climate change, hydrologic cycle disruption, and sea level rise are not unique to the County of Maui, the State of Hawaiʻi, or even the United States.   Yet the Complaint attempts to supplant decades of national energy, economic, and environmental policies by prompting a Hawaiʻi state court to take control over an entire industry and its interstate commercial activities, and impose massive damages and injunctive relief contrary to long-standing federal regulatory schemes and systems.   The Complaint does this in numerous ways including, but not limited to, the following.

142.   *First*, Congress has struck a careful balance between energy production

and environmental protection by enacting federal statutes such as the CAA, 42 U.S.C. § 7401(c), and by directing the EPA to regulate Defendants' conduct and perform its own cost-benefit analyses, *see AEP*, 564 U.S. at 426–47.

143. *Second*, Plaintiff's claims impede the foreign-affairs power by seeking to regulate global climate change, which has been and continues to be the subject of major international treaties.

144. *Third*, Plaintiff alleges a causation theory that depends on proof that federal policymakers would have adopted different energy and climate policies absent the alleged conduct.

145. *Fourth*, Plaintiff's claims raise the issue whether a state may, by lawsuit, assert control over the navigable waters of the United States.

146. *Fifth*, Plaintiff's claims require interpretation of international climate treaties, which is the exclusive province of the federal courts.

147. *Sixth*, the Complaint's reliance on injuries allegedly suffered by way of navigable waters provides an additional basis for the exercise of federal jurisdiction under *Grable*.

148. *Seventh*, as explained above, federal common law exclusively governs Plaintiff's claims because they implicate three areas that our constitutional structure does not allow state or municipal law to control: transboundary pollution, navigable waters, and foreign relations.

149.   *Eighth*, this action raises important constitutional issues regarding the relationship between states and the division of authority between the federal government and the states.

150.   **Plaintiff's Claims Are Completely Preempted By Federal Law.** This Court also has original jurisdiction over this lawsuit for the independent and separate reason that Plaintiff requests relief that would alter or amend the rules regarding interstate—and even international—regulation of greenhouse gas emissions.  Accordingly, this action is completely preempted by federal law.  The Supreme Court has held that a federal court will have jurisdiction over an action alleging only state-law claims where the "extraordinary pre-emptive power [of federal law] converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987).  A state-law cause of action is preempted by a federal statute when the "pre-emptive force of the statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *see also Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. California*, 463 U.S. 1, 23 (1983) ("[P]reemptive force . . . is so powerful as to displace entirely any state cause of action.").

151.   Applying state law to the inherently transnational activity challenged

by the Complaint would inevitably intrude on the foreign affairs and foreign commerce powers of the federal government and is completely preempted.  *See, e.g., American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418 (2003) ("[S]tate action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state [action], and hence without any showing of conflict.").

152.   Plaintiff's claims are also completely preempted by the CAA.  A state-law cause of action may be completely preempted where a federal statutory scheme "provide[s] the exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies," *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003), and the state-law cause of action falls within the scope of the federal cause of action, including where it "duplicates, supplements, or supplants" that cause of action, *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).  Both requirements for complete preemption are present here.

153.   Finally, Plaintiff's claims are completely preempted because, as explained above, they necessarily arise under federal law.  *See Vaden v. Discover Bank*, 556 U.S. 49 (2009) ("A complaint purporting to rest on state law, we have recognized, can be recharacterized as one 'arising under' federal law if the law governing the complaint is exclusively federal. . . . Under this so-called complete preemption doctrine, a plaintiff's state cause of action may be recast as a federal

claim for relief, making its removal by the defendant proper on the basis of federal question jurisdiction." (citation and internal quotation marks omitted)); *Beneficial Nat'l Bank*, 539 U.S. at 8 n.4 and accompanying text (recognizing that *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 675 (1974), reflects a non-statutory form of complete preemption based on "the uniquely federal 'nature and source of the possessory rights of Indian tribes'"); *Caterpillar*, 482 U.S. at 393 n.8 (same); *Massachusetts v. Exxon Mobil Corp.*, 2020 WL 2769681, at *8 (D. Mass. May 28, 2020) ("Just as a congressional policy may sometimes require the federal cause of action to be exclusive and thus completely preempt state law, so too the 'basic scheme of the Constitution' may sometimes require an exclusively federal cause of action.").

## VIII.  PLAINTIFF'S CONCEALMENT ALLEGATIONS ARE IRRELEVANT AND BASED ON DEMONSTRABLY FALSE PREMISES

154.   The Complaint necessarily implicates the production, sale and use of oil and gas and, therefore, this action belongs in federal court for the reasons discussed above.  Plaintiff's fictionalized account of Defendants' supposed "concealment" and "misrepresentations" does not change the jurisdictional analysis and should be recognized for what it is:  a baseless and strained attempt to evade the jurisdiction of federal courts.

155.   Faced with insurmountable precedent foreclosing it from pursuing the

precise type of policy-setting relief it seeks in federal court,[161] Plaintiff has *labeled* its claims as sounding in state common law under a theory purportedly focused on concealment and misrepresentation.  But Plaintiff's claims do not and cannot rest solely on alleged misrepresentations; they instead rise and fall on a chain of causation linking all of Defendants' production and sale of oil and gas to global climate change and the allegedly resulting harms for which Plaintiff seeks relief. Production and consumption are critical links in Plaintiff's causal chain:  Plaintiff claims that Defendants' alleged misrepresentations led to sustained or increased demand, production, and consumption of oil and gas, which led to increased emissions, which led to global climate change, causing Plaintiff's alleged injuries. Plaintiff itself places production of oil and gas in the (tenuous) causal chain between Defendants' alleged misrepresentations and Plaintiff's alleged harm.  And, as explained above, Plaintiff seeks sweeping relief—including compensatory damages and abatement—based not only on Defendants' alleged misrepresentations, but also on global production and consumption of oil and gas over several decades.

156.  Moreover, Plaintiff's concealment and misrepresentation allegations ignore the vast public record establishing that the risks of climate change, including its potential impacts on Hawaiʻi, have been discussed publicly since at least the

---

[161] *See, e.g.*, *AEP*, 564 U.S. at 421–22; *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 855–58 (9th Cir. 2012); *Standard Oil*, 332 U.S. at 305–06.

1950s.  The world has known for many decades that the combustion of fossil fuels releases greenhouse gases into the atmosphere, which may contribute to global warming and climate change.  Scientists have publicly described these effects since the nineteenth century.  In 1896, Svante Arrhenius reported that "if the quantity of carbonic acid increases in geometric progression, the augmentation of the temperature will increase nearly in arithmetic progression."[162]  Similarly, in 1938, G.S. Callendar observed that "the increase in mean temperature, due to the artificial production of carbon dioxide, is estimated to be at the rate of 0.003°C per year at the present time."[163]

157.  By the early 1950s, the potential link between fossil fuel use and climate change had been reported in the media.  In 1953, popular media publications, including the *New York Times*, *The Washington Post*, *Time Magazine*, and *Popular Mechanics*, as well as Hawaiʻi newspapers, reported research concluding that "Earth's ground temperature is rising 1½ degrees a century as a result of carbon dioxide discharged from the burning of about 2,000,000,000 tons of coal and oil

---

[162] Svante Arrhenius, *On the Influence of Carbonic Acid in the Air upon the Temperature of the Ground*, 41 Philosophical Magazine and Journal of Science 237, 267 (1896), https://www.rsc.org/images/Arrhenius1896_tcm18-173546.pdf.

[163] Miyagi Decl. Ex. 69, at 223 (G.S. Callendar, *The Artificial Production of Carbon Dioxide and Its Influence on Temperature*, 64 Q.J. Royal Meteorological Soc'y 199 (1938)).

yearly."[164]

158.   National and Hawaiʻi newspapers similarly reported the potential risks of sea level rise from global warming as early as the 1950s and 60s.  In 1957, a front-page article in *The Washington Post* titled "*Teller Sees World-Flooding Peril Due to Industrial Overheating*" reported that prominent nuclear physicist Edward Teller had noted that "increase[s] in carbon dioxide [are] the result of the ever mounting uses of fuel energy such as coal, oil and derivatives during the industrial age" and, as a result, "the *ice caps on the poles will begin to melt* and the amount of water on the earth will increase . . . [and] '[s]uch places as *New York and Holland would be inundated.*'"[165]   This was two years *before* Teller's speech to API, which is referenced in the complaint.  Compl. ¶ 58.  Similarly, a 1956 article in the Honolulu-Star Bulletin reported:   "Accelerated burning of coal and oil by man may be increasing the carbon dioxide content in the atmosphere and thereby melting snow in the polar region. . . . Over a few generations, . . . a melting polar region could also

---

[164] Miyagi Decl. Ex. 11 (Popular Mechanics, *Growing Blanket of Carbon Dioxide Raises Earth's Temperature* (August 1953); *see also id.* Ex. 12 (W.K., *How Industry May Change Climate*, N.Y. Times (May 24, 1953)); *id.* Ex. 13 (Time Magazine, *Invisible Blanket* (May 25, 1953)); *id.* Ex. 70 (Wash. Post, *Industrial Gases Warming Up Earth*, Physicist Notes Here (May 5, 1953)).

[165] Miyagi Decl. Ex. 16 (Wash. Post, at A1 (Dec. 8, 1957) (emphases added) (internal quotation marks omitted)).

raise sea level all over the world 200 to 250 feet and change the earth's gravity."[166]

159.   The potential impact of climate change was a frequent topic in newspaper articles in the decades that followed.  Searches for "greenhouse effect," "global warming" or "climate change" in the Newspapers.com archives for Hawaiʻi papers between 1957 and 2000 alone identify more than 18,000 results.  The same search in all U.S. newspapers covered by Newspapers.com between 1957 and 2000 yields more than 350,000 matches.  Scientific journals also have published an exponentially growing volume of articles addressing climate change, with one researcher identifying more than 222,000 published scientific articles about climate change from 1980 to 2014 alone.[167]   Accordingly, Plaintiff's assertions that Defendants somehow deceived or concealed the relationship between greenhouse gas emissions and climate change are belied by this exceptionally long, substantial, and robust public discussion for more than sixty years.

160.   Plaintiff's allegations are further undermined by the undisputed fact that the U.S. government was well aware of the potential link between fossil fuel use and global climate since at least the 1950s and, notwithstanding such knowledge, made the policy decisions to not only actively encourage and promote production of

---

[166] Miyagi Decl.  Ex. 71 (*Scientist to See if Ice In Antarctic Is Melting*, *Honolulu Star-Bulletin*, 8 (Dec. 29, 1956).

[167] Robin Haunschild, Lutz Bornmann & Werner Marx, *Climate Change Research in View of Bibliometrics*, PLOS ONE, July 2016.

domestic oil and gas but to continue to mandate, direct, and control its production. Testimony before Congress in 1956 revealed that "[b]ased on figures given out by the United Nations . . . by the year 2010, we will have added something like 70 percent of the present atmospheric carbon dioxide to the atmosphere. This is an enormous quantity. . . . [I]t may, in fact, *cause a remarkable change in climate*."[168] Also in 1956, a study funded by the Office of Naval Research found that "[t]he extra $CO_2$ released into the atmosphere by industrial processes and other human activities may have caused the temperature rise during the present century" and predicted "that *this warming trend will continue, at least for several centuries*."[169]

161.   In 1965—more than 20 years before Plaintiff alleges Defendants began their purported campaign of deception—President Lyndon B. Johnson proclaimed to Congress that "[t]his generation has *altered the composition of the atmosphere on a global scale* through radioactive materials and a steady increase in carbon dioxide from the burning of fossil fuels,"[170] and the President's Science Advisory Committee

---

[168] Miyagi Decl. Ex. 72 (*Second Supplemental Appropriation Bill: Hearing on H. Doc. 330 Before the Subcommittees of the Committee on Appropriations*, 84th Cong. 472–73 (1956)) (emphasis added).

[169] Gilbert N. Plass, *The Carbon Dioxide Theory of Climatic Change*, 8 Tellus 140 (1956)), http://nsdl.library.cornell.edu/websites/wiki/index.php/PALE_ClassicArticles/archives/classic_articles/issue1_global_warming/n7._Plass__1956corrected.pdf (emphasis added).

[170] Special Message to the Congress Transmitting Report on the National Wilderness Preservation System, 1 Pub. Papers 161 (Feb. 8, 1965),

explained: "By the year 2000 the increase in atmospheric $CO_2$ will be close to 25%. This may be sufficient to *produce measurable and perhaps marked changes in climate*, and *will almost certainly cause significant changes in the temperature* and other properties of the stratosphere."[171]

162.   President Nixon's administration also recognized and understood the potential impacts of climate change, even as it worked assiduously to increase oil and gas production from federal lands.  As former Harvard professor and future U.S. Senator Daniel Patrick Moynihan put it at the time:  "It is now pretty clearly agreed that the $CO_2$ content will rise 25% by 2000. This could increase the average temperature near the earth's surface by 7 degrees Fahrenheit. This in turn could *raise the level of the sea by 10 feet. Goodbye New York.  Goodbye Washington*, for that matter."[172]

163.  So too did the Carter Administration:  A report requested by the Director of the Office of Science and Technology Policy concluded that "[w]e now have *incontrovertible evidence that the atmosphere is indeed changing* and that we

---

http://www.lbjlibrary.net/collections/selected-speeches/1965/02-08-1965.html (emphasis added).

[171] Envtl. Pollution Panel, President's Sci. Advisory Comm., Restoring the Quality of Our Environment: Report of the Environmental Pollution Panel 9 (1965), https://hdl.handle.net/2027/uc1.b4315678 (emphasis added).

[172] Miyagi Decl. Ex. 73 (Memorandum from Daniel P. Moynihan for John Ehrlichman, (Sept. 17, 1969)) (emphasis added).

ourselves contribute to that change.  Atmospheric concentrations of carbon dioxide are steadily increasing, and *these changes are linked with man's use of fossil fuels and exploitation of the land.*"[173]  The report also found that as "[c]arbon dioxide continues to increase, the study group finds *no reason to doubt that climate change will result and no reason to believe that these changes will be negligible.*"[174]

164.   The federal government's understanding of, and warnings about, the potential link between fossil fuel use and global climate change continued into the Reagan administration and beyond.  For example, a 1983 EPA report concluded that "[e]vidence continues to accumulate that *increases in atmospheric carbon dioxide* ($CO_2$) *and other 'greenhouse' gases will substantially raise global temperature*" and that its findings "support the conclusion that a global greenhouse warming is neither

---

[173] Climate Research Board, *Carbon Dioxide and Climate: A Scientific Assessment* (July 23–27, 1979), https://www.bnl.gov/envsci/schwartz/charney_report1979.pdf (emphases added).

[174] U.S. Envtl. Prot. Agency, *Can We Delay A Greenhouse Warming?* (1983)(emphasis added).  Additionally, in 1980, The Global 2000 Report was published and a Congressional Hearing Before the Congressional Subcommittee on International Economics of the Joint Economic Committee was held to discuss the report.  The Report found that "[r]ising CO2 concentrations are of concern because of their potential for causing a warming of the earth. Scientific opinion differs on the possible consequences, but a widely held view was that highly disruptive effects on world agriculture could occur before the middle of the twenty-first century."  *The Global 2000 Report: Hearing Before the Subcommittee on International Economics of the Joint Economic Committee*, 96th Cong.                        36                        (1980), https://www.jec.senate.gov/reports/96th%20Congress/The%20Global%202000%20Report%20(998).pdf.

trivial nor just a long-term problem" and "*call for an expeditious response*."[175] A 1983 report from the Carbon Dioxide Assessment Committee concluded that the "increase [in atmospheric $CO_2$] is *primarily attributable to burning of coal, oil, and gas*."[176]  And in 1988, James Hansen of NASA testified before the Senate—which, according to the Complaint, received "coverage on the front-page of *The New York Times*" (Compl. ¶ 99(a))—that "[g]lobal warming has reached a level such that we can ascribe with *a high degree of confidence a cause and effect relationship between the greenhouse effect and the observed warming*."[177]

165.  As noted above, the State of Hawaiʻi itself has long studied and reported the link between fossil fuels, climate change, and sea level rise.  It even reported in 1985 on potential adverse impacts on Hawaiʻi from climate-change induced sea-level rise, concluding that "[t]he situation continues to be aggravated by the use of fossil fuels for energy generation."  Miyagi Decl. Ex. 74, at 4 (Hawaii Coastal Zone Management Program, *Effects on Hawaii of a Worldwide Rise in Sea Level Induced*

---

[175] *Can We Delay A Greenhouse Warming?*, *supra* note 186 (emphases added).

[176] Bd. on Atmospheric Scis. And Climate, Comm'n on Physical Scis., Mathematics, and Res., Nat'l Rsch. Council, Changing Climate 1 (1983), https://download.nap.edu/cart/download.cgi?record_id=18714 (emphasis added).

[177] *Greenhouse Effect and Global Climate Change: Hearing Before the Committee on Energy and Natural Resources*, 134th Cong. 39 (1988) (testimony of Dr. James Hansen) https://www.sealevel.info/Hansen.0623-1988_oral.pdf (emphasis added).

*by the "Greenhouse Effect,"* 1985).   Yet this has not stopped Hawaiʻi from continuing to recognize—by statute—that oil and gas are "essential to the health, welfare, and safety of the people of Hawaii."  Haw. Rev. Stat. Ann. § 125C-1 (1975).

166.   In short, Plaintiff's claim that Defendants had exclusive, unique, early, or superior knowledge about the potential link between fossil fuel use, greenhouse gas emissions, and climate change is demonstrably false.  The vast public record of media articles, scientific journals, and government reports over the course of the past fifty-plus years makes   clear that any claim of "concealment"—actionable or otherwise—is absurd.

167.   To be clear, this long history of public knowledge and discussion about the risk of global warming from carbon dioxide emissions does not mean, as Plaintiff suggests, that there was no scientific debate about the causes and potential impacts of climate change.  For example, the U.N. Intergovernmental Panel on Climate Change (IPCC), "a scientific panel dedicated to providing the world's governments with an objective, scientific analysis of climate change and its environmental, political, and economic impacts," Compl. ¶ 99(c), concluded in 1990 that there was insufficient data to determine that observed warming trends were due to human activities:  "Thus, it is not possible at this time to attribute all or even a large part of the observed global warming to the enhanced greenhouse effect on the basis of

observational data currently available."[178]  The IPCC further noted that "[t]here are many uncertainties in our predictions particularly with regard to the timing, magnitude and regional patterns of climate change due to our incomplete understanding" of various issues, like the sources of greenhouse gases, clouds, oceans and polar ice sheets.[179]  By 1995, the IPCC still had not concluded with certainty that there was a human influence on climate: "Our ability to quantify the human influence on global climate is currently limited because the expected signal is still emerging from the noise of natural variability, and because there are uncertainties in key factors."[180]  Ultimately, the IPCC could only conclude that "the balance of evidence suggests" that there is a human influence on climate.[181]

168.  It was not until 2001 that the IPCC stated that new evidence indicated that human activity was "likely" (meaning 66–90% probability) responsible for "most" of the warming observed:  "There is new and stronger evidence that most of the warming observed over the last 50 years is attributable to human activities."[182]  Even that caveated conclusion was questioned by the National Academies of Science, however, which cautioned that the conclusions in the IPCC's 2001 report

---

[178] Miyagi Decl. Ex. 75, at 254 (IPCC (1990)).

[179] Miyagi Decl. Ex. 75 at xii (IPCC (1990)).

[180] Miyagi Decl. Ex. 76 at 22 (IPCC (1995)).

[181] *Id.*

[182] Miyagi Decl. Ex. 77 at 10 (IPCC (2001)).

should not be overstated: "Climate projections will always be far from perfect. Confidence limits and probabilistic information, with their basis, should always be considered as an integral part of the information that climate scientists provide to policy and decision makers. Without them, the IPCC [2001 report] could give an impression that the science of global warming is 'settled,' even though many uncertainties still remain."[183]

169.   In a report to Congress in 1991 titled "U.S. Efforts to Address Global Climate Change," the U.S. Department of State and U.S. EPA, like the IPCC, recognized the risk of climate change but noted that significant scientific uncertainties remained: "The possibility of global climate change has become an issue of great concern in the international community and within the United States. Much is unknown, however, about whether or not such changes have been detected, when and how they might occur, or what can be done about it. . . . [M]any scientific and economic uncertainties remain about possible climate change, its impacts, and societal responses. Much remains to be known about the magnitude and extent of a possible climate change."[184]   In 2002, even after the IPCC's report noting the

---

[183] Comm. on the Sci. of Climate Change, Div. of Earth & Life Studies, Nat'l Rsch. Council, Climate Change Science: An Analysis of Some Key Questions 22 (2001), https://www.nap.edu/catalog/10139/climate-change-science-an-analysis-of-some-key-questions.

[184] U.S. Envtl. Prot. Agency, U.S. Efforts to Address Global Climate Change 1-2 (1991),

"likely" contribution of human activities to climate change, EPA's "Guide to Climate Change" noted: "The Earth's surface is becoming warmer, and evidence is mounting that human activities are likely contributing to the warming trend. Still, uncertainties exist about exactly how much of the warming is due to human activities, whether recent temperature trends are truly outside the range of natural climate variability, and the effect that warming could have on our climate, lives, and habitat."[185]   In short, the scientific and policy debate about the causes, timing, impacts, and responses to climate change was occurring in thousands of newspaper articles, scientific publications, and government reports.  Plaintiff's assertions that Defendants concealed the truth and "embarked on a decades-long campaign" to fabricate uncertainty ignore the vast public record and are plainly false. Compl. ¶ 101.

170.  Yet, despite this public knowledge and the extensive public debate about the risks of climate change, the consumption of oil and gas, including by the federal government and Plaintiff itself, increased dramatically during this period. From 1960 to 2018, consumption of both oil and gas in the United States more than

---

https://nepis.epa.gov/Exe/ZyPDF.cgi/9101OZWK.PDF?Dockey=9101OZWK.PDF.

[185] Miyagi Decl. Ex. 78, at 2 (U.S. Envtl. Prot. Agency, EPA's Guide to Climate Change (2002)).

doubled.[186]  Even from the 1990s, domestic consumption of oil and gas has increased by 20% and 57%, respectively, through 2018.[187]   In 2018, the United States consumed more energy than ever before, with fossil fuels accounting for 80% of this record-breaking consumption.[188]

171.   Given that the United States, and the world, has continued to rely on and use oil and gas at ever-increasing rates, with full knowledge and understanding that such usage may have adverse climate impacts, there can be no real doubt that increased production and consumption of oil and gas were not caused by Defendants' alleged "concealment," but by the country's—and the world's—fundamental and vital need for energy.  In fact, the federal government has reported that world energy consumption is expected to grow by 50% by 2050 and will be focused in regions where strong economic growth is driving demand.[189]

172.  For this reason, the federal government has continued to actively promote, mandate, and direct domestic production of oil and gas, providing both

---

[186] U.S. Energy Info. Admin., State Energy Data System (SEDS), All Consumption Estimates            –           US            (2018), https://www.eia.gov/state/seds/sep_use/total/pdf/use_US.pdf.

[187] *Id.*; *see also* U.S. Energy Info. Admin., *Today in Energy* (Apr. 16, 2019) https://www.eia.gov/todayinenergy/detail.php?id=39092.

[188] Hannah Ritchie & Max Roser, *Fossil Fuels, Our World in Data*, https://ourworldindata.org/fossil-fuels (last visited Oct. 7, 2020).

[189] *See* U.S. Energy Info. Admin., International Energy Outlook 2019 24–26 (2019), https://www.eia.gov/outlooks/ieo/pdf/ieo2019.pdf.

incentives for and contracts with Defendants to obtain these products in the national interest.  In particular, the federal government has continued to encourage domestic production on the OCS because, in part, it has concluded that even if this domestic source of oil and gas were cut off, consumers would simply obtain "oil and gas from other sources," including foreign sources, which would put our national security and economy at risk and "leave a void in planning for national energy needs."[190]  Indeed, the environmental analysis required to reauthorize the OCS leasing program recognized the existence of climate change but nonetheless concluded that relying on renewable energy sources at the current time would be neither possible nor advantageous.[191]   Similarly, in 2001 the federal government issued a report

---

[190] U.S. Dep't of Interior , Bureau of Ocean Energy Mgmt., OCS EIS/EA BOEM 2012-030, OCS Oil and Gas Leasing Program:  2012-2017 Final Programmatic Environmental Impact Statement, 4-606, 4-643 (2012), https://www.boem.gov/sites/default/files/uploadedFiles/BOEM/Oil_and_Gas_Energy_Program/Leasing/Five_Year_Program/2012-2017_Five_Year_Program/2012-2017_Final_PEIS.pdf (projecting changes to domestic oil and gas supplies if OCS leases were halted); U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., Record of Decision and Approval of the 2017-2022 Outer Continental Shelf Oil and Gas Leasing Program, 82 Fed. Reg. 6643 (Jan. 17, 2017).

[191] U.S. Dep't of Interior, Bureau of Ocean Energy Mgmt., OCS EIS/EA BOEM 2016-060, OCS Oil and Gas Leasing Program: 2017-2022 Final Programmatic Environmental Impact Statement, Vol. 1, at 1-11 (2016), https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2012-2017/BOEMOceanInfo/fpeis_volume1.pdf ("The development of renewable energy sources is strategically important, but the development of these resources

emphasizing the national interest in promoting domestic oil and gas development and explained that "we must continue meeting the nation's energy requirements by the means available to us."[192]  The report's findings led to the Energy Policy Act of 2005, which encouraged further exploration of the OCS and other onshore federal lands through contracts with Defendants.[193]  And, as noted above, in 2010 President Obama recognized the need to balance production with alternative sources of energy, and expanded the offshore leasing program.  *See supra* note 2.

## IX.   THIS COURT HAS JURISDICTION AND REMOVAL IS PROPER

173.   Based on the allegations in the Complaint, and others not specifically described herein, this Court has original jurisdiction over this action under 28 U.S.C. § 1331, 1442, 1367(a), as well as 43 U.S.C. §1349(b).  Accordingly, removal of this action is proper under 28 U.S.C. §§ 1441(a) and 1446.

174.   The United States District Court for the District of Hawaii is the appropriate venue for removal pursuant to 28 U.S.C. § 1441(a) because it embraces the place where Plaintiff originally filed this case, in the Circuit Court of the Second

---

in the foreseeable future does not fully or partially satisfy the purpose of and need for the Proposed Action [i.e., meeting the nation's current energy demand].").

[192] U.S. Nat'l Energy Policy Dev. Grp., Reliable, Affordable, and Environmentally Sound Energy for America's Future, 1–13 (2001), https://www.nrc.gov/docs/ML0428/ML042800056.pdf**.**

[193] Energy Policy Act of 2005, Pub. L. No. 109-58, § 357(a)(2)(B), 119 Stat. 594 (2005).

Circuit, State of Hawaiʻi.  *See* 28 U.S.C. § 1441(a).

175.   All defendants that have been properly joined and served have consented to the removal of the action, *see* Miyagi Decl. ¶ 2, and there is no requirement that any party not properly joined and served consent.  *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from "all defendants who have been properly joined and served"); *Pressman v. Meridian Mortg. Co.*, 334 F. Supp. 2d 1236, 1241-42 (D. Haw. 2004) (citing *Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1193 n.1 (9th Cir. 1988), for the proposition that the "general rule" requiring consent of all defendants "applies . . . only to defendants properly joined and served in the action").[194]  Copies of all process, pleadings, and orders from the state-court action being removed to this Court that are in the possession of the Chevron Parties are attached hereto as Exhibit 1 to the Miyagi Declaration.  Pursuant to 28 U.S.C. § 1446(a), this constitutes "a copy of all process, pleadings, and orders" received by the Chevron Parties in the action.  Upon filing this Notice of Removal, Defendants will furnish written notice to Plaintiff's counsel, and will file and serve a copy of this Notice with the Clerk of the Circuit Court of the Second Circuit, State of

---

[194] In addition, the consent of all defendants is not required for federal officer removal under 28 U.S.C. § 1442.  *See Durham*, 445 F.3d at 1253 ("Whereas all defendants must consent to removal under section 1441, . . . a federal officer or agency defendant can unilaterally remove a case under section 1442.") (citation omitted).

Hawai'i, pursuant to 28 U.S.C. § 1446(d).

176.   Accordingly, Defendants remove to this Court the above action pending against them in the Circuit Court of the Second Circuit, State of Hawai'i.

Respectfully submitted,

DATED:  OCTOBER 30, 2020       WATANABE ING LLP

                               /s/ Melvyn M. Miyagi
                               MELVYN M. MIYAGI
                               ROSS T. SHINYAMA
                               SUMMER H. KAIAWE
                               THEODORE J. BOUTROUS, JR.
                               *Attorneys for Defendants*
                               CHEVRON CORPORATION
                               and CHEVRON U.S.A., INC.