DEPARTMENT OF THE
CORPORATION COUNSEL          205

MOANA M. LUTEY                    6385
Corporation Counsel
RICHELLE M. THOMSON          8965
KEOLA R. WHITTAKER            11200
Deputies Corporation Counsel
County of Maui
200 South High Street, Third Floor
Wailuku, Hawaiʻi 96793
Telephone: (808) 270-7741
Facsimile: (808) 270-7152
E-mail: moana.lutey@co.maui.hi.us
E-mail: richelle.thomson@co.maui.hi.us
E-mail: keola.whittaker@co.maui.hi.us

SHER EDLING LLP
VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
CORRIE J. YACKULIC (*pro hac vice* forthcoming)
TIMOTHY R. SLOANE (*pro hac vice* forthcoming)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Telephone: (628) 231-2500
Facsimile: (628) 231-2929
E-mail: vic@sheredling.com
E-mail: matt@sheredling.com
E-mail: corrie@sheredling.com
E-mail: tim@sheredling.com

Attorneys for Plaintiff,
COUNTY OF MAUI

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| COUNTY OF MAUI, | CASE NO. 20-CV-00470-DKW-KJM |
| Plaintiff, | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF COUNTY OF MAUI'S MOTION TO REMAND TO STATE COURT** |
| v. | |
| SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; SHELL OIL PRODUCTS COMPANY LLC; CHEVRON CORP; CHEVRON USA INC.; BHP GROUP LIMITED; BHP GROUP PLC; BHP HAWAII INC.; BP PLC; BP AMERICA INC.; MARATHON PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; AND DOES 1 through 100, inclusive, | No Hearing Date Calendared<br><br>Action Filed: October 12, 2020<br>No Trial Date Set |
| Defendants. | |

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND ...........................4

III.  LEGAL STANDARDS..............................................................6

IV.   THIS CASE SHOULD BE REMANDED BECAUSE THERE IS NO
      SUBJECT-MATTER JURISDICTION. .......................................9

      A.   The Ninth Circuit Has Conclusively Rejected Defendants'
           "Governed by Federal Common Law" Argument...................9

      B.   The County's Claims Do Not "Necessarily Raise" Any
           "Substantial Questions of Federal Law.".............................11

           1.   None of Defendants' Purported Federal Issues Is
                "Substantial."...................................................13

           2.   The County's Claims Do Not "Necessarily Raise" Any
                Issue of Federal Law. .......................................14

           3.   To the Extent Defendants' "Federal Common Law"
                Argument Is Cognizable Under *Grable*, It Fails...........15

      C.   There Is No OCSLA Jurisdiction.......................................17

      D.   There Is No Federal Officer Removal Jurisdiction Because
           No Federal Officer Directed the Defendants' Tortious Conduct. .........22

           1.   Defendants Cannot Show They Were Acting Under a
                Federal Officer. .............................................24

                a.   A Purported General Federal Policy Interest in Domestic
                     Fossil Fuel Production Cannot Satisfy the "Acting Under"
                     Requirement. .........................................26

                b.   Defendants' Transactions with the Military Do Not
                     Establish That They Engaged in Their Deception Campaign
                     at the Direction of Federal Officers. .........................29

          c.  Defendants' Fossil Fuel Production Under Federal
Oversight Is Not a Basis for Federal Officer Jurisdiction. .......36

      2.  There Is No Causal Connection Between Defendants'
Campaign of Deception and the County's Claims.........................43

E.    There Is No Enclave Jurisdiction Because the County's Claims
Did Not "Arise" Within Any Federal Enclave, Nor Do They
Present Any Federal Question. ...............................................................47

      1.  The County's Injuries Occurred and Will Occur Exclusively
on Non-Federal Lands....................................................................48

      2.  Defendants' Assertions Are Not Supported by the
Complaint. .....................................................................................49

      3.  Each of the County's Claims Arose Only Once a Complete
Tort Accrued, Which Occurred When and Where the
County Suffered Injury—on Non-Federal Lands. .........................50

      4.  Defendants Fail to Identify a Federal Question Arising
on Enclaves in Hawaiʻi Over Which the State Has
Concurrent Jurisdiction. ...............................................................53

F.    Defendants' "Complete Preemption" Arguments Are Foreclosed........55

G.    Defendants' Attacks on the Merits of the County's Claims
Are Premature and Misguided. ................................................................57

**V.**      **CONCLUSION** ........................................................................................**60**

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Elec. Power Co. v. Connecticut,*
    564 U.S. 410 (2011) ................................................................. 15, 16, 56

*Baker v. Atl. Richfield Co.,*
    962 F.3d 937 (7th Cir. 2020) ..............................................................46

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.,*
    405 F. Supp. 3d 947 (D. Colo. 2019) ........................................... *passim*

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.,*
    965 F.3d 792 (10th Cir. 2020) .................................................... *passim*

*Beneficial Nat'l Bank v. Anderson,*
    539 U.S. 1 (2003) ...................................................................... 55, 56

*Bordetsky v. Akima Logistics Servs., LLC,*
    No. CV 14-1786 (NLH/JS), 2016 WL 614408 (D.N.J. Feb. 16, 2016) ..............51

*Brooklyn Union Expl. Co. v. Tejas Power Corp.,*
    930 F. Supp. 289 (S.D. Tex. 1996)........................................................20

*Carriere v. Sears, Roebuck & Co.,*
    893 F.2d 98 (5th Cir. 1990) ................................................................57

*Caterpillar, Inc. v. Williams,*
    482 U.S. 386 (1987) ...................................................... 7, 8, 10, 55

*Chevron U.S.A., Inc. v. United States,*
    110 Fed. Cl. 747 (2013)....................................................................41

*Ching v. Aila,*
    No. CIV. 14-00253 JMS, 2014 WL 4216051 (D. Haw. Aug. 22, 2014) ...... 53, 54

*City of Oakland v. BP PLC,*
    969 F.3d 895 (9th Cir. 2020) ....................................................... *passim*

*Cmty. Hous. P'ship v. Byrd,*
    No. 13-3031 JSC, 2013 WL 6087350 (N.D. Cal. Nov. 19, 2013) ......................54

*Coleman v. Trans Bay Cable, LLC,*
    No. 19-CV-02825-YGR, 2019 WL 3817822 (N.D. Cal. Aug. 14, 2019)...........51

*Collier v. District of Columbia,*
    46 F. Supp. 3d 6 (D.D.C. 2014).........................................................20

*Collins v. Yosemite Park & Curry Co.,*
    304 U.S. 518 (1938) ......................................................................53

*Corley v. Long-Lewis, Inc.*,
    688 F. Supp. 2d 1315 (N.D. Ala. 2010) ..................................................... 51, 52

*Cty. of San Mateo v. Chevron Corp.*,
    960 F.3d 586 (9th Cir. 2020) .................................................................... *passim*

*Cty. of San Mateo v. Chevron Corp.*,
    294 F. Supp. 3d 934 (N.D. Cal. 2018).......................................................... *passim*

*Doe Parents No. 1 v. State, Dep't of Educ.*,
    100 Hawai'i 34 (2002).....................................................................................51

*Durham v. Lockheed Martin Corp.*,
    445 F.3d 1247 (9th Cir. 2006) ............................................................ 47, 51, 52

*Empire Healthchoice Assur., Inc. v. McVeigh*,
    547 U.S. 677 (2006) .........................................................................................12

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
    26 F.3d 563 (5th Cir. 1994) ................................................................ 19, 20, 22

*Exxon Mobil Corp. v. United States*,
    No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020) ...... 27, 28, 30

*Fidelitad, Inc. v. Insitu, Inc.*,
    904 F.3d 1095 (9th Cir. 2018) .........................................................................29

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*,
    463 U.S. 1 (1983) .......................................................................................... 8, 14

*Gaus v. Miles, Inc.*,
    980 F.2d 564 (9th Cir. 1992) .............................................................................7

*Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*,
    865 F.3d 1237 (9th Cir. 2017) .................................................................... 43, 44

*Goto v. Whelan*,
    No. 20-cv-01114 (HSG), 2020 WL 4590596 (N.D. Cal. Aug. 11, 2020)............49

*Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*,
    545 U.S. 308 (2005) ..................................................................................... *passim*

*Gunn v. Minton*,
    568 U.S. 251 (2013) ..................................................................................... 12, 54

*Holliday v. Extex*,
    No. CIV. 05-00194SPK/LEK, 2005 WL 2158488 (D. Haw. July 6, 2005) . 50, 51

*Humble Pipe Line Co. v. Waggonner*,
    376 U.S. 369 (1964) .........................................................................................48

*Hobson v. Hansen*,
    265 F. Supp. 902 (D.D.C. 1967)......................................................................50

*In re Deepwater Horizon*,
   745 F.3d 157 (5th Cir. 2014) ...................................................................... 18, 20

*In re Def. Ass'n of Philadelphia*,
   790 F.3d 457 (3d Cir. 2015) ................................................................................44

*In re MTBE Prods. Liab. Litig.*,
   488 F.3d 112 (2d Cir. 2007) ................................................................................45

*Jacobsen v. U.S. Postal Service*,
   993 F.2d 649 (9th Cir. 1992) ...............................................................................50

*Jefferson Cty. v. Acker*,
   527 U.S. 423 (1999) ................................................................................ 7, 23, 24

*Johnson v. Raybestos-Manhattan, Inc.*,
   69 Haw. 287 (1987) ...........................................................................................51

*K&D LLC v. Trump Old Post Office LLC*,
   951 F.3d 503 (D.C. Cir. 2020) ..............................................................................7

*Kalaka Nui, Inc. v. Actus Lend Lease, LLC*,
   2009 WL 1227892 (D. Haw. May 5, 2009) ...........................................................53

*Kelly v. Monsanto Co.*,
   No. 4:15 CV 1825 JMB, 2016 WL 3543050 (E.D. Mo. June 29, 2016) ...... 32, 33

*Latiolais v. Huntington Ingalls, Inc.*,
   951 F.3d 286 (5th Cir. 2020) ...............................................................................46

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ................................................................. 23, 46, 57

*Littleton v. State*,
   66 Haw. 55 (1982) .............................................................................................51

*LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*,
   No. CIVA 06-11248, 2007 WL 854307 (E.D. La. Mar. 16, 2007).......................19

*Maryland v. Soper*,
   270 U.S. 9 (1926) ..............................................................................................44

*Massachusetts v. Exxon Mobil Corp.*,
   462 F. Supp. 3d 31 (D. Mass. 2020)................................................................ *passim*

*Mater v. Holley*,
   200 F.2d 123 (5th Cir. 1952) ...............................................................................53

*Matheson v. Progressive Specialty Ins. Co.*,
   319 F.3d 1089 (9th Cir. 2003) ...............................................................................7

*Mayor & City Council of Baltimore v. BP P.L.C.*,
   388 F. Supp. 3d 538 (D. Md. 2019) ................................................................ *passim*

*Mayor & City Council of Baltimore v. BP P.L.C.*,
    952 F.3d 452 (4th Cir. 2020) ................................................................. *passim*

*Metro. Life Ins. Co. v. Taylor*,
    481 U.S. 58 (1987) ............................................................. 8, 55, 56

*Mississippi River Fuel Corp. v. Cocrehan*,
    390 F.2d 34 (5th Cir. 1968) .........................................................48

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    663 F. Supp. 2d 863 (N.D. Cal. 2009) ......................................16

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
    696 F.3d 849 (9th Cir. 2012) ................................................ 15, 16, 17

*Nevada v. Bank of Am. Corp.*,
    672 F.3d 661 (9th Cir. 2012) .........................................................7

*New Mexico ex rel. Balderas v. Monsanto Co.*,
    454 F. Supp. 3d 1132 (D.N.M. 2020)........................................33

*Parish of Plaquemines v. Total Petrochem. & Refining USA, Inc.*,
    64 F. Supp. 3d 872 (E.D. La. 2014) .........................................19

*People v. ConAgra Grocery Prods. Co.*,
    17 Cal. App. 5th 51 (Cal. Ct. App. 2017)...........................................58

*Recar v. CNG Producing Co.*,
    853 F.2d 367 (5th Cir. 1988) .........................................................20

*Rhode Island v. Chevron Corp.*,
    393 F. Supp. 3d 142 (D.R.I. 2019) ......................................... *passim*

*Rhode Island v. Chevron Corp.*,
    __ F.3d__, No. 19-1818, 2020 WL 6336000 (1st Cir. Oct. 29, 2020) ......... *passim*

*Riggs v. Airbus Helicopters*,
    939 F.3d 981 (9th Cir. 2019) ................................................ 28, 29

*Rivet v. Regions Bank of La.*,
    522 U.S. 470 (1998) .....................................................................8

*Schmitt v. War Emergency Pipelines*,
    175 F.2d 335 (8th Cir. 1949) .........................................................31

*Shell Oil Co. v. United States*,
    751 F.3d 1282 (Fed. Cir. 2014) .................................................30

*Spittler v. Charbonneau*,
    145 Hawaiʻi 204 (Ct. App. 2019)...................................................51

*State v. Monsanto Co.*,
    274 F. Supp. 3d 1125 (W.D. Wash. 2017) ................................ 45, 49

*State v. Purdue Pharma L.P.*,
   No. CJ-2017-816, 2019 WL 9241510 (Okl. Dist. Ct. Nov. 15, 2019).............59

*United States v. Standard Oil Co.*,
   545 F.2d 624 (9th Cir. 1976) ......................................................................40

*Ulleseit v. Bayer HealthCare Pharm. Inc.*,
   826 F. App'x 627 (9th Cir. 2020)..............................................................44

*United States v. Philip Morris USA, Inc.*,
   449 F. Supp. 2d 1 (D.D.C. 2006) ...............................................................59

*United States v. Swiss Am. Bank, Ltd.*,
   191 F.3d 30 (1st Cir. 1999) .......................................................................10

*Vaden v. Discover Bank*,
   556 U.S. 49 (2009) ......................................................................................8

*Watson v. Philip Morris Cos.*,
   551 U.S. 142 (2007) ...................................................................... *passim*

**Statutes**

10 U.S.C. § 7430 ..............................................................................................42

28 U.S.C. § 1331 ...................................................................... 9, 11, 12, 14

28 U.S.C. § 1441 .............................................................................................7

28 U.S.C. § 1442 ...................................................................... *passim*

42 U.S.C. § 1983 ............................................................................................50

42 U.S.C. § 9601 ............................................................................................28

43 U.S.C. § 1349(b)(1).......................................................... 3, 17, 18

49 U.S.C. § 40101(d)(1) ...............................................................................28

**Rules**

Fed. R. Civ. P. 12(b)(1)...........................................................................57

**Other Authorities**

Pub. L. No. 86-3, 73 Stat. 11–12 (1959)...................................................53

Restatement (Second) Torts §§ 158, 161 ...............................................51

## TABLE OF EXHIBITS REFERENCED IN THIS BRIEF

Unless otherwise indicated, all citations below to "Ex." refer to exhibits to the Declaration of Melvin M. Miyagi in Support of Defendants' Notice of Removal, ECF No. 1-1. The below table identifying each exhibit in numerical order is provided for the Court's convenience.

Asterisks denote exhibits that were *not* filed *City and County of Honolulu v. Sonoco LP*, Case No. 20-CV-00163-DKW-RT, i.e. those that appear for the first time here.

- Ex. 5: U.S. Department of the Interior, Oil and Gas Lease of Submerged Lands Under the Outer Continental Shelf Lands Act, Form BOEM-2005 (February 2017).

- Ex. 6: Unit Plan Contract between the Navy Department and Standard Oil Company of California (June 19, 1944).

- Ex. 9: Statement of Sen. Hollings on the Outer Continental Shelf Lands Act Amendments of 1975, 94 Cong. Rec. S903 (daily ed. Jan. 27, 1975).

- Ex. 10: John W. Frey, et al., *A History of the Petroleum Administration for War: 1941–1945* (1946).

- *Ex. 20: Daniel Yergin, *The Prize: The Epic Quest for Oil, Money & Power* (1991).

- *Ex. 21: Ian O. Lesser, *Resources and Strategy* (1989).

- Ex. 22: Letter from P.M. Robinson, Petroleum Administrator for War, to R.K. Davies, Petroleum Administration for War Deputy Administrator, *Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams* (Aug. 12, 1942).

- *Ex. 23: National Petroleum Council, *A National Oil Policy for the United States* (1949).

- Ex. 27: *Report by the Ad Hoc Select Committee on the Outer Continental Shelf*, H.R. Rep. 95-590 (Aug. 29, 1977).

- *Ex. 28: Texas Association of Realtors' Form TAR-2101.

- *Ex. 29: Statement of Gerald D. Morgan, Special Counsel to the Committee on Naval Affairs, *in* U.S. House of Representatives, Committee on Naval Affairs, Hearing Record at 3737–38 (Sept. 9, 1946).

- *Ex. 30: Statement of Commodore W.G. Greenman, U.S. Navy, Director, Naval Petroleum Reserves, *in* U.S. House of Representatives, Committee on Naval Affairs, Hearing Record at 3693–94, made on March 28, 1946. [Note: Ex. 30 appears to be a copy of Ex. 29.]

- *Ex. 31: Document entitled "Elk Hills Development," which Defendants identify as "Records Concerning Reserves in the U.S. and PAW Districts 1941-45, Elk Hills, collected at the National Archives in Suitland, Maryland."

- Ex. 32: Operating Agreement between Navy Department and Standard Oil Company of California, Relating to Naval Petroleum Reserve No. 1 (Elk Hills) (Nov. 3, 1971).

- *Ex. 33: Letter from J.R. Grey, President of Standard Oil Company of California, to Jack L. Bowers, Acting Secretary of the Navy (Jan. 7, 1975).

- *Ex. 35: Statement of John F. O'Leary, Administrator, Federal Energy Administration, *in* Review of the Strategic Petroleum Reserve Plan: Hearing Before the Committee on Interior and Insular Affairs, U.S. Senate, S. Rep. No. 95-10 (Feb. 4, 1977).

- *Ex. 37: Department of the Interior, Minerals Management Service, *News Release: MMS [Royalty in Kind] Program to Help Fill Strategic Petroleum Reserve* (May 31, 2007).

- *Ex. 38: Statement of George A. Wilson, Director of Supply and Transportation Division, Petroleum Administration for War, *in* Wartime Petroleum Policy Under the Petroleum Administration for War: Hearings Before a Special Committee Investigating Petroleum Resources, U.S. Senate, S. Res. 36 (Nov. 28–30, 1945).

- Ex. 39: Speech by Secretary Harold Ickes to the Conference of Petroleum Industry Chairmen (Aug. 11, 1941).

- <u>Ex. 40</u>: W.J. Sweeney et al., *Aircraft Fuels and Propellants: A Report of the [Army Air Force] Scientific Advisory Group* (1946).

- <u>Ex. 44</u>: Certificate of Dissolution of War Emergency Pipelines, Inc. (Aug. 28, 1947).

- *<u>Ex. 45</u>: Statement of W. Alton Jones, Chairman, Committee on Post-War Disposal of Pipe Lines, Refineries, and Tankers, *in* War Emergency Pipe-Line Systems and Other Petroleum Facilities: Hearings before the Special Committee Investigating Petroleum Resources, 79th Cong. (Nov. 15–17, 1945).

- <u>Ex. 46</u>: *Fourth Annual Report of the Activities of the Joint Committee on Defense Production*, H.R. Rep. No. 84-1 (Jan. 5, 1955).

- <u>Ex. 49</u>: John W. Finney, *Fuel is Diverted for the Military*, N.Y. Times (Nov. 28, 1973).

- <u>Ex. 50</u>: Gregory Pedlow and Donald Welzenbach, *The Central Intelligence Agency and Overhead Reconnaissance: The U-2 and OXCART Programs, 1954–1974* (1992).

- *<u>Ex. 52</u>: Ben R. Rich and Leo Janos, Skunk Works: A Personal Memoir of My Years at Lockheed (1994).

- <u>Ex. 53</u>: Negotiated Contract No. AF33(657)-8577 with Shell Oil Company (Aug. 14, 1962).

- <u>Ex. 54</u>: Letter re: Contract Amendment No. 2 to Contract No. AF33(657)-8577 with Shell Oil Company (Aug. 26, 1963).

- *<u>Ex. 61</u>: Memorandum for Assistant Director, OSA, *Summary of OSA Activities for Week Ending 21 August 1963* (Aug. 23, 1963).

- <u>Ex. 62</u>: Tesoro Corporation: Exemplary Contracts for Highly Specialized Military Jet Fuel (table drafted by counsel followed by exhibits of federal solicitations/contracts).

# I.      INTRODUCTION

The County of Maui (the "County") brought this action in Hawaiʻi state court, asserting Hawaiʻi common law claims for public and private nuisance, strict liability and negligent failure to warn, and trespass. The County seeks to vindicate its local injuries caused by Defendants' decades-long campaign to discredit the science of global warming, conceal the dangers posed by their fossil-fuel products, and misrepresent their role in combatting the climate crisis. Defendants removed, asserting a litany of arguments that misrepresent both the contents of the County's complaint and the controlling law. All of Defendants' arguments are meritless, and this Court lacks subject-matter jurisdiction. This case should be returned to state court, where it was filed and where it belongs.[1]

The Ninth Circuit has squarely rejected the bulk of Defendants' removal arguments in factually analogous cases where local governments assert state-law claims against fossil-fuel companies based on harms suffered from Defendants' disinformation and deception campaign. Defendants argue here that the County's claims are removable because they "necessarily arise under federal [common] law," Notice of Removal, ECF No. 1 ("NOR") ¶¶ 134–38; because "Plaintiff's claims

---

[1] The parties' arguments here and in the pending motion to remand in *City and County of Honolulu v. Sunoco LP*, Case No. 20-CV-00163-DKW-RT, are virtually the same except Defendants offer slightly different evidence to support their federal officer jurisdiction arguments here. As explained in Part IV.D, *infra*, however, that evidence does not change the result: federal jurisdiction does not exist here.

necessarily raise disputed and substantial federal issues," *id.* ¶¶ 139–49; and because they "are completely preempted by federal law," *id.* ¶¶ 150–53, including the Clean Air Act. The Ninth Circuit disposed of the same arguments in the materially identical case *City of Oakland v. BP PLC*, 960 F.3d 570 (9th Cir. 2020), *opinion amended and superseded on denial of reh'g sub nom.*, 969 F.3d 895 (9th Cir. 2020) ("*Oakland*") (vacating order denying motion to remand). Recognizing that controlling caselaw forecloses their position, Defendants note they assert those grounds only to "preserve them for appellate review" pending a change in existing law. NOR ¶ 9.

Defendants' remaining grounds for removal likewise fail. The Ninth Circuit also rejected federal officer removal under 28 U.S.C. § 1442, in *County of San Mateo v. Chevron Corp.*, 960 F.3d 586 (9th Cir. 2020), *reh'g en banc denied* (Aug. 4, 2020) ("*San Mateo II*"). Like *Oakland*, many of the defendants in *San Mateo II* are present here, and their virtually identical arguments, roundly rejected by the Ninth Circuit, have no newfound merit. Defendants allege they "were 'acting under' a federal officer" when they engaged in the alleged bad acts, "and the claims against them relate to acts under color of federal office." NOR ¶ 6. But just as in *San Mateo II*, Defendants "have not carried their burden of proving by a preponderance of the evidence that they were 'acting under' a federal officer" with respect to the conduct they assert in support of removal. *See* 960 F.3d at 603. The new factual federal

2

officer allegations Defendants assert are irrelevant to the County's claims, and do not call for a different result.

Defendants resist well-established law. In total, five district courts in four circuits have rejected Defendants' attempts to remove substantially similar cases, and four of those decisions have been affirmed in relevant part on appeal.[2] Those cases considered and rejected *every* ground for removal Defendants assert here, both on the grounds reached by the Ninth Circuit and for other reasons, including federal enclave jurisdiction and jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1349(b)(1). The only decision by any court accepting any of Defendants' arguments was vacated on appeal in *Oakland*. *See* 969 F.3d at 911–12. Defendants' arguments are without merit, and this case should be remanded.

---

[2] *See Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 937 (N.D. Cal. 2018) ("*San Mateo I*") (granting remand), *aff'd in part, appeal dismissed in part*, *San Mateo II*, 960 F.3d 586 (9th Cir. 2020), *reh'g en banc denied* (Aug. 4, 2020); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) ("*Baltimore I*") (granting remand), *as amended* (June 20, 2019), *aff'd in part, appeal dismissed in part*, 952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*"), *cert. granted*, ___ ___S.Ct.___, 2020 WL 5847132 (Oct. 2, 2020) ; *Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947 (D. Colo. 2019) ("*Boulder I*") (granting remand), *aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020) ("*Boulder II*"); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019) ("*Rhode Island I*") (granting remand), *aff'd in part, appeal dismissed in part*, ___F.3d___, No. 19-1818, 2020 WL 6336000 (1st Cir. Oct. 29, 2020) (*Rhode Island II*); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020) (granting remand).

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The County's complaint alleges injuries caused by Defendants' decades-long campaign to discredit the science of global warming, conceal dangers posed by their fossil-fuel products, and misrepresent their role in combatting the climate crisis. Complaint, ECF No. 1-2 ("Compl.") ¶¶ 1–15. For more than half a century, Defendants have known that their oil, gas, and coal products create greenhouse gas pollution that changes the climate, warms the oceans, and causes sea levels to rise. *Id*. ¶¶ 1, 7, 56–96. Starting as early as the 1950s, Defendants researched the link between fossil-fuel consumption and global warming, amassing a remarkably comprehensive and nuanced understanding of the adverse climate impacts caused by their fossil-fuel products. *Id*. ¶¶ 56–96. In widely circulated internal reports and communications, their own scientists predicted that the unabated consumption of fossil fuels would cause "dramatic environmental effects," warning that the world had only a narrow window of time to curb emissions and stave off "catastrophic" climate change. *Id*. ¶¶ 69, 151; *see also, e.g., id*. ¶¶ 67, 75, 87, 88. Defendants took these warnings seriously: they evaluated impacts of climate change on their infrastructure, invested to protect assets from rising seas and more extreme storms, and developed technologies to profit off a warmer world. *See id*. ¶¶ 89, 94, 131–36.

But when the United States and other countries started to treat climate change as a grave threat requiring concerted action, Defendants embarked on a campaign of

denial and disinformation about the existence, cause, and adverse effects of global warming. *See id.* ¶¶ 97–130. Among other tactics, Defendants (1) bankrolled contrarian climate scientists whose views conflicted not only with the overwhelming scientific consensus, but also with Defendants' internal understanding of global warming; (2) funded think tanks, front groups, and dark money foundations that peddled in climate change denialism; and (3) spent millions of dollars on newspaper ads, radio commercials, and mailers that casted doubt on the science of climate change. *See*, *e.g.*, *id.* ¶¶ 107–08, 115, 120–22, 125–27.

When public awareness finally started catching up to Defendants' own knowledge of the serious dangers posed by their fossil-fuel products, Defendants pivoted to a new deceptive strategy: "greenwashing." *Id.* ¶¶ 149–59. They advertise, for example, that certain fossil-fuel products are "green" or "clean," while failing to warn that the very production and use of those products is the leading cause of climate change. *Id.* ¶¶ 149–61. They falsely portray themselves as environmentally conscious companies that invest heavily in renewable energy sources, even though they devote negligible investments to low-carbon energy and continue to develop new fossil-fuel resources and ramp up production. *Id.* ¶¶ 149, 154–55.

Now and in the years to come, the County must bear the costs of Defendants' deception and disinformation. *See id.* ¶¶ 160–203. Air temperatures in the County, for instance, are warming at alarming rates, leading to more heatwaves, decreased

water supply, and more frequent and intense wildfires. *See id*. ¶¶ 163–64. Meanwhile, rising sea levels and increasingly frequent storm surges threaten billions of dollars of infrastructure and property along the County's highly developed coastline. *See id*. ¶¶ 169–72. And the County's tourism and fishing industries will suffer as the warming and acidification of the local air and water kill coral reefs, reduce fish catch, and push various endemic species toward extinction. *See id*.

To redress these local harms, the County sued Defendants in the Second Circuit Court, State of Hawai'i, for state-law public and private nuisance, strict liability and negligent failure to warn, and trespass. *See id*. ¶¶ 204–55. Contrary to Defendants' reimagining of the Complaint, this lawsuit does not seek to limit extraction of fossil fuels or otherwise regulate greenhouse gas emissions. *See*, *e.g.*, NOR ¶¶ 21, 141, 150, 155. Rather, the County requests damages for the harms that it has already incurred—and costs of abating and mitigating the harms that it will suffer—as a result of Defendants' tortious campaign to mislead and conceal the dangers of their fossil-fuel products. *See* Compl. ¶¶ 15, 16; Prayer for Relief.

Defendants filed their Notice of Removal on October 30, 2020, purporting to identify six grounds for federal subject matter jurisdiction.

## III.   LEGAL STANDARDS

Federal courts are courts of limited jurisdiction, and "statutes extending federal jurisdiction . . . are narrowly construed so as not to reach beyond the limits

intended by Congress." *Oakland*, 969 F.3d at 903. Removal statutes in particular are "strictly construed against federal court jurisdiction." *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 667 (9th Cir. 2012). "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992); *Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003) (same).

Defendants attempt to mislead the Court by stating that "[t]he Court must "'credit [Defendants'] theory of the case for purposes . . . of" the removal inquiry.'" NOR at 5 (quoting *K&D LLC v. Trump Old Post Office LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020) & *Jefferson Cty. v. Acker*, 527 U.S. 423 (1999)). *K&D LLC* held that the Court may credit Defendants' theory of the case with respect to *federal officer removal* only. 951 F.3d at 506. Even then, a court need not blindly credit the defendant's theory if, as here, it is "not plausibly related to" the conduct in the complaint. *See, e.g.*, *Massachusetts*, 462 F. Supp. 3d at 47; *see also* Part IV.D. *infra*.

Removal of claims under 28 U.S.C. § 1441 is controlled by the "well-pleaded complaint" rule, whereby "federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 391–92 (1987). The rule "makes the plaintiff the master of the claim," because, in drafting the complaint, the plaintiff may choose to "avoid federal jurisdiction by exclusive reliance on state law." *Id*. at 392. It is a "powerful

doctrine" that "severely limits the number of cases in which state law 'creates the cause of action' that may be initiated in or removed to federal district court." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 9–10 (1983). A close corollary of the well-pleaded complaint rule is that "[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense" based in federal law. *Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009).

There are two relevant exceptions to the well-pleaded complaint rule. *See Oakland*, 969 F.3d at 904–06; *San Mateo II*, 960 F.3d at 598. The first narrowly permits federal-question jurisdiction over state-law claims that "'really and substantially involv[e] a dispute or controversy respecting the validity, construction or effect of [federal] law.'" *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313 (2005). The second, referred to as "complete preemption" or the "artful pleading" doctrine,[3] permits federal-question removal in rare circumstance where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). Neither exception applies here.

---

[3] Although courts have at times expressed confusion over whether the "artful pleading" and "complete preemption" doctrines are synonymous, the Supreme Court and Ninth Circuit have treated them as coextensive. *See*, *e.g.*, *Rivet v. Regions Bank of La.*, 522 U.S. 470, 471 (1998); *Oakland*, 969 F.3d at 905–06 (same).

## IV.   THIS CASE SHOULD BE REMANDED BECAUSE THERE IS NO SUBJECT-MATTER JURISDICTION.

### A.   The Ninth Circuit Has Conclusively Rejected Defendants' "Governed by Federal Common Law" Argument.

Defendants concede that *Oakland* forecloses their argument that the County's claims arise under federal law because federal common law supposedly "governs" them, NOR ¶ 9; as such, the County will address the argument only briefly. In *Oakland*, the plaintiffs brought state law nuisance claims against five fossil-fuel companies. 969 F.3d at 901. The district court denied the motion to remand, adopting the defendants' argument "that it had federal-question jurisdiction . . . because the [public nuisance] claim was 'necessarily governed by federal common law.'" *Id.* at 902. The Ninth Circuit reversed, holding that "the district court lacked federal-question jurisdiction unless one of the two exceptions to the well-pleaded-complaint rule [*Grable* or complete preemption] applies." *See id.* at 904–08. The court reasoned that "because neither exception to the well-pleaded-complaint rule applies . . . the district court erred in holding that it had jurisdiction under 28 U.S.C. § 1331." *Id.* at 908. As to federal common law, the court held that "[e]ven assuming that the [plaintiffs'] allegations could give rise to a cognizable claim for public nuisance under federal common law, the district court did not have jurisdiction under § 1331 because the state-law claim for public nuisance fails to raise a substantial federal question" under *Grable*. *Id.* at 906 (citations omitted).

9

*Oakland* did not separately analyze the complaints under a third exception for state-law claims "governed by" federal common law because there simply is no such exception. Defendants' insistence that federal common law "governs," or "applies," *see* NOR ¶¶ 135–36, is a euphemism for what they would dare not say: that federal common law *preempts* the County's claims. But the law is unambiguous: "jurisdiction depends solely on the plaintiff's claims for relief," and "a case may *not* be removed . . . on the basis of a federal defense, including the defense of preemption." *Oakland*, 969 F.3d at 903–04 (quotations omitted). Defendants' argument that the Court must determine "whether the source of law is federal or state based on the nature of the issues at stake," NOR ¶ 135, is irrelevant. The opposite is true: "the plaintiff can generally 'avoid federal jurisdiction by exclusive reliance on state law.'" *Oakland*, 969 F.3d at 904 (quoting *Caterpillar*, 482 U.S. at 392).[4]

Defendants "fail to cite any Supreme Court or other controlling authority authorizing removal based on state law claims implicating federal common law," *Boulder I*, 405 F. Supp. 3d at 963, because none exists. In addition to *Oakland*, five district courts have rejected federal common law arguments identical to those

---

[4] *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30 (1st Cir. 1999), has nothing to do with removal, or even subject-matter jurisdiction. There, the U.S. sued foreign banks to recover assets subject to a forfeiture order. *Id.* at 34. The U.S. argued personal jurisdiction existed because its conversion claims were governed by federal common law. *Id*. at 38–39, 43. The court narrowly held that when the U.S. sues "to recoup assets . . . forfeited to it, the rights that it has acquired find their roots in, and must be adjudicated in accordance with, a federal source." *Id.* at 45.

10

Defendants make here in substantially similar climate cases asserting state-law tort and consumer protection claims.[5] The Ninth Circuit already rejected Defendants' shaky federal common law removal theory, and the theory finds no support in any other body of law. Removal jurisdiction on this ground must be rejected.

### B.   The County's Claims Do Not "Necessarily Raise" Any "Substantial Questions of Federal Law."

*Oakland* also confirms that Defendants' arguments under *Grable* lack merit.[6] Here, just as in *Oakland*, Defendants identify no substantial federal question necessarily raised in the County's complaint, but rather "suggest that the . . . state-law claim implicates a variety of 'federal interests'" that "d[o] not raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *Oakland*, 969 F.3d at 906–07. The County's claims, moreover, do not "necessarily raise" any issue of regulatory "balanc[ing] between energy production and environmental protection," NOR ¶ 142; foreign affairs, *id.* ¶ 143;

---

[5] *See San Mateo I*, 294 F. Supp. 3d at 937; *Baltimore I*, 388 F. Supp. 3d at 555; *Rhode Island I*, 393 F. Supp. 3d at 149; *Boulder I*, 405 F. Supp. 3d at 963; *Massachusetts*, 462 F. Supp. 3d at 40 n.6.

[6] The holding in *Oakland* represents the nationwide consensus. "Every court to consider the question has rejected the oil-industry defendants' arguments for *Grable* jurisdiction." *Massachusetts*, 462 F. Supp. 3d at 45. Five district courts in four circuits have also considered Defendants' *Grable* arguments in similar state-law cases alleging that fossil-fuel-industry defendants misrepresented their products' dangers, and all five granted remand. *See id.* at 44–45; *San Mateo I*, 294 F. Supp. 3d at 938; *Baltimore I*, 388 F. Supp. 3d at 558–61; *Rhode Island I*, 393 F. Supp. 3d at 150–51; *Boulder I*, 405 F. Supp. 3d at 964–68. Defendants offer no reason to deviate from the consensus here, and none exists.

"proof that federal policymakers would have adopted different energy and climate policies," *id*. ¶ 144; control over navigable waters, *id*. ¶ 145; international climate treaties, *id*. ¶ 146; "injuries allegedly suffered by way of navigable waters," *id*. ¶ 147; or other "constitutional issues," *id*. ¶ 148–49. There is no *Grable* jurisdiction.

Under *Grable*, "the Supreme Court has recognized a 'special and small category' of state-law claims that arise under federal law for purposes of § 1331 'because federal law is a necessary element of the claim for relief,'" and are thus removable. *Oakland*, 969 F.3d at 904 (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 699 (2006)) (some punctuation omitted). *Grable*'s limited exception to the well-pleaded complaint rule arises only where an issue of federal law is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013) (citing *Grable*, 545 U.S. at 314). "Only a few cases have fallen into this 'slim category,'" and the Supreme Court has found jurisdiction lacking over state-law causes of action "even when the claims were premised on violations of federal law, . . . required remedies 'contemplated by a federal statute,' . . . or required the interpretation and application of a federal statute." *See Oakland*, 969 F.3d at 904 (collecting cases). Defendants cannot satisfy *Grable* here.

### 1. None of Defendants' Purported Federal Issues Is "Substantial."

Removal under *Grable* is improper because there are no "substantial" issues implicated here. *Oakland* is dispositive. There, the court explained that an issue is "substantial" when it "raises substantial questions as to the interpretation or validity of a federal statute, or when it challenges the functioning of a federal agency or program," or when it "directly draws into question the constitutional validity of an act of Congress, or challenges the actions of a federal agency, and a ruling on the issue is both dispositive of the case and would be controlling in numerous other cases." 969 F.3d at 905 (cleaned up). "By contrast, a federal issue is not substantial if it is fact-bound and situation-specific, or raises only a hypothetical question unlikely to affect interpretations of federal law in the future." *Id.*

As in *Oakland*, the County's case "neither requires an interpretation of a federal statute, nor challenges a federal statute's constitutionality," and Defendants "do not identify a legal issue necessarily raised by the claim that, if decided, will be controlling in numerous other cases." *See id.* at 906 (cleaned up). Just as in *Oakland*, "evaluation of the [County's] claim that the [Defendants'] activities amount to a public nuisance [or another alleged tort] would require factual determinations, and a state-law claim that is 'fact-bound and situation-specific' is not the type of claim for which federal-question jurisdiction lies." *See id.* at 907. And Defendants' gesturing toward "energy policy, national security, and foreign policy" may invoke "important

13

policy question[s], but it does not raise a substantial question of federal law for the purpose of determining whether there is jurisdiction under § 1331." *See id.* Jurisdiction must be rejected.

### 2. The County's Claims Do Not "Necessarily Raise" Any Issue of Federal Law.

Removal under *Grable* also fails because no federal issue is "necessarily raised" here at all. A federal question is "necessarily raised" under *Grable* only when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd.*, 463 U.S. at 28. Removal jurisdiction is "unavailable unless it appears that some substantial, disputed question of federal law is a *necessary element* of one of the well-pleaded state claims." *Id.* at 13 (emphasis added); *see also Oakland*, 969 F.3d at 904 (*Grable* jurisdiction available only where "federal law is a necessary element of the claim for relief" (citation omitted)).

The County alleges public and private nuisance, strict liability and negligent failure to warn, and trespass. Compl. ¶¶ 204–55. The rights the County seeks to vindicate, and the relief sought, stem entirely from state law. No element of the County's claims "depends on resolution of a substantial question of federal law," because there is none. *See Franchise Tax Bd.*, 463 U.S. at 28. Defendants' laundry list of theories, including congressional balancing, foreign affairs, and navigable

14

waters, are all irrelevant. None of the County's claims requires proof on those topics, which have been rejected by every court that has considered them.[7]

### 3. To the Extent Defendants' "Federal Common Law" Argument Is Cognizable Under *Grable*, It Fails.

Defendants' federal common law argument does not provide a separate basis for removal under *Grable*. *See Oakland*, 969 F.3d at 906 (holding state law nuisance claim did not necessarily raise a substantial federal common law question).

Contrary to Defendants' assertions, "the Supreme Court has not yet determined that there is a federal common law of public nuisance relating to interstate pollution," and the Ninth Circuit has "held that federal public-nuisance claims aimed at imposing liability on energy producers for 'acting in concert to create, contribute to, and maintain global warming' and 'conspiring to mislead the public about the science of global warming,' . . . are displaced by the Clean Air Act." *Id.* (citing *Am. Elec. Power Co. v. Connecticut* ("*AEP*"), 564 U.S. 410, 423 (2011) & *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 854 (9th Cir. 2012), *cert. denied*, 569 U.S. 1000 (2013)). Any federal common law that might have supplied a "substantial federal issue" to satisfy *Grable* in this case, "no longer exists." *San Mateo I*, 294 F. Supp. 3d at 937.

---

[7] *See Oakland*, 969 F.3d at 906–07, 911 n.12; *San Mateo I*, 294 F. Supp. 3d at 938; *Baltimore I*, 388 F. Supp. 3d at 559–61; *Rhode Island I*, 393 F. Supp. 3d at 151; *Boulder I*, 405 F. Supp. 3d at 965–67; *Massachusetts*, 462 F. Supp. 3d at 44.

In *AEP*, plaintiffs sued power companies in federal court, alleging that the companies' greenhouse-gas emissions violated the federal common law of interstate nuisance or, in the alternative, state tort law. 564 U.S. at 418. A unanimous Supreme Court held that "the Clean Air Act and the EPA actions it authorizes displace any federal common-law right to seek abatement of carbon-dioxide emissions from fossil-fuel fired powerplants" because it was "plain that the Act 'speaks directly' to emissions of carbon dioxide from the defendants' plants." 564 U.S. at 424. The Court expressly reserved the question whether the plaintiffs' *state* nuisance claims remained viable. *Id.* at 429.

The Ninth Circuit reinforced *AEP*'s holding in *Kivalina*. There, the plaintiff municipality brought both federal and state nuisance claims in federal court against fossil fuel and utility companies. 696 F.3d at 853–56. The district court had granted the defendants' motion to dismiss the federal claims, separately stating that it "decline[d] to assert supplemental jurisdiction over the remaining state law claims." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 663 F. Supp. 2d 863, 882–83 (N.D. Cal. 2009). Because the plaintiff did not appeal the discretionary dismissal of the supplemental state law claims, the Ninth Circuit had no occasion to address federal jurisdiction over them, much less their removability had they been filed originally in state court. Rather, the Court of Appeals applied *AEP*'s holding that the

16

CAA addresses "domestic greenhouse gas emissions from stationary sources and has therefore displaced *federal* common law." 696 F.3d at 856 (emphasis added).

Likewise, the Ninth Circuit held in *Oakland* that the plaintiffs' claims did not arise under federal common law, in part because "the Supreme Court has not yet determined that there *is* a federal common law of public nuisance relating to interstate pollution," and because, "*federal* public-nuisance claims aimed at imposing liability on energy producers" for climate crisis injuries "are displaced by the Clean Air Act." *Oakland*, 969 F.3d at 906 (emphasis added).

The federal common law of "transboundary pollution" that Defendants say "governs" here is not relevant to the County's tort claims. To the extent such common law ever existed, it was displaced by the CAA, and therefore cannot provide a basis for removal under *Grable* or otherwise. "Simply put, th[is] cas[e] should not have been removed to federal court on the basis of federal common law that no longer exists." *San Mateo I*, 294 F. Supp. 3d at 937.

### C.   There Is No OCSLA Jurisdiction.

This case is not subject to federal jurisdiction under OCSLA, 43 U.S.C. § 1349(b)(1), which provides subject-matter jurisdiction over disputes involving physical injuries on the Outer Continental Shelf ("OCS"), or where the dispute actually and directly involves OCS drilling and exploration activities, such as contract disputes between OCS contractors. Contrary to Defendants' assertions,

the method and location of Defendants' production of fossil-fuels is immaterial here, and it does not create a basis for OCSLA jurisdiction. Every court to consider Defendants' argument in an analogous case has therefore rejected it.[8]

OCSLA grants federal courts jurisdiction over cases "arising out of, or in connection with . . . any operation conducted on the [OCS] which involves exploration, development, or production of the minerals" held in certain regions of the OCS. 43 U.S.C. § 1349(b)(1). Although the Ninth Circuit has not ruled on the outer limits of OCSLA jurisdiction, Defendants' arguments fail even under a maximally broad reading of Fifth Circuit law, which sets forth a two-step test:

> whether (1) the activities that caused the injury constituted an "operation" "conducted on the [OCS]" that involved the exploration and production of minerals, and (2) the case "arises out of, or in connection with" the operation.

*In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014).

---

[8] *See, e.g.*, *Boulder I*, 405 F. Supp. 3d at 978 ("[F]or jurisdiction to lie, a case must arise directly out of OCS operations. . . . The fact that some of ExxonMobil's oil was apparently sourced from the OCS does not create the required direct connection."); *Rhode Island I*, 393 F. Supp. 3d at 151–52 (no OCSLA jurisdiction even where "Defendants' operations on the [OCS] may have contributed to the State's injuries," because "Defendants have not shown that these injuries would not have occurred but for those operations"); *Baltimore I*, 388 F. Supp. 3d at 566 ("Even under a 'broad' reading of the OCSLA jurisdictional grant endorsed by the Fifth Circuit, defendants fail to demonstrate that OCSLA jurisdiction exists."); *San Mateo I*, 294 F. Supp. 3d at 938–39 ("Removal under the [OCLSA] was not warranted because even if some of the activities that caused the alleged injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf.").

First, "the term 'operation' contemplate[s] the doing of some physical act on the OCS." *EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 567 (5th Cir. 1994). But the relevant activity here "is the concealment and misrepresentation of the products' known dangers—and simultaneous promotion of their unrestrained use—that allegedly drove consumption, and thus greenhouse gas pollution, and thus climate change." *Baltimore II*, 952 F.3d at 467; *see also Rhode Island II*, 2020 WL 6336000, at *7; *see, e.g.*, Compl. ¶¶ 12, 160. Defendants' deception is not an "operation" conducted on the OCS. *See Boulder I*, 405 F. Supp. 3d at 978–79; *Baltimore I*, 388 F. Supp. 3d at 566–67. "[F]or jurisdiction to lie, a case must arise directly out of OCS operations," and "[t]he fact that some of [Defendants'] oil was apparently sourced from the OCS does not create the required direct connection" between the County's claims and an operation on the OCS. *Boulder I*, 405 F. Supp. 3d at 978. Courts routinely refuse to exercise jurisdiction over cases like this one, where the claims are only tangentially related to mineral exploration and production on the OCS, and where granting relief would have no effect on those operations.[9]

---

[9] *See, e.g.*, *LLOG Expl. Co. v. Certain Underwriters at Lloyd's of London*, No. CIVA 06-11248, 2007 WL 854307, at *5 (E.D. La. Mar. 16, 2007) (no OCSLA jurisdiction over insurance dispute "regarding damages to production facilities that have already occurred" because suit "does not affect or alter the progress of production activities on the OCS, nor does it threaten to impair the total recovery of federally owned minerals from the OCS"); *Parish of Plaquemines v. Total Petrochem. & Refining USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014) (no OCSLA jurisdiction where injurious conduct occurred in state waters, even though it "involved pipelines that

Second, a case "arises out of, or in connection with" an OCS operation when (1) the plaintiff "would not have been injured 'but for'" the operation, *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988), and (2) granting relief "threatens to impair the total recovery of the federally-owned minerals" from the OCS, *EP Operating Ltd. P'ship*, 26 F.3d at 570. Neither apply here.[10] "[T]he 'but-for' test . . . is not limitless" and must be applied in light of the OCSLA's overall goals. *Plains Gas Sols.*, 46 F. Supp. 3d at 704–05. "[A] 'mere connection' between the cause of action and the OCS operation" that is "too remote" will not "establish federal jurisdiction." *Deepwater Horizon*, 745 F.3d at 163. Here, the County's claims are based on Defendants' failure to warn consumers and the public of known dangers associated with fossil fuel products, and Defendants' campaign to deceive the public regarding those dangers—no matter where or by what operations some products' constituent elements were originally extracted. *See, e.g.*, Compl. ¶ 12. Defendants' assertion that OCSLA jurisdiction attaches because "a substantial part" of oil and

---

ultimately stretch to the OCS"); *Brooklyn Union Expl. Co. v. Tejas Power Corp.*, 930 F. Supp. 289, 292 (S.D. Tex. 1996) ("A controversy exclusively over the price of gas which has already been produced, as in the instant case, simply does not implicate the interest expressed by Congress in the efficient exploitation of natural resources on the OCS.").

[10] Defendants' assertion that "Plaintiff also alleges that emissions have risen due to increased OCS extraction technologies," NOR ¶ 19 (citing Compl. ¶¶ 132–35), is a purposeful mischaracterization. Those paragraphs refer to actions by Defendants that belied their climate denialist communications to the public, such as "raising offshore oil platforms to protect against sea level rise." *See* Compl. ¶ 131.

natural gas production arise from OCS operations, NOR ¶ 19, amounts to an "argument that there is federal jurisdiction if any oil *sourced* from the OCS is some *part* of the conduct that creates the injury," which would "dramatically expand the statute's scope." *See Boulder I*, 405 F. Supp. 3d at 979. Defendants have not met their burden to show that the County would not have suffered its injuries but for Defendants' operations on the OCS—even assuming some quantum of fossil fuels originating from the OCS contributed to them.[11]

Nor will granting relief here threaten to impair recovery from the OCS. Defendants' argument that the County's "request for abatement is functionally the same as seeking to *enjoin* Defendants' production of oil and gas," NOR ¶ 21, mischaracterizes the law and the Complaint. On the law, contrary to Defendants' suggestion, *Haynes v. Haas* simply adopted a rule that allows an individual plaintiff

---

[11] Defendants have argued in every similar case that the sheer volume of their production on the OCS means their OCS operations must be a but-for cause of the plaintiff's injuries, therefore satisfying OCSLA jurisdiction. Every court has rejected that argument. *See San Mateo I*, 294 F. Supp. 3d at 938–39; *Boulder I*, 405 F. Supp. 3d at 979; *Rhode Island I*, 393 F. Supp. 3d at 151–52; *Baltimore I*, 388 F. Supp. 3d at 566–67. Moreover, Defendants' citation to a Congressional Research Service Report to support their argument that production of fossil fuels from the OCS is and has been substantial falls flat. *See* NOR ¶ 19. The Report examines fossil fuel production from federal areas generally, rather than providing information on OCS production specifically, and in fact notes that crude oil production on federal lands *fell* from 36% (2009) to 24% (2017), and the decline of natural gas production on federal lands "can be attributed to offshore production falling by over 55%." *See* Cong. Rsch. Serv., R42432, U.S. Crude Oil and Natural Gas Production in Federal and Nonfederal Areas 1, 4 (updated Oct. 23, 2018), https://crsreports.congress.gov/product/pdf/R/R42432.

to sue for damages under a public nuisance theory. 146 Hawai'i 452, 461 (2020). The *Haynes* court did *not* hold that a prohibitory injunction is the only available abatement remedy, as Defendants imply. *See id.* (noting "[i]t may be reasonable to continue an important activity if payment is made for the harm it is causing but unreasonable to continue it without paying"). On the facts, the County seeks only to abate hazardous climate change-related impacts existing "in and near the County" (Compl. Part VII) through local measures such as mitigating flooding. No such relief could "threate[n] to impair the total recovery of the federally-owned minerals" from the OCS. *EP Operating Ltd. P'ship*, 26 F.3d at 570.

To find that OCSLA grants jurisdiction here would mean that any spill of gasoline sourced from some fraction of OCS oil, and any claims for nuisance abatement or monetary damages against fossil-fuel companies for any reason, could be removed to federal court. Neither the OCSLA statute nor any case law permits such an absurd result. *See Boulder I*, 405 F. Supp. 3d at 979.

### D.   There Is No Federal Officer Removal Jurisdiction Because No Federal Officer Directed the Defendants' Tortious Conduct.

Defendants' federal officer removal arguments under 28 U.S.C. § 1442 are meritless. The Ninth Circuit in *San Mateo II* squarely rejected Defendants' argument that they "acted under" federal officers in supplying or formulating fossil fuels for the government, 960 F.3d at 600–03, and the other appellate courts considering similar cases have either agreed; held that there is no sufficient relationship between

Defendants' dealings with the federal government and plaintiffs' claims; or both.[12]

Nothing in Defendants' removal notice provides a different result.

While courts generally interpret the federal officer removal statute more broadly than other grounds for removal, *see Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014), that breadth is not without limit. Any theory of the case to which the Court gives "credit" while resolving its federal officer jurisdiction must be grounded in the allegations actually present in the Complaint. *See Rhode Island II*, 2020 WL 6336000, at *7 (affirming dismissal for lack of federal officer jurisdiction because defendants' theory of the case was a "mirage" untethered to the complaint).[13]

---

[12] *Rhode Island II*, 2020 WL 6336000 at *7 ("There is simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer."); *Baltimore II*, 952 F.3d at 463, 467–68 (holding that NEXCOM contracts did not satisfy "acting under"; doubting that Elk Hills contract satisfied "acting under" but certainly was not "for or relating to" prong; and OCS leases satisfied neither); *Boulder II*, 965 F.3d at 826–27 (Defendants were not "acting under" federal officer while adhering to OCS leases).

[13] Defendants' reliance on *Jefferson County* is therefore misplaced, because there, the parties' competing theories of the case were interpretations of an integral component of the complaint: the occupational tax ordinance that created the plaintiff's claims. 527 U.S. at 432. In crediting the defendants' theory, the Court was still evaluating a theory grounded in the plaintiff's allegations that the defendants had violated the ordinance. *See id*. at 432–33 (finding that, to the extent the ordinance made it illegal for defendants to engage in their federal judgeships without paying the tax, their refusal to pay had a nexus to their activity under color of federal office). Although Justice Scalia disagreed that the defendants' failure to pay the tax was connected to their federal judgeships, his partial dissent articulates the natural limits of the "credit" courts may give to defendants' characterizations of complaints in assessing federal officer removal: "When identifying, for purposes of § 1442(a)(3), what a suit is 'for,' it is necessary to focus, not on grounds of liability that the

Here, Defendants' theory of the case—that their exploration for and production and provision of fossil fuel products to the government are bases for the County's claims—bears no relation to what the County *actually* asserts. Rather, liability here rests on Defendants' disinformation and deception campaign, and the County expressly disclaims liability for injuries arising out of fossil fuel dealings with the government. *See, e.g.*, Compl. ¶¶ 1–3; 14; *see also Rhode Island II*, 2020 WL 6336000, at *7. "[The County's] claim is simple: the oil companies knew what fossil fuels were doing to the environment and continued to sell them anyway, all while misleading consumers about the true impact of the products." *Id*. at *2. In resolving federal officer jurisdiction, the Court should not "credit" Defendants' theory of the case when it has no basis in the Complaint.

### 1.      Defendants Cannot Show They Were Acting Under a Federal Officer.

The "acting under" analysis looks at the nature of the relationship between the government and the private defendant to determine whether the complained-of conduct was taken "under color of such [federal] office." 28 U.S.C. § 1442(a)(1). Factors evidencing the high degree of federal control necessary to create the "acting under" relationship include whether the defendant: (1) acted "on behalf of the federal officer in a manner akin to an agency relationship;" (2) "act[ed] under the

_____

plaintiff *could* assert, but on the ground *actually* asserted." *Id*. at 444 (Scalia, J., concurring in part, dissenting in part).

'subjection, guidance, or control' of the officer, or in a relationship which 'is an unusually close one involving detailed regulation, monitoring, or supervision;'" (3) was "fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm"; and (4) undertook actions "so closely related to the government's implementation of its federal duties" that it would "face[] 'a significant risk of state-court prejudice'" by defending itself in state court. *See San Mateo II*, 960 F.3d at 599–600 (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152–53 (2007).

Notwithstanding these factors, the Supreme Court and Ninth Circuit have determined that certain conduct categorically does not qualify as "acts under color of federal office:"

> By contrast, a person is not "acting under" a federal officer when the person enters into an arm's-length business arrangement with the federal government or supplies it with widely available commercial products or services. Nor does a person's "*compliance* with the law (or *acquiescence* to an order)" amount to "'acting under,' a federal officer who is giving an order or enforcing the law." This is true "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."

*Id*. at 600 (citations omitted). *San Mateo II* forecloses Defendants' argument that they "acted under" any federal officer in a way that could confer removal jurisdiction here. As there, the facts alleged in the Notice show, at most, that certain Defendants entered "arm's-length business arrangement[s] with the federal government" or complied with federal law during the period relevant to the Complaint. *Id*. And

federal involvement in Defendants' dealings with the government does not alone satisfy § 1442 without demonstrating the likelihood of prejudice that underlies the purpose for federal officer removal jurisdiction. *See id.* at 600–02.

> **a. A Purported General Federal Policy Interest in Domestic Fossil Fuel Production Cannot Satisfy the "Acting Under" Requirement.**

Defendants' excursion into the history of federal energy policies and fuel shortages does not show that when they committed the alleged tortious acts here, they were acting under the "subjection, guidance, or control" of a federal officer, or "assisting the federal officer in fulfilling 'basic governmental tasks' that 'the Government itself would have had to perform' if it had not contracted with a private firm." *San Mateo II*, 960 F.3d at 599 (quoting *Watson*, 551 U.S. at 153–54). Rather, their citations illustrate a universal *demand* for fossil fuels during conflicts in the twentieth century, but describe conditions temporally irrelevant to the tortious conduct alleged in the Complaint *and* devoid of federal involvement.[14] Any evidence of the relationships through which they satisfied the United States' segment of that demand is extremely limited, and merely illustrates arms-length commercial

---

[14] For instance, Defendants cite a book chronicling British development of internal combustion war machines and the corresponding demand for oil during World War I. Ex. 20 at 170–77. But that citation lacks any discussion of Defendants' conduct at the direction of the federal government, and nothing in the Complaint deals with Defendants' conduct during the period examined in that document, 1914 to 1917. *See id.*; *see also* Ex. 21 at 42–43 (describing the mechanization of Allied military equipment during World War I without mentioning any Defendant).

relationships not subject to federal officer removal. For instance, the Government facilitated expanded OCS production during the Arab Oil Embargo not by forcing Defendants to produce any particular quantity of oil from their leases, but instead by expanding the federal acreage available on the OCS to entice Defendants to apply for those potentially commercially lucrative leases. NOR ¶ 37.[15] Defendants demonstrate no federal compulsion to seek, let alone operate and produce from OCS leases—and proffer no federal interest in their deceptive marketing and disinformation campaign at all. At best, Defendants show there was demand for their products, and federal policies provided oil companies opportunities to satisfy that demand. But that is insufficient to confer federal officer removal jurisdiction, because it would "expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *Watson*, 551 U.S. at 153.[16]

Defendants cite various sources regarding the government's "vital national interest in assuring adequate energy sources for the national defense and economic

---

[15] *See also* NOR ¶ 36 n.39 (citing Excerpts from Nixon Message, N.Y. TIMES (Apr. 19, 1973), https://www.nytimes.com/1973/04/19/archives/excerpts-from-nixon-message-developing-our-domestic-energy.html); *id.* ¶¶ 39, 40 n.46 (noting that the Federal Energy Administration Act facilitated production by "accelerat[ing]" leasing on the OCS, not by mandating production).

[16] For that reason, Defendants' citation to *Exxon Mobil Corp. v. United States*, No. CV H-10-2386, 2020 WL 5573048 (S.D. Tex. Sept. 16, 2020), is inapposite. That case involved the Government's role in hazardous waste releases at refineries during

well-being." NOR ¶ 27. But private businesses are not entitled to federal officer removal simply because their industries are nationally important, and Defendants' *own* bluster concerning that importance cannot change the result.[17] In *Riggs v. Airbus Helicopters*, for example, a helicopter manufacturer removed a wrongful death and product defect action on federal officer grounds, arguing that it acted under a federal officer when it self-certified its helicopter's compliance with FAA safety regulations. 939 F.3d 981, 983–84 (9th Cir. 2019), *cert. denied*, __ S. Ct. __, No. 19-1158, 2020 WL 3492671 (U.S. June 29, 2020). The Ninth Circuit disagreed, holding that the language of the regulations governing the FAA's delegation of authority, and the defendant's own description of its participation, "suggest a relationship based on compliance rather than assistance to federal officers," insufficient to satisfy § 1442's "acting under" requirement. *Id*. at 988–89. It made no difference that Congress instructed the FAA Administrator to consider "assigning, maintaining, and enhancing safety and security as the highest priorities in air commerce," including when delegating certification authority. *See* 49 U.S.C.

---

WWII and the Korean War for the purpose of allocating liability under CERCLA, 42 U.S.C. § 9601 *et seq*. *See Exxon*, 2020 WL 5573048 at *1. It did *not* consider whether the Government's control over refining activities would have engendered undue "local prejudice" in state court warranting federal officer removal. *See San Mateo II*, 960 F.3d at 599. Nor did it assess the Government's role in the deceptive marketing and disinformation campaign at the crux of the County's claims.

[17] *See, e.g.*, NOR ¶ 32 (citing Ex. 23, a position paper prepared by the National Petroleum Council, for the proposition that oil is "a bulwark of our national security").

§ 40101(d)(1). The actual conduct at issue involved "mere compliance" with federal regulations, and the court thus affirmed remand. *Riggs*, 939 F.3d at 989; *see also Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1099–100 (9th Cir. 2018) (no federal officer jurisdiction where defendant delayed delivery of parts for end sale to foreign military, notwithstanding national security interest in arms sales regulations).

Defendants' encomium to the national importance of the oil and gas sector is no different from the importance of aircraft safety in *Riggs*, or arms export regulation in *Fidelitad*. The outcome is also the same: Defendants' arguments that the government has a "vital national interest in ensuring adequate energy sources," NOR ¶ 27, does not mean Defendants' production of oil and gas (much less their disinformation campaign) was "assisting the federal officer in fulfilling 'basic governmental tasks' that 'the government itself would have had to perform' if it had not contracted with a private firm." *San Mateo II*, 960 F.3d at 599.

### b. Defendants' Transactions with the Military Do Not Establish That They Engaged in Their Deception Campaign at the Direction of Federal Officers.

Defendants' evidence involving interactions with the military only supports arguments already rejected in previous cases.[18] To the extent it presents the military-industrial relationship from a different angle, it still fails to show that Defendants acted under federal officers in any way relevant to this case.

---

[18] *See San Mateo II*, 960 F.3d at 600–602; *Baltimore II*, 952 F.3d at 463–64.

***World War II and the Korean War.*** Defendants were not "under the 'subjection, guidance, or control'" of a federal officer in providing fuel to the military during World War II and the Korean War (the "Wars") in any manner that supports federal officer jurisdiction here.[19] *Id.* (citation omitted). Rather, even setting aside the disinformation campaign on which the Complaint rests, Defendants' evidence speaks to a cooperative, mutually beneficial relationship between the military and the industry. For instance, the historical report Defendants cite frames the Petroleum Administration for War's ("PAW") relationship with the industry as a "partnership" that was "dedicated to the proposition that cooperation, rather than coercion, was the formula by which the forces of Government and industry could best be joined." Ex. 10 at 1. In meeting the Government's demand for oil during WWII, it was, in fact "[t]he oil industry [that] produced the oil that produced results.

---

[19] Defendants' references to fact findings in other cases do not support their arguments. *Shell Oil Co. v. United States*, 751 F.3d 1282 (Fed. Cir. 2014), and *Exxon*, 2020 WL 5573048, are not applicable here for the reasons set forth in note 16, *supra*. *See also San Mateo II*, 960 F.3d at 599. *United States v. Shell Oil Co.*, also a CERCLA case, underscores the cooperative relationship between industry and the military during WWII, noting that, despite its war powers, the military "relied almost exclusively on contractual agreements to ensure avgas production," and "the Oil Companies designed and built their facilities, maintained private ownership," "managed their own refinery operations," and "affirmatively sought contracts to sell avgas to the government," which "were profitable throughout the war." 294 F.3d 1045, 1049–50 (9th Cir. 2002).

*No Government agency had to compel them to do the job.*" *Id.* at 169 (emphasis added).[20]

Similarly, wartime infrastructure projects like the "Big Inch" and "Little Big Inch" pipelines were products of "wartime teamwork" between the government and outgrowths of the industry. *Id.* at 108. And perhaps more relevant, War Emergency Pipelines, Inc. ("WEP")—the entity that built and operated the pipelines—is not a Defendant in this case. *See Schmitt v. War Emergency Pipelines*, 175 F.2d 335, 335 (8th Cir. 1949). While a handful of Defendants' affiliates held minority shares in WEP, *see* Ex. 44 at 1–2, WEP would have been the proper entity to evaluate "acting under" with respect to pipeline construction and any "directives"[21] concerning its operation, which of course are unrelated to the County's claims. But it dissolved in 1947, well before the unlawful conduct at issue here. *Id.* at 3–4.

---

[20] Defendants' Exhibit 38, a statement of a PAW official, states that the success of the "intricate military supply procedure depended in large measure upon close cooperation between PAW and the industry as well as with the military forces" and that PAW's role was "to designate *for* the military," and not *to* the oil industry, which companies could supply the required products, in what quantities, and when. Ex. 38 at 212 (emphasis added). At most, PAW designated that a fraction of a particular refinery's output be committed to "military products." *Id.* But Defendants do not identify such products as fossil fuels, let alone detail which Defendant(s) produced them or in what quantity, as to carry their burden to establish jurisdiction.

[21] Defendants' citation to a congressional committee hearing statement by WEP's president discussing the disposition of the Big Inch and Little Inch pipelines after WWII, Ex. 45 at 25–26, in no way establishes the relationship between any Defendant and a federal officer such as would enable the "acting under" analysis, and should therefore be disregarded.

31

Defendants offer no compelling evidence of actual coercion by the PAW over their wartime production. *See* NOR ¶ 94. Instead, they offer a speech hypothesizing a need for unspecified alternatives to voluntary public rationing as a means of bolstering avgas supplies, Ex. 39 at 8; and a telegram discussing measures to ensure oil company responses to an earlier telegram, Ex. 22. Neither document demonstrates an actual instance of federal subjection to produce oil (let alone to deceptively market it), nor carries the weight of coercion necessary to establish the "acting under" element. *See, e.g.*, *Kelly v. Monsanto Co.*, No. 4:15 CV 1825 JMB, 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016) (granting remand where the defendants failed to show that a defendant "was compelled to produce the PCBs under threat of criminal sanction"). The record here is similarly devoid of actual directives requiring any "changes to Defendants' refining equipment and operations" during the Wars. NOR ¶ 95 (citing an advisory report, Ex. 40 at 40, for the unremarkable observation that "a refiner cannot build the equipment for making [a] fuel without knowing what its composition must be").

***Compliance with the Defense Production Act.*** Defendants' proffered "directives" under the Defense Production Act of 1950 ("DPA") similarly do not demonstrate federal control or an agency relationship regarding the tortious conduct at issue. *See* NOR ¶¶ 103–04. The "production orders," NOR ¶ 103, did not demand any specific formulation or quantity of fuel for the military; instead, they merely

restrained the use of certain fuel additives in non-military applications to ensure adequacy of supply for military avgas. *See* Ex. 46 at 122. The suggestion that Defendants were directed to produce under the DPA for two months in 1973, *e.g.*, Ex. 49, is insufficient to establish that they "act[ed] under" federal authority. *See New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1141, 1146 (D.N.M. 2020) (compliance with DPA insufficient to establish "acting under" element under *Watson*). Moreover, the proffered directives did not require Defendants to *produce* any specific quantity of their products, but instead "to *divert* petroleum supplies, such as gasoline and jet fuel, that would otherwise[] have gone to the civilian sector." Ex. 49 at 3 (emphasis added). And any such provision to the Government—which amounted to about one day's worth of domestic consumption of petroleum products in 1973, *id.*—was a minute fraction of Defendants' total production during the period relevant to the Complaint, and is irrelevant to the County's claims. *See, e.g., Kelly*, 2016 WL 3543050, at *9 (rejecting federal officer jurisdiction where insignificant fraction of defendants' PCBs were sold to military).

***Specialized Jet Fuel:*** Defendants' evidence concerning their provision of "specialized" fuels to the military is limited to their dealings related to jet fuel and illustrations of specific fuel standards, but again fails to demonstrate the relationship between any Defendant and the military that is critical to the "acting under" analysis. *See Watson*, 551 U.S. at 151–52. In some cases, there is no clear relationship

between the defendant and the federal government at all. For instance, any "subjection, guidance, or control," *id.* at 151, Shell may have endured in developing jet fuel for certain spy planes came from aircraft manufacturer Lockheed, not the federal government. *See* Ex. 50 at 61–62 (describing Shell's assistance in solving Lockheed engineers' technical quandary). Defendants also cite an irrelevant memoir describing a Lockheed employee's relationship with military staff during development of the SR-71 Blackbird that has no bearing on any *Defendant's* actions taken under color of federal office. *See generally* Ex. 52.

Tesoro's commercial contracts with the military, Ex. 62, evidence exactly the type of arms-length business relationship that does not support federal officer jurisdiction under *San Mateo II*, 960 F.3d at 600. The federal form solicitations for certain products and evidence of Tesoro's assent, *see generally*, Ex. 62, hardly evidence the types of "detailed regulation, monitoring, or supervision," over Tesoro's production decisions and processes that could warrant federal officer jurisdiction. *Watson*, 551 U.S. at 153. To the contrary, the military's control over Tesoro's performance is limited to a right to inspect the contract goods prior to

delivery.[22] *E.g.* Ex. 62 at 115, 130.[23] Moreover, these excerpts confirm the government did *not* solicit fossil fuel companies to engage in deception campaigns concerning military jet fuel, let alone compel such conduct. *Id*. Nor did the government force Tesoro to enter contracts or control Tesoro's sales, advertising, processing, or refining activities. *Id*. The fact that the Government specified certain chemical requirements in the fuels it purchased, including the use of "static dissipator additive," "fuel system icing inhibitor," and "corrosion inhibitor/lubricity inhibitor," *see* NOR ¶¶ 108–13, is immaterial because the County's claims have nothing to do with the inclusion of those components in Defendants' products.

None of the contracts establish that any Defendant's fuel-related duties were "the duties or tasks of [a] federal superior" or that their relationship with any federal superior involved federal "subjection, guidance, or control" over conduct addressed by the County's claims. *Watson*, 551 U.S. at 151–52. Defendants demonstrate no

---

[22] Similarly, evidence of federal control over Shell's performance of contracts for "Processing Fluid (PF-1)" is limited to a reservation of right to inspect goods prior to delivery, packaging and labeling specifications, and a requirement that Shell maintain secrecy around its performance. Exs. 53 Parts III, IV, VIII, & X; 54 (amending same). Evidence of Shell's purported "testing" of fuels for the military fails to illustrate any federal directive to conduct the test, doesn't explain how the County's claims arise out of that test, and in any case is limited to a single instance of the military testing 100,000 gallons of fuel—too small to be material to the County's claims. *See* Ex. 61 at ECF PageID 1074). And in any case, these do not show federal directives to misinform the public about fossil fuel products.

[23] ECF PageIDs 1191, 1206.

compulsion to produce specialized jet fuel, let alone a compulsion to misrepresent the consequences of using it. This evidence cannot satisfy the "acting under" test.

### c. Defendants' Fossil Fuel Production Under Federal Oversight Is Not a Basis for Federal Officer Jurisdiction.

*OCSLA and MLA leases.* The Ninth Circuit in *San Mateo II* unambiguously held that fossil-fuel companies do not "act under" federal officers when they extract oil and gas from the OCS pursuant to federal mineral leases. *See* 960 F.3d at 602–03; *accord Boulder II*, 965 F.3d at 826; *Baltimore II*, 952 F.3d at 465–66; *Rhode Island II*, 2020 WL 6336000, at *6. Nevertheless, Defendants urge this Court to depart from binding precedent based on two meritless arguments.

First, Defendants claim their performance under OCS leases works to "further the national interest, not merely the commercial interests of the lessees," NOR ¶ 51, a point they underscore by inaccurately suggesting Congress proposed to "create a national oil company."[24] Although plenty of economic activities can be said to

---

[24] NOR ¶ 47, Ex. 9 (Sen. Hollings introducing OCSLA Amendments bill of 1975). Under Senator Hollings' actual proposal, "[l]easing [OCS mineral rights] *to private companies* would await the availability of much-needed data on the size and location of oil and gas in new areas" gathered by the government, because "[w]ith better information, we can be sure that *bids for production rights* on federally explored tracts are truly representative of the value of the resources." Ex. 9 at S904 (emphases added). The bill would not have created a "national oil company"; to the contrary, it would have simply enabled the government to extract higher royalties from *private lessees* developing the OCS. The legislative history of the law that actually passed, contained in Defendants' own exhibits, also shows that Congress's purpose in amending OCSLA was to permit private exploitation of OCS oil and gas. A select

further the national interest—grazing and timber harvest on federal lands, agriculture, or even a robust stock market—private entities engaging in those activities do not automatically become federal officers because of the national importance of their industries. *See* Part IV.D.1.a, *supra*. The Ninth Circuit rejected the same arguments in *San Mateo II*, emphasizing that these leases "do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties." 960 F.3d at 602–03. The court explained that exercising jurisdiction would not serve the purposes of federal officer removal, because lessees are not "engaged in an activity so closely related to the government's function that the lessee faces a 'significant risk of state-court prejudice.'" *Id.*

Second, Defendants offer various examples of federal leasing program requirements, but none rise to the level of federal control needed for federal officer jurisdiction here. Defendants note that OCS lessees "must prepare and comply with detailed plans that are subject to [federal] comment and amendment." NOR ¶ 53. They also claim that the government's control extends over the disposition of OCS oil and gas after extraction, asserting the government "conditions OCS leases with a

_____

committee report stated that lessees would "face more and stricter regulation" from the House amendment bill, but would "also enjoy less red tape, [and] fewer delays" to ameliorate "industry complaints about 'overregulation.'" Ex. 27 at *48. The committee made clear that "[p]rivate energy companies will continue to be the major explorers for oil and gas, and the developers and producers of these resources." *Id.* at *49. The law encourages private development and does not resemble Defendants' hypothetical nationalized oil company. *Id.* at *50.

right of first refusal to purchase all minerals '[i]n time of war or when the President of the United States shall so prescribe'" (*id.* ¶ 59), and that the government "may compel" a lessee to offer a percentage of lease production "to small or independent refiners" (*id.* ¶ 60). But *San Mateo II* analyzed the same lease terms and found they "largely track legal requirements" in OCSLA itself, mere compliance with which cannot, by itself, satisfy the "acting under" requirement. *See* 960 F.3d at 602–03.

The rest of Defendants' purported evidence of governmental control fares no better. Defendants highlight, for instance, boilerplate language in OCS leases that require lessees to "exercise diligence in the development of the leased area" and to "conform to sound conservation practices to preserve, protect, and develop minerals resources and maximize the ultimate recovery of hydrocarbons from the leased area." Ex. 5 at 2. The Ninth and Fourth Circuits both rejected Defendants' reliance on analogous terms in other contracts with the federal government because they "'seem typical of any commercial contract' and are 'incidental to sale and sound in quality assurance.'" *San Mateo II*, 960 F.3d at 601 (quoting *Baltimore II*, 952 F.3d at 464). The "typical commercial lease" Defendants now proffer to support their argument is a form commercial lease from the Texas Association of Realtors, *see* Ex. 28, that has nothing to do with oil or gas leasing, a specialized arrangement that exists subject to applicable federal or state regulations. The OCS and MLA lease terms "evince an arm's-length business relationship" between the government and

Defendants. *San Mateo II*, 960 F.3d at 601. They do not satisfy § 1442.[25]

Finally, Defendants cite various federal regulations that allow the government to set "a cap on the production rate" from OCS wells. NOR ¶ 57. At most, those suggest that "OCS resource development is highly regulated." *Baltimore II*, 952 F.3d at 465. And as the Fourth Circuit explained in rejecting nearly identical arguments, "'differences in the degree of regulatory detail or supervision cannot by themselves transform . . . regulatory *compliance* into the kind of assistance' that triggers the 'acting under' relationship." *Baltimore II*, 952 F.3d at 465 (citation omitted).

**Elk Hills Reserve.** Defendants next argue that Standard Oil (Chevron's predecessor), and later Chevron operated the Elk Hills Reserve under the "control" of the Navy based on a Unit Plan Contract ("UPC") executed in 1944. NOR ¶¶ 71, 81; Ex. 6. But the Ninth Circuit analyzed the exact same UPC in *San Mateo II* and held that Standard's activities under the "arm's-length business arrangement" did not give rise to an "acting under" relationship because Standard was not acting on behalf of the government to perform a basic government function. 960 F.3d at 602. "Rather, Standard and the government reached an agreement that allowed them to

---

[25] This conclusion does not change simply because those particular lease requirements concern fossil-fuel production, as opposed to other aspects of OCS exploration or development. *See Boulder II*, 965 F.3d at 821. Indeed, in *San Mateo II*, the Ninth Circuit concluded that contractual agreements which control the level of an oil company's production of fossil fuels do not necessarily "give rise to a relationship where [the oil company] was 'acting under' a federal officer for purposes of § 1442." 960 F.3d at 602.

coordinate their use of the oil reserve in a way that would benefit both parties: the government maintained oil reserves for emergencies, and Standard ensured its ability to produce oil for sale." *Id*.; *accord Baltimore II*, 952 F.3d at 471.[26]

Likewise, Defendants fail to present evidence to support that the Navy's hiring of Standard as a contractor to operate the reserve "give[s] rise to the 'unusually close' relationship" that satisfies the acting under requirement. *San Mateo II*, 960 F.3d at 603 (quoting *Watson*, 551 U.S. at 153). Defendants cite a GAO report outlining the history of the reserve, NOR ¶ 69 n.86, and an unattributed statement that Standard "*offered* to perform the work without making a profit," NOR ¶ 78 (citing Ex. 31).[27] But these documents show only "an arm's-length business arrangement with the Navy." *See San Mateo II*, 960 F.3d at 602. Standard's unilateral termination of its operatorship, Ex. 33, further illustrates the arms-length relationship, and shows Standard's operation was "not an activity so closely related to the government's implementation of federal law that [Standard] faces a significant risk of state-court prejudice." *San Mateo II*, 960 F.3d at 601 (quotation omitted).

---

[26] Defendants cite to observations of the federal-industrial relationship under the UPC made to a congressional committee by a special advisor and a Naval Director, Exs. 29 & 30. But such statements do not change the fact that *San Mateo II* controls here, especially given that the statements post-date the execution of the UPC by two years, the *San Mateo II* court already considered the history of the UPC, *see* 960 F.3d at 601 (citing to *United States v. Standard Oil Co.*, 545 F.2d 624 (9th Cir. 1976)), and Defendants largely rely on the terms of the UPC itself to make their argument, *see e.g.*, NOR ¶¶ 72–77 (citing Ex. 6).

[27] The operator's contract provides a fee paid to Standard. *See* Ex. 32, § 5.

40

Additionally, the GAO report on which Defendants rely establishes that Standard's operation of the reserve was "marked by the congressional intent to *retain the oil in the ground* except when it was needed for national defense or to avoid damage to the field and the irretrievable loss of oil." *See* GAO Report, cited in NOR ¶ 69 n.86, at 2 (emphasis added). For most of its life, production at the reserve was maintained at "minimum" levels to extract as little as possible, and Standard's operation entailed simply maintaining the field. *Id.* at 15. Even if Standard's conduct in *not* producing oil at the field could satisfy the acting under requirement—and it is not clear that it could—it has no relation to the conduct at issue here.

Finally, the changes at the Elk Hills reserve in response to the oil crisis of the 1970s only confirm that private production at the reserve was not done at the behest of a federal superior. The 1974 congressional authorization Defendants refer to concerning development of the reserve culminated in the Naval Petroleum Reserve Production Act of 1976 ("NPRPA"). In the Act, "Congress determined that the Navy no longer needed to maintain a petroleum reserve for a national emergency," and the parties "executed an amendment to the UPC, removing any reference to the need for a petroleum reserve and substituting language emphasizing the new national policy to encourage *economic productivity*." *Chevron U.S.A., Inc. v. United States*, 110 Fed. Cl. 747, 754 (2013) (emphasis added). The NPRPA directed that reserve oil be sold "at public sale to the highest qualified bidder," on terms "so structured as

41

to give full and equal opportunity for the acquisition of petroleum by all interested persons, including major and independent oil producers and refiners alike," without "creat[ing] or maintain[ing] a situation inconsistent with the antitrust laws." 10 U.S.C. §§ 7430(b)(1), (d), (g)(2).

Ultimately, the government's role at Elk Hills became that of a market participant offering its oil for sale at public auction. The field has "generated over $17 billion for the U.S. Treasury," NOR ¶ 84, precisely because the government sold oil on the open market; any role Chevron played as operator there was, once again, an "arm's-length business arrangement" to develop the reserve and bring the oil to market. *See San Mateo II*, 960 F.3d at 602. It did not involve the kind of subjection, guidance, and control necessary to satisfy § 1442.

**Strategic Petroleum Reserve ("SPR").** This same reasoning precludes a finding that Defendants were acting under a federal officer when they produced oil and operated infrastructure for the SPR. NOR ¶¶ 86–91. The SPR constitutes the United States' emergency crude oil supply and is principally filled through royalty-in-kind ("RIK") transfers from Defendants and others, which accrue to the United States pursuant to OCS leases. NOR ¶¶ 86, 88. But RIKs are nothing more than the type of commercial transactions that the Ninth, Fourth, and Tenth Circuits have found do not support federal officer removal, as compliance with federal law is not enough. *San Mateo II*, 960 F.3d at 602–03; *Baltimore II*, 952 F.3d at 465–66;

42

*Boulder II*, 965 F.3d at 823. "'[T]he willingness to lease federal property or mineral rights to a private entity for the entity's own commercial purposes, without more' cannot be 'characterized as the type of assistance that is required' to show that the private entity is 'acting under' a federal officer." *San Mateo II*, 960 F.3d at 603 (quoting *Baltimore II*, 952 F.3d at 465).[28]

### 2.   There Is No Causal Connection Between Defendants' Campaign of Deception and the County's Claims.

To invoke § 1442(a)(1), Defendants must also establish that "there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and [the] plaintiff's claims." *San Mateo II*, 960 F.3d at 598. Conduct done "acting under" a federal officer satisfies the causal nexus requirement only when "such action is causally connected with the plaintiffs' claims." *Id.* Defendants' allegations do not satisfy § 1442's nexus requirement, no matter how it is framed or applied.

The nexus is present only when the defendant's "challenged acts occurred *because of* what they were asked to do by the Government." *Goncalves By & Through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1245 (9th

---

[28] Defendants' evidence does not change the result, and indeed makes clear that the Government "decided not to exercise its discretionary authority" to mandate that oil companies store any portion of their product at an unrealized industrial component of the SPR. Ex. 35 at 32. To the extent Defendants participated in SPR operations, they did so by merely *transporting* oil pursuant to RIK contracts, Ex. 37, conduct that doesn't implicate Defendants' spurious theory of the case, much less the disinformation campaign at the heart of the County's claims.

Cir. 2017) (quotations and citation omitted). Defendants cite exclusively out-of-circuit authority to suggest that the Removal Clarification Act of 2011 dramatically relaxed the causal connection requirement. *See* NOR ¶¶ 116. While some circuits have held that their pre-2011 application of the nexus element did not survive the Removal Clarification Act, *see, e.g.*, *In re Def. Ass'n of Philadelphia*, 790 F.3d 457, 471 (3d Cir. 2015), *as amended* (June 16, 2015), the Ninth Circuit's application of the "causally connected" standard, *San Mateo II*, 960 F.3d at 598, remains consistent with the language and purpose of § 1442 as amended. *See Ulleseit v. Bayer HealthCare Pharm. Inc.*, 826 F. App'x 627, 629 n.2 (9th Cir. 2020) ("We do not think there is a meaningful difference between the causal nexus requirement articulated by our pre-2011 cases and the requirement imposed by the amended statute."); *Goncalves*, 865 F.3d at 1245 ("[T]he statute does not require that the prosecution must be for the very acts which the officer admits to have been done by him under federal authority.") (quoting *Maryland v. Soper*, 270 U.S. 9, 33 (1926)).

Defendants assert that this case relates to the government's contractual rights under various OCS leases and production contracts, Defendants' sale and supply of their to the military, and the government's general supposed "promotion" of fossil fuel production "in furtherance of federal policy." NOR ¶ 119. While at first glance those allegations "may have the flavor of federal officer involvement in the [Defendants'] business" that broadly and generically relates to the County's claims,

44

"that mirage only lasts until one remembers what [the County] is alleging in its lawsuit:" that Defendants failed to warn of the known risks of fossil fuel combustion on a massive scale, misled the public regarding those risks, promoted their products' unlimited use, and engaged in a multi-decadal disinformation campaign to support the ever-increasing production, sale, and combustion of fossil fuel products. *Rhode Island II*, 2020 WL 6336000, at *7.[29] "[The County's] claim is simple: the oil companies knew what fossil fuels were doing to the environment and continued to sell them anyway, all while misleading consumers about the true impact of the products." *Id.* at *2. The conduct the County has actually sued on has nothing to do with the acts on which Defendants rely. Every court that has considered Defendants' nexus arguments has rejected them, as should this Court.

The Fourth Circuit in *Baltimore II* recognized that a similar complaint "clearly [sought] to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign." 952 F.3d at 467. Thus, "the relationship between Baltimore's claims and any federal authority over a portion of certain Defendants' production and sale of fossil fuel products [wa]s too

---

[29] *See also Baltimore II*, 952 F.3d at 466–67; *Boulder I*, 405 F. Supp. 3d at 976–77; *San Mateo I*, 294 F. Supp. 3d at 939; *cf. State v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1131 (W.D. Wash. 2017), *aff'd*, 738 F. App'x 554 (9th Cir. 2018); *In re MTBE Prods. Liab. Litig.*, 488 F.3d 112, 131 (2d Cir. 2007) (federal officer removal improper in case involving heavily regulated fuel additive where federal regulations "say nothing" about deceptive marketing and other tortious conduct).

tenuous to support removal under § 1442." *Id.* at 468. *See also Massachusetts*, 462 F. Supp. 3d at 47 ("ExxonMobil's marketing and sale tactics were not plausibly 'relat[ed] to' the drilling and production activities supposedly done under the direction of the federal government."). The same result obtains here.[30]

"There is simply no nexus between anything for which [the County] seeks damages and anything the oil companies allegedly did at the behest of a federal officer." *Rhode Island II*, 2020 WL 6336000, at *7. Jurisdiction must be denied.[31]

---

[30] Neither *Baker v. Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020), nor *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc) suggest—much less compel—a different result. In *Latiolais*, the Fifth Circuit found a nexus where an employer did not warn about asbestos on naval ships "pursuant to directions of the U.S. Navy" in most of the contracts requiring asbestos during the relevant period. 951 F.3d at 289–90, 296. That connection between the employer's misconduct and "an act pursuant to a federal officer's directions" is far more direct than the attenuated relationship between the massive disinformation campaign here and Defendants' unrelated interactions with the government. *Id.* In *Baker*, the Seventh Circuit found that the government had "required" one defendant's predecessor to refine lead and other metals "according to detailed federal specifications" at a site, such that later-discovered lead pollution at the site was "connected to or associated with" the government's explicit, coercive control over the predecessor's activities, and therefore the plaintiff's claims arising out of that pollution. 962 F.3d at 940, 945. Any relationship here between general government direction and Defendants' overall production of fossil fuels is far more tenuous than the relationship in *Baker*; and as discussed above, there is no connection at all between government direction and Defendants' decades of deception and misrepresentations.

[31] The Court also lacks jurisdiction because Defendants do not have a colorable federal defense. Defendants' vague listing of defenses, without any explanation as to why those defenses apply, NOR ¶ 121, does not satisfy their burden. *See Leite*, 749 F.3d at 1122 (Defendant "bears the burden of proving by a preponderance of the evidence that the colorable federal defense and causal nexus requirements for removal jurisdiction have been met.").

### E. There Is No Enclave Jurisdiction Because the County's Claims Did Not "Arise" Within Any Federal Enclave, Nor Do They Present Any Federal Question.

"Federal courts have federal question jurisdiction over tort claims that *arise on* 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006) (emphasis added). Here, this basis for jurisdiction fails for at least four reasons. First, the Complaint expressly disclaims injuries to any federal property within the County. Compl. ¶¶ 14, 198 n.156. Second, Defendants' vague assertions that some of their alleged bad acts occurred on federal land are not supported by the Complaint. Third, even if some portion of Defendants' tortious conduct did occur on federal land, the County's claims "arose" only once all the elements of the claim were complete, which occurred here when and where the County suffered injuries—i.e., on non-federal land. Finally, Defendants have not shown any actual federal question with respect to claims that allegedly arose on enclaves in Hawai'i, where state law remains in force.

Four other district courts, including the Northern District of California, have rejected similar arguments raised in other climate deception tort cases against many of these Defendants. *San Mateo I*, 294 F. Supp. 3d at 939; *Baltimore I*, 388 F. Supp. 3d at 565–66; *Rhode Island I*, 393 F. Supp. 3d at 152; *Boulder I*, 405 F. Supp. 3d at 974. The Court should do so here as well.

### 1. The County's Injuries Occurred and Will Occur Exclusively on Non-Federal Lands.

The Complaint seeks to abate the local nuisance injuries from sea level rise, extreme weather, drought, and ocean warming and acidification, among other climate crisis-related environmental changes, and "the cascading social, economic, and other consequences of those and myriad other environmental changes . . . in the County." Compl. ¶ 10. The Complaint defines the scope of injury to exclude any federal territory. *Id.* ¶¶ 14, 198 n.156. The only claimed injuries occurred on non-federal land, and the County's claims therefore "arise" on non-federal land. The Court's inquiry should end there.[32] There is no basis for enclave jurisdiction based on the location of County's injuries.[33] And while Defendants attempt to argue that

---

[32] Every court that has considered Defendants' enclave arguments has rejected them on these grounds. *See*, *e.g.*, *San Mateo*, 294 F. Supp. 3d at 939 (finding enclave jurisdiction did not apply since "federal land was not the locus in which the claim arose") (quotations omitted); *Rhode Island I*, 393 F. Supp. 3d at 152 (same, "since [the State's] complaint avoids seeking relief for damages to any federal lands."); *Boulder Cty. I*, 405 F. Supp. 3d at, 974 (same where plaintiff did "not seek damages or abatement relief for injuries to or occurring to federal lands") (citations omitted); *Baltimore I*, 388 F. Supp. 3d at 565 (same where "[t]he Complaint . . . expressly define[d] the scope of injury to exclude any federal territory").

[33] Defendants' reliance on *Humble Pipe Line Co. v. Waggonner*, 376 U.S. 369, 372–74 (1964), and *Mississippi River Fuel Corp. v. Cocrehan*, 390 F.2d 34, 35 (5th Cir. 1968), is misplaced. *See* NOR ¶ 126. Both cases held that a state may not exercise its taxing power over oil and gas drilling and pipeline operations located entirely within the federal enclave. Neither analyzed where a state law tort cause of action arises for enclave jurisdiction purposes—let alone whether injuries sustained on exclusively non-federal land could be subject to enclave jurisdiction, as Defendants urge. Neither case can be read for that proposition.

the County cannot disclaim injuries on federal property, such disclaimers routinely support remand. *See, e.g.*, *Goto v. Whelan*, No. 20-cv-01114 (HSG), 2020 WL 4590596, at *4 (N.D. Cal. Aug. 11, 2020); *Monsanto*, 274 F. Supp. 3d at 1132; *Baltimore I*, 388 F. Supp. 3d at 565 (collecting cases).

### 2.    Defendants' Assertions Are Not Supported by the Complaint.

Second, Defendants argue that "[i]n targeting Defendants' oil and gas operations, Plaintiff necessarily sweeps in those activities that occur on military bases and other federal enclaves" and that "the Complaint relies upon conduct occurring in the District of Columbia." NOR ¶¶ 126–27. Neither assertion is supported by the Complaint, and the County does not seek remedies for injuries in such locations. *See, e.g*., Compl. ¶ 14; *Boulder I*, 405 F. Supp. 3d at 974 (The fact that "the alleged climate alteration by Defendants may have caused similar injuries to federal property does not speak to the nature of Plaintiffs' alleged injuries for which they seek compensation, and does not provide a basis for removal."). Defendants further state that some portion of certain Defendants' fossil fuel extraction has occurred on federal land, but cite no allegation in the Complaint referring to those lands or conduct occurring there. *See* NOR ¶ 126. Defendants also refer to their trade association memberships and financing of think tanks and lobbyists. NOR ¶ 128 (citing Compl. ¶¶ 125–30). These vague allegations do not

provide any basis for enclave removal.[34]

### 3. Each of the County's Claims Arose Only Once a Complete Tort Accrued, Which Occurred When and Where the County Suffered Injury—on Non-Federal Lands.

Even if Defendants' Notice of Removal accurately described the contents of the Complaint, federal enclave jurisdiction would still be improper because the County's claims "arose" only at the time and place where all the elements of the claims were complete, on non-federal land. As Defendants concede, NOR ¶ 125, "the key factor in determining whether federal enclave jurisdiction exists is the location of the plaintiff's injury." *Holliday v. Extex*, No. CIV. 05-00194SPK/LEK, 2005 WL 2158488, at *4 (D. Haw. July 6, 2005), *report and recommendation adopted*, No. CIV05-00299SPK/LEK, 2005 WL 2179392 (D. Haw. Aug. 24, 2005) (denying motion to remand where injury was a helicopter crash in Volcanoes

---

[34] The cases Defendants cite to support their District of Columbia ("D.C.") argument (NOR ¶¶ 127–28) have nothing to do with removal, and do not even discuss the Enclave Clause as a basis for jurisdiction. In *Jacobsen v. U.S. Postal Service*, the court considered whether "ingress-egress walkways" at federal post offices are public fora under the First Amendment. 993 F.2d 649, 652 (9th Cir. 1992). The opinion did not address any jurisdictional issue. *Id. Collier v. District of Columbia* was an excessive force action against a police officer, in which the court observed in dicta that "[b]ecause the District of Columbia is a federal enclave, it is subject to the Fifth Amendment, and not the Fourteenth, which applies to the States." 46 F. Supp. 3d 6, 20 n.8 (D.D.C. 2014). The court did not otherwise discuss or cite the Enclave Clause, and jurisdiction existed because the plaintiff expressly brought claims under the Constitution and 42 U.S.C. § 1983. *Id.* at 14. *Hobson v. Hansen* held in relevant part that a statute vesting certain power in D.C. district court judges was constitutional under the Enclave Clause. 265 F. Supp. 902, 906 (D.D.C. 1967). That case had nothing to do with removal jurisdiction over state law tort claims.

National Park, an undisputed federal enclave). This construction is consistent with the weight of case law on enclave removal, which holds that a cause of action "arises" when and where "the 'substance and consummation' of events giving rise the claim occur." *Coleman v. Trans Bay Cable, LLC*, No. 19-CV-02825-YGR, 2019 WL 3817822, at *3 (N.D. Cal. Aug. 14, 2019); *Bordetsky v. Akima Logistics Servs., LLC*, No. CV 14-1786 (NLH/JS), 2016 WL 614408, at *2 (D.N.J. Feb. 16, 2016); *Holliday*, 2005 WL 2158488, at *4 (collecting cases indicating that the site of injurious exposure is key to establishing enclave jurisdiction).

Each of the County's claims is defined under state law, and each cause of action has an "injury" or "physical intrusion" element.[35] Each claim thus arose only where the County suffered the injury or intrusion. Because the alleged injuries and intrusions occurred on non-federal land only, enclave jurisdiction is improper.

Defendants mischaracterize *Durham*, 445 F.3d at 1250, and *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315 (N.D. Ala. 2010), as holding that enclave jurisdiction applies if only "'some' of the events or damages alleged in the complaint occurred on a federal enclave." NOR ¶ 125. The passage Defendants quote from

---

[35] *See Littleton v. State*, 66 Haw. 55, 67 (1982) (elements of nuisance claim); *Johnson v. Raybestos-Manhattan, Inc.*, 69 Haw. 287, 288 (1987) (elements of a strict products liability claim); *Doe Parents No. 1 v. State, Dep't of Educ.*, 100 Hawai'i 34, 68 (2002), as amended (Dec. 5, 2002) (elements of negligence claim); *Spittler v. Charbonneau*, 145 Hawai'i 204, 210–11 (Ct. App. 2019) (citing Restatement (Second) Torts §§ 158, 161 for elements of trespass).

*Durham* actually relates to whether and when a defendant has notice that a complaint reveals a potential basis for federal jurisdiction: "The complaint revealed that some of Durham's claims arose on federal enclaves, so . . . [the defendant] had thirty days from when it received the complaint to remove to federal court." 445 F.3d at 1250. Whether a complaint discloses sufficient facts to trigger the 30-day removal deadline is entirely different from the question of whether federal enclave jurisdiction applies.

In *Corley*, the plaintiff was "continually exposed" to asbestos-containing products when he "performed a substantial amount of work" on naval bases over his 17 years in the Navy. *Id.* at 1317, 1328. The court concluded that enclave jurisdiction applied, rejecting plaintiff's argument that he was exposed to more asbestos outside the enclaves than in them, because "[t]he fact that the injury occurred [on a federal enclave] is sufficient." *Id.* at 1329. Thus, *Corley* actually supports the County's argument that the location of *injury*—here, on non-federal land—is a critical factor in determining enclave jurisdiction. *See also Baltimore I*, 388 F. Supp. 3d at 565 ("[C]ourts have only found that claims arise on federal enclaves . . . when all or most of the pertinent events occurred there.") (collecting cases).[36]

---

[36] Defendants' reliance on *Bell v. Arvin Meritor, Inc.*, where the plaintiff alleged he was exposed to asbestos on various federal enclaves during his employment with the Army, is unavailing for similar reasons. No. 12-00131-SC, 2012 WL 1110001 (N.D. Cal. Apr. 2, 2012).

4.   **Defendants Fail to Identify a Federal Question Arising on Enclaves in Hawai'i Over Which the State Has Concurrent Jurisdiction.**

Where there is *exclusive* federal enclave jurisdiction, courts have generally determined that the state law that would otherwise govern is assimilated as federal law, conferring federal question jurisdiction. *See Mater v. Holley*, 200 F.2d 123, 124–25 (5th Cir. 1952); *see also Baltimore I*, 388 F. Supp. 3d at 564 ("Courts have held that federal question jurisdiction exists over claims that arise on federal enclaves . . . . because, quite simply, there is no other law.") (citations omitted). However, when a state and the federal government have *concurrent* jurisdiction over the enclave, courts look to whether the claim arises under federal law. *See Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 530 (1938) ("[J]urisdiction less than exclusive may be granted [to] the United States."); *Ching v. Aila*, No. CIV. 14-00253 JMS, 2014 WL 4216051, at *4–8 (D. Haw. Aug. 22, 2014) (remanding claim that arose on federal enclave in Hawai'i after finding that the plaintiffs' claims were not created by federal law and did not arise under federal law). Here, as Defendants concede, NOR ¶ 129, the State of Hawai'i has concurrent jurisdiction with the United States over enclaves within the state per the 1959 Act to Provide for the Admission of the State of Hawai'i into the Union ("Admission Act"). *See* Pub. L. No. 86-3, 73 Stat. 11–12 (1959); *see also Kalaka Nui, Inc. v. Actus Lend Lease, LLC*, 2009 WL 1227892, at *5 (D. Haw. May 5, 2009) ("The Admission Act clearly

53

provides that Hawaiʻi has concurrent jurisdiction over such military bases so long as state jurisdiction is consistent with" federal law.).

"[W]here there is broad concurrent enclave jurisdiction, there is no concern that the enclave will be left without laws regulating private rights—state law applies with no need to assimilate state law into federal law." *Ching*, 2014 WL 4216051, at *6; *see also Cmty. Hous. P'ship v. Byrd*, No. 13-3031 JSC, 2013 WL 6087350, at *6–7 (N.D. Cal. Nov. 19, 2013) (granting motion to remand in unlawful detainer action on enclave subject to concurrent jurisdiction where defendant failed to establish a federal question arose). In *Ching*, a breach of trust action by private plaintiffs against the State for failure to enforce the terms of a lease on enclave lands, the court explained that "[u]pon admission to the Union, Hawaiʻi adopted its own laws—which plainly apply to Plaintiffs' [state law] breach of trust claim." 2014 WL 4216051 at *7. Thus, while the plaintiffs' claim arose on that federal enclave, it raised only questions of state law and federal jurisdiction was improper. *Id*.

Defendants identify only one federal enclave in Hawaiʻi in their Notice of Removal: the Red Hill Bulk Fuel Storage Facility, a facility that is not located in the County. NOR ¶¶ 130–31. Defendants concede, as they must, that the State retains concurrent jurisdiction over that enclave. *Id*. They do not establish, however, that any claim arising at Red Hill falls into the "special and small category" of state law claims that necessarily raise federal issues. *See Gunn,* 568 U.S. at 258; *see also* Part

54

IV.B, *supra*. The Admission Act expressly reserves the State's sovereign right to have such claims adjudicated under its own laws in its own courts. Federal enclave jurisdiction does not apply here.

### F.   Defendants' "Complete Preemption" Arguments Are Foreclosed.

As Defendants concede, NOR ¶ 133, their complete preemption argument is also entirely foreclosed by *Oakland*, where the Ninth Circuit held that the plaintiffs' state-law public nuisance claim was not completely preempted by the CAA, 969 F.3d at 907–08.

Complete preemption only occurs in the narrow circumstance where "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar*, 482 U.S. at 393 (quoting *Metro. Life*, 481 U.S. at 65). "To have this effect, a federal statute must [1] 'provide[ ] the exclusive cause of action for the claim asserted and also [2] set forth procedures and remedies governing that cause of action.'" *Oakland*, 969 F.3d at 905 (quoting *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003)). "The Supreme Court has identified only three statutes that meet this criteria." *Id.*

Defendants primarily argue that the CAA completely preempts the County's claims. *See* NOR ¶ 152. But "[t]he Clean Air Act is not one of the three statutes that the Supreme Court has determined has extraordinary preemptive force." *Oakland*,

969 F.3d at 907. "Rather, the Supreme Court has left open the question whether the Clean Air Act preempts a state-law nuisance claim under ordinary preemption principles." *Id.* (citing *AEP*, 564 U.S. at 429).[37]

Defendants' secondary argument, that the County's claims are completely preempted because they "would inevitably intrude on the foreign affairs and foreign commerce powers of the federal government," NOR ¶ 151, is unserious. The Supreme Court has only recognized complete preemption *by statute*, because the "extraordinary pre-emptive power . . . that converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule" should not be exercised "[i]n the absence of explicit direction from Congress." *See Metro. Life*, 481 U.S. at 64–65; *Beneficial Nat'l Bank*, 539 U.S. at 8 ("[A] state claim may be removed to federal court . . . when Congress expressly so provides . . . or when a federal *statute* wholly displaces the state-law cause of action through complete pre-emption." (emphasis added)). There is no basis to believe Congress intended the foreign affairs doctrine to have complete preemptive force over any state law. *See Boulder I*, 405 F. Supp. 3d at 973; *Rhode Island I*, 393 F. Supp. 3d at 150, n.3; *Baltimore I*, 388 F. Supp. 3d at 562.

---

[37] The Ninth Circuit's decision in *Oakland* is in accord with the district court decisions in analogous cases, which have all held that the CAA lacks complete preemptive force. *San Mateo I*, 294 F. Supp. 3d at 938; *Baltimore I*, 388 F. Supp. 3d at 563; *Rhode Island I*, 393 F. Supp. 3d at 150; *Boulder I*, 405 F. Supp. 3d at 970.

### G. Defendants' Attacks on the Merits of the County's Claims Are Premature and Misguided.

In a last-ditch effort to avoid remand, Defendants attack the merits of the County's claims, asserting that they could not have misled the public about the dangers of their fossil-fuel products because everyone already knew about the risks of global warming. NOR ¶¶ 154–72. The Court should reject this untimely and misguided attack out of hand.

To begin, Defendants' plausibility challenges are premature at this early stage of the litigation. As the Ninth Circuit explained in *Leite*, motions to remand are analogous to motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *See* 749 F.3d at 1121–22. Thus, when presented with a remand motion, a court may determine only whether a defendant's "jurisdictional allegations" of fact are sufficient to invoke federal jurisdiction. *Id.* at 1121. It cannot address issues that are "intertwined with an element of the merits of the [County's] claim[s]." *Id.* at 1122 n.3. Here, Defendants invite this Court to resolve thorny issues of fact that go to the heart of the County's theory of culpability. The Court should therefore decline this improper invitation to pre-try the case, and instead "leave the resolution of [these] material factual disputes to the trier of fact." *Id.*; *see also Carriere v. Sears, Roebuck & Co.*, 893 F.2d 98, 100 (5th Cir. 1990) ("[W]e have frequently cautioned the district courts against pretrying a case to determine removal jurisdiction.").

57

In any event, Defendants' attacks on the merits of the Complaint miss their mark. In arguing that the County's claims are "unfounded and implausible," NOR ¶ 4, Defendants point to a handful of publications that accurately reported on the climate risks of Defendants' fossil-fuel products, *see, e.g., id.* ¶¶ 156–58.[38] But the fact that some people published truthful information about global warming does not eliminate "the source of tort liability" in this case, namely: Defendants' decades-long campaign to conceal and affirmatively misrepresent the dangers of fossil fuels to consumers and the public writ large. *Baltimore II*, 952 F.3d at 467. Indeed, where companies have engaged in analogous campaigns of concealment and deception, courts have not hesitated to hold them liable for the harms caused by their products, notwithstanding evidence suggesting that those harms were known to some segments of the population. *See, e.g., People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 65, 93 (Cal. Ct. App. 2017) (lead-paint companies liable for knowingly promoting a hazardous product, notwithstanding evidence suggesting

---

[38] Defendants purportedly identified thousands of articles in newspaper archives that contained the phrases "greenhouse effect," "global warming," or "climate change." NOR ¶ 159. But because these search results do not indicate whether the articles provided accurate or misleading information about climate change, they lend no support to Defendants' assertion that everyone already knew about the dangers of fossil-fuel consumption. Indeed, as the County documents in the Complaint, Defendants themselves contributed to the public discussion on climate change—albeit, by flooding the public discourse with false and misleading representations about the existence, causes, and adverse consequences of climate change. *See* Compl. ¶¶ 101–30.

that, "[s]ince the 19th century, the medical profession has recognized that lead paint is toxic and a poison"); *State v. Purdue Pharma L.P.*, No. CJ-2017-816, 2019 WL 9241510, at *8–9, 12, 14 (Okl. Dist. Ct. Nov. 15, 2019) (pharmaceutical companies liable for their "misleading marketing and promotion of opioids," notwithstanding evidence that government agencies were aware of the addiction risks of opioids); *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 26, 35–36 (D.D.C. 2006) (tobacco companies liable for "unlawful conspiracy to deceive the American public about the health effects of smoking," even though scientists and the media had been reporting on these harms since the 1950s).

This case is no different. As the Complaint documents, public awareness of climate change was growing at the end of the 1980s, leading to calls for fossil-fuel regulation. *See* Compl. ¶¶ 99–100. But when Defendants heard those calls, they acted swiftly to protect their bottom line, orchestrating a sophisticated and widespread disinformation campaign to undermine the science of climate change and thereby forestall concerted action. *See id*. ¶¶ 101–30. Taking a page out of big tobacco's playbook, Defendants spent millions of dollars trying to convince the public that the existence, causes, and adverse effects of global warming were "open question[s]"—even though, internally, Defendants harbored no such doubts. *Compare Philip Morris USA, Inc.*, 449 F. Supp. 2d at 208 (finding that the tobacco industry "mounted a coordinated, well-financed, sophisticated public relations

campaign to attack and distort the scientific evidence demonstrating the relationship between smoking and disease, claiming that the link between the two was still an 'open question'") *with* Compl. ¶¶ 104–30 (documenting Defendants' efforts to undermine public understanding of climate science). And even as Defendants publicly insisted that fossil-fuel regulations would be premature in light of what they characterized as unsettled science, they internally took steps to protect their own assets from negative climate impacts and to take advantage of new profit opportunities that would come with a warmer world. *See* Compl. ¶¶ 131–36.

It is that affirmative misconduct—a purposeful disinformation campaign that knowingly concealed, misled, and misrepresented the dangers of fossil-fuel products—that renders Defendants liable to the County under Hawaiʻi law. Defendants cannot escape the legal consequences of their misconduct simply by noting that others chose to do the right thing and publish accurate information about the existential threat of global warming.

## V.  CONCLUSION

For the foregoing reasons, the County of Maui requests that this Court remand the Complaint to state court.

///

DATED:  November 25, 2020          Respectfully Submitted,

**MOANA M. LUTEY**
Corporation Counsel

By:  _/s/ Moana M. Lutey_____
RICHELLE M. THOMSON
KEOLA R. WHITTAKER
Deputies Corporation Counsel

By:  __/s/ Victor M. Sher_____
VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
CORRIE J. YACKULIC *(pro hac vice*
forthcoming)
TIMOTHY R. SLOANE (*pro hac vice*
forthcoming)
Sher Edling LLP

Attorneys for Plaintiff
COUNTY OF MAUI