DEPARTMENT OF THE
CORPORATION COUNSEL          205

MOANA M. LUTEY          6385
Corporation Counsel
RICHELLE M. THOMSON          8965
KEOLA R. WHITTAKER          11200
Deputies Corporation Counsel
County of Maui
200 South High Street, Third Floor
Wailuku, Hawaiʻi 96793
Telephone: (808) 270-7741
Facsimile: (808) 270-7152
E-mail: moana.lutey@co.maui.hi.us
E-mail: richelle.thomson@co.maui.hi.us
E-mail: keola.whittaker@co.maui.hi.us

SHER EDLING LLP
VICTOR M. SHER (*pro hac vice*)
MATTHEW K. EDLING (*pro hac vice*)
CORRIE J. YACKULIC (*pro hac vice* forthcoming)
TIMOTHY R. SLOANE (*pro hac vice* forthcoming)
100 Montgomery St. Ste. 1410
San Francisco, CA 94104
Telephone: (628) 231-2500
Facsimile: (628) 231-2929
E-mail: vic@sheredling.com
E-mail: matt@sheredling.com
E-mail: corrie@sheredling.com
E-mail: tim@sheredling.com

Attorneys for Plaintiff,
COUNTY OF MAUI

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF HAWAIʻI

COUNTY OF MAUI,

      Plaintiff,

  v.

SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; ROYAL DUTCH SHELL PLC; SHELL OIL COMPANY; SHELL OIL PRODUCTS COMPANY LLC; CHEVRON CORP; CHEVRON USA INC.; BHP GROUP LIMITED; BHP GROUP PLC; BHP HAWAII INC.; BP PLC; BP AMERICA INC.; MARATHON PETROLEUM CORP.; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; AND DOES 1 through 100, inclusive,

      Defendants.

CASE NO. 20-CV-00470-DKW-KJM

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO REMAND (ECF NO. 74)**

No Hearing Date Calendared

Action Filed: October 12, 2020
No Trial Date Set

I.    INTRODUCTION .........................................................................1

II.   DEFENDANTS' NEW JURISDICTIONAL ALLEGATIONS ARE
      IMPERMISSIBLE AND UNTIMELY. .......................................................2

III.  THIS CASE SHOULD BE REMANDED BECAUSE THERE IS NO
      SUBJECT-MATTER JURISDICTION. .....................................................5

      A.   There Is No Outer Continental Shelf Lands Act Jurisdiction.................5

      B.   There Is No Federal Officer Removal Jurisdiction. .............................10

           1.   Defendants Were Not "Acting Under" a Federal Officer..............10

                a.   A Purported General Federal Policy Interest in Supporting
                     the Fossil Fuel Industry Cannot Satisfy the "Acting Under"
                     Requirement. ...........................................................11

                b.   Defendants' Mineral Leases Provide No Basis for Federal
                     Officer Removal.......................................................13

                c.   Defendants' Transactions with the Military Provide No
                     Basis for Federal Officer Removal Jurisdiction. .....................17

                d.   Chevron's Business at the Elk Hills Reserve Does Not
                     Give Rise to Federal Officer Removal. ...................................21

                e.   Defendants' Contributions into the Strategic Petroleum
                     Reserve Were Not Made at Government Direction..................24

           2.   There Is No Causal Connection Between Defendants' Acts
                and the County's Claims. ..............................................26

      C.   There Is No Enclave Jurisdiction.........................................31

      D.   Defendants' Attacks on the Merits of the County's Claims Are
           Misguided...............................................................33

IV.   CONCLUSION ...........................................................................34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AIG Europe (UK) Ltd. v. McDonnell Douglas Corp.*,
  No. CV 02-8703-GAF, 2003 WL 257702 (C.D. Cal. Jan. 28, 2003) .................20

*Ballard v. Ameron Int'l Corp.*,
  No. 16-CV-06074-JSC, 2016 WL 6216194 (N.D. Cal. Oct. 25, 2016) ..............32

*Ballenger v. Agco Corp.*, No. C,
  No. C 06–2271 CW, 2007 WL 1813821 & n.2 (N.D. Cal. June 22, 2007) .........27

*Barrow Dev. Co. v. Fulton Ins. Co.*,
  418 F.2d 316 (9th Cir. 1969) .............................................................................2, 4

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
  405 F. Supp. 3d 947 (D. Colo. 2019) ......................................................... *passim*

*Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*,
  965 F.3d 792 (10th Cir. 2020) ..............................................................................1

*Cabalce v. Thomas E. Blanchard & Assocs., Inc.*,
  797 F.3d 720 (9th Cir. 2015) ...................................................... 19, 20, 22, 23

*Carson Harbor Vill., Ltd. v. Unocal Corp.*,
  270 F.3d 863 (9th Cir. 2001) ...............................................................................21

*City of Oakland v. BP PLC*,
  969 F.3d 895 (9th Cir. 2020) ............................................................................1, 2

*Coleman v. Trans Bay Cable, LLC*,
  No. 19-CV-02825-YGR, 2019 WL 3817822 (N.D. Cal. Aug. 14, 2019)..... 28, 32

*Corley v. Long-Lewis, Inc.*,
  688 F. Supp. 2d 1315 (N.D. Ala. 2010) .............................................................32

*Cty. of San Mateo v. Chevron Corp.*,
  294 F. Supp. 3d 934 (N.D. Cal. 2018)......................................................... *passim*

*Cty. of San Mateo v. Chevron Corp.*,
  960 F.3d 586 (9th Cir. 2020) ....................................................................... *passim*

*Dejong v. Prod. Assocs., Inc.*,
  No. CV 14-02357 MMM DTBX, 2015 WL 1285282
  (C.D. Cal. Mar. 19, 2015)......................................................................................4

*Doe I v. UPMC*,
  No. 2:20-CV-359, 2020 WL 4381675 (W.D. Pa. July 31, 2020) .......................22

*EP Operating Ltd. P'ship v. Placid Oil Co.*,
  26 F.3d 563 (5th Cir. 1994) .............................................................. 6, 7, 9

*Faulk v. Owens-Corning Fiberglass Corp.*,
  48 F. Supp. 2d 653 (E.D. Tex. 1999) ...................................................31

*Fidelitad, Inc. v. Insitu, Inc.*,
  904 F.3d 1095 (9th Cir. 2018) ..............................................................22

*Fisher v. Asbestos Corp.*,
  No. 2:14-CV-02338-WGY, 2014 WL 3752020 (C.D. Cal. July 30, 2014) .........27

*Freedom Holdings, Inc. v. Spitzer*,
  357 F.3d 205 (2d Cir. 2004) ....................................................................9

*Gilstrap v. United Air Lines, Inc.*,
  709 F.3d 995 (9th Cir. 2013) ...................................................................9

*Goncalves By & Through Goncalves v. Rady Children's Hospital San Diego*,
  865 F.3d 1237 (9th Cir. 2017) ................................................... 13, 29, 30

*Haynes v. Haas*,
  146 Haw. 452 (2020) ...............................................................................8

*Hemphill v. Transfresh Corp.*,
  No. C-98-0899-VRW, 1998 WL 320840 (N.D. Cal. June 11, 1998) ...................4

*Hester v. Horowitz*,
  No. CV 17-00014 LEK-KSC, 2017 WL 1536401 (D. Haw. Apr. 28, 2017) .........3

*In re Deepwater Horizon*,
  745 F.3d 157 (5th Cir. 2014) ................................................................6, 8

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
  428 F. Supp. 2d 1014 (D. Minn. 2006) ...................................................31

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,
  488 F.3d 112 (2d Cir. 2007) ............................................................ 26, 31

*Kruse v. Actuant Corp.*,
  No. 219-cv-09540-ODW(RAOx), 2020 WL 3287883
  (C.D. Cal. June 18, 2020) .......................................................................22

*Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*,
  754 F.2d 1223 (5th Cir. 1985) ..................................................................6

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ................................................................33

*Luehrs v. Utah Home Fire Ins. Co.*,
  450 F.2d 452 (9th Cir. 1971) ....................................................................4

*M/V Am. Queen v. San Diego Marine Constr. Corp.*,
  708 F.2d 1483 (9th Cir. 1983) ................................................................20

*Maracich v. Spears*,
570 U.S. 48 (2013) ...........................................................................7

*Massachusetts v. Exxon Mobil Corp.*,
462 F. Supp. 3d 31 (D. Mass. 2020)........................................... *passim*

*Mayor & City Council of Baltimore v. BP P.L.C.*,
388 F. Supp. 3d 538 (D. Md. 2019) ............................... 1, 6, 7, 32

*Mayor & City Council of Baltimore v. BP P.L.C.*,
952 F.3d 452 (4th Cir. 2020) ...................................................... *passim*

*McMann v. Air & Liquid Sys. Corp.*,
No. 2:14-CV-00281-RSM, 2014 WL 1794694 (W.D. Wash. 2014) ..................5

*Meyers v. Chesterton*,
No. CIV.A 15-292, 2015 WL 2452346 (E.D. La. May 20, 2015) ......................31

*Meyers v. CBS Corp.*,
No. 15-30528, 2015 WL 13504685 (5th Cir. Oct. 28, 2015) .............................31

*New Mexico ex rel. Balderas v. Monsanto Co.*,
454 F. Supp. 3d 1132 (D.N.M. 2020)...............................................32

*Newman–Green, Inc. v. Alfonzo–Larrain*,
490 U.S. 826 (1989) ...........................................................................3

*Nken v. Holder*,
556 U.S. 418 (2009) ...........................................................................2

*Oklahoma v. Purdue Pharma LP*,
No. CJ-2017-816, 2019 WL 4019929 (Okla. Dist. Ct. Aug. 26, 2019) .......... 9, 34

*Par. of Cameron v. Auster Oil & Gas Inc.*,
420 F. Supp. 3d 532 (W.D. La. 2019) ...................................... 12, 18

*Par. of Plaquemines v. Chevron USA, Inc.*,
969 F.3d 502 (5th Cir. 2020) ...............................................................12

*People v. ConAgra Grocery Prods. Co.*,
17 Cal. App. 5th 51 (Cal. Ct. App. 2017)...................................... 9, 34

*Pharm. Research & Mfrs. of Am. v. Concannon*,
249 F.3d 66 (1st Cir. 2001) ...............................................................9

*Pioneer Asset Inv. Ltd. v. Arlie & Co.*,
No. CV 15-00387-ACK, 2015 WL 9665667 (D. Haw. Dec. 14, 2015) ...............3

*Plains Gas Sols., LLC v. Tenn. Gas Pipeline Co., LLC*,
46 F. Supp. 3d 701 (S.D. Tex. 2014)................................................6, 8

*Plaquemines v. Total Petrochem. & Refining USA, Inc.*,
64 F. Supp. 3d 872 (E.D. La. 2014) ...................................................6

*Reaser v. Allis Chambers Corp.*,
  No. CV 08-1296-SVW, 2008 WL 8911521 (C.D. Cal. June 23, 2008) .............27

*Recar v. CNG Producing Co.*,
  853 F.2d 367 (5th Cir. 1988) ................................................................7

*Ret. Plans Comm. of IBM v. Jander*,
  140 S. Ct. 592 (2020) ........................................................................2

*Rhode Island v. Chevron Corp.*,
  393 F. Supp. 3d 142 (D.R.I. 2019) ........................................... 1, 6, 26

*Rhode Island v. Chevron Corp.*,
  979 F.3d 50 (1st Cir. 2020) ................................................. 1, 7, 26, 29

*Riggs v. Airbus Helicopters, Inc.*,
  939 F.3d 981 (9th Cir. 2019) ..............................................................20

*Rodrigue v. Aetna Cas. & Sur. Co.*,
  395 U.S. 352 (1969) ...........................................................................6

*Ross v. Hawaii Nurses' Ass'n Office & Prof'l Employees Int'l Union Local 50*,
  290 F. Supp. 3d 1136 (D. Haw. 2018) ..................................................3

*Ryan v. Dow Chem. Co.*,
  781 F. Supp. 934 (E.D.N.Y. 1992)......................................................28

*Singer v. State Farm Mut. Auto Ins. Co.*,
  116 F.3d 373 (9th Cir. 1997) ...............................................................4

*Thompson v. Crane Co.*,
  No. 11-00638-LEK, 2012 WL 1344453 (D. Haw. Apr. 17, 2012).....................13

*Ulleseit v. Bayer HealthCare Pharm. Inc.*,
  826 F. App'x 627 (9th Cir. 2020)........................................................30

*United States v. Philip Morris USA, Inc.*,
  449 F. Supp. 2d 1 (D.D.C. 2006) ........................................................34

*Vaden v. Discover Bank*,
  556 U.S. 49 (2009) ...........................................................................10

*Ward v. 84 Lumber Co.*,
  No. CV 12-10490 JGB(PLAx), 2013 WL 12415465
  (C.D. Cal. Mar. 11, 2013)...................................................................22

*Washington v. Monsanto Co.*,
  274 F. Supp. 3d 1125 (W.D. Wash. 2017) ...........................................26

*Watson v. Phillip Morris Companies, Inc.*,
  551 U.S. 142 (2007) .................................................................. 11, 17

## Statutes

28 U.S.C. § 1442................................................................................2

28 U.S.C. § 1443................................................................................2

28 U.S.C. § 1446(b)(1).....................................................................2, 3

28 U.S.C. § 1447(d) ...........................................................................1

28 U.S.C. § 1653 ......................................................... 2, 3, 4, 5

42 U.S.C. § 6241..............................................................................25

43 U.S.C. § 1349(b)(1).......................................................................7

## Other Authorities

14C Wright & Miller, Fed. Prac. & Proc. § 3733 (4th ed.) .......................................5

# TABLE OF EXHIBITS REFERENCED IN THIS BRIEF

All citations below to "Ex." refer to exhibits to the Declaration of Melvin M. Miyagi in Support of Defendants' Notice of Removal, ECF No. 1-1. Citations below to "Opp. Ex." Refer to the Declaration of Melvin M. Miyagi in Support of Defendants' Opposition to Plaintiff's Motion to Remand, ECF No. 96-3. The below table identifying exhibits to each declaration, in numerical order, is provided for the Court's convenience.

## Exhibits to Miyagi Declaration in Support of Notice of Removal

- <u>Ex. 9</u>: Statement of Sen. Hollings introducing Outer Continental Shelf Lands Act of 1975, 94 Cong. Rec. S903, S904 (daily ed. Jan. 27, 1975).
- <u>Ex. 10</u>: John W. Frey and H. Chandler Ide, A History of the Petroleum Administration for War (1946).
- <u>Ex. 32</u>: Operating Agreement between Navy Department and Standard Oil Company of California, Relating to Naval Petroleum Reserve No. 1 (Elk Hills), Contract No. NOd-9930 (November 3, 1971).
- <u>Ex. 36</u>: Letter to Operator from L. Dennett, Associate Director for Royalty Management, United States Department of the Interior, Minerals Management Service ("MMS"), dated December 14, 1999.

## Exhibits to Miyagi Declaration in Support of Opposition to Motion to Remand

- <u>Opp. Ex. 2</u>: Supplemental Affidavit of John W. Walker in Support of Motion for Order Staying Judgment, *United States of America v. Standard Oil Co. of California*, No. F-74-11-MDC (E.D. Cal. 1978).
- <u>Opp. Ex. 6</u>: President Nixon's Special Message to the Congress on the Energy Crisis (January 23, 1974).
- <u>Opp. Ex. 7</u>: Remarks of Senator Henry M. Jackson (August 22, 1978) (124 Cong. Rec. S13994-99).
- <u>Opp. Ex. 8</u>: President Ronald Reagan's Message Transmitting the National Energy Policy Plan, Pursuant to Section 801 of the Dep't of Energy Organization Act, made on July 17, 1981, and accompanying National Energy Policy Plan.
- <u>Opp. Ex. 9</u>: Outer Continental Shelf Deep Water Royalty Relief Act, Pub. L. 104-58, 109 Stat. 557, enacted November 28, 1995.

- <u>Opp. Ex. 10</u>: White House Press Secretary's Statement on North Slope Oil Bill Signing (November 28, 1995).

- <u>Opp. Ex. 11</u>: National Energy Policy Development Group, Reliable, Affordable, and Environmentally Sound Energy for America's Future (May 2001).

- <u>Opp. Ex. 12</u>: Energy Policy Act of 2005, Pub. L. 109-58, 119 Stat. 594 § 354(a)(2)(B).

- <u>Opp. Ex. 13</u>: Gulf of Mexico Energy Security Act of 2006, Pub. L. 109-432, 120 Stat. 3003.

- <u>Opp. Ex. 14</u>: President George W. Bush's Statement Upon Signing [H.R. 6111], White House Press Release, 2006 U.S.C.C.A.N. S73, S75 (December 20, 2006).

- <u>Opp. Ex. 15</u>: President Barak Obama's Remarks on Energy at Andrews Air Force Base, Maryland (March 31, 2010).

- <u>Opp. Ex. 16</u>: John W. Frey and H. Chandler Ide, A History of the Petroleum Administration for War (1946).

- <u>Opp. Ex. 17</u>: Statement of Ralph K. Davies, Deputy Petroleum Administrator for War, made to the Special Committee Investigating Petroleum Resources, S. Res. 36 (November 28, 1945).

- <u>Opp. Ex. 18</u>: Remarks of Representative Herbert E. Harris II, 121 Cong. Rec. 9201, 9275–76 (April 8, 1975).

- <u>Opp. Ex. 20</u>: Report of the Minority Staff of the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs of the United States Senate, entitled U.S. Strategic Petroleum Reserve: Recent Policy Has Increased Costs to Consumers But Not Overall U.S. Energy Security (March 5, 2003).

- <u>Opp. Ex. 21</u>: U.S. Department of Energy's SPR Annual Report to Congress for Calendar Year 2018 (2020).

- <u>Opp. Ex. 22</u>: U.S. Department of Energy's Strategic Petroleum Reserve ("SPR") Annual Report to Congress for Calendar Year 2010 (2011).

## I.    INTRODUCTION

Defendants' Opposition (ECF No. 96, "Opp.") to the County's Motion to Remand (ECF No. 74, "Mot.") rehashes arguments repeatedly rejected nationwide—by district and circuit courts alike.[1, 2] Despite their attempt to impermissibly introduce new evidence, Defendants cannot escape *San Mateo II*'s rejection of federal officer jurisdiction, nor the rejection of OCSLA and enclave jurisdiction by every court that has considered them in analogous cases. This Court should remand.[3]

---

[1] *See Cty. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934 (N.D. Cal. 2018) ("*San Mateo I*"), *aff'd in part, appeal dismissed in part*, 960 F.3d 586 (9th Cir. 2020), *reh'g en banc denied* (Aug. 4, 2020) ("*San Mateo II*") "), *petition for cert. filed* (U.S. Dec. 30, 2020) (No. 20-884); *City of Oakland v. BP PLC*, 969 F.3d 895 (9th Cir. 2020) ("*Oakland*"), *petition for cert. filed* (U.S. Jan. 8, 2021) (docket number pending); *Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) ("*Baltimore I*"), *as amended* (June 20, 2019), *aff'd in part, appeal dismissed in part*, 952 F.3d 452 (4th Cir. 2020) ("*Baltimore II*"), *cert. granted*, No. 19-1189, 2020 WL 5847132 (U.S. Oct. 2, 2020); *Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 405 F. Supp. 3d 947 (D. Colo. 2019) ("*Boulder I*"), *aff'd in part, appeal dismissed in part*, 965 F.3d 792 (10th Cir. 2020) ("*Boulder II*"), *petition for cert. filed* (U.S. Dec. 8, 2020) (No. 20-783); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142 (D.R.I. 2019) ("*Rhode Island I*") (granting remand), *aff'd in part, appeal dismissed in part*, 979 F.3d 50 (1st Cir. 2020) ("*Rhode Island II*"), *petition for cert. filed* (U.S. Dec. 30, 2020) (No. 20-900); *Massachusetts v. Exxon Mobil Corp.*, 462 F. Supp. 3d 31 (D. Mass. 2020).

[2] Defendants concede that their federal common law, substantial federal question, and complete preemption arguments were "rejected" by the Ninth Circuit and are presented here solely "to preserve them for appellate review." *See* Opp. 6 & n.1.

[3] The Court should also reject Defendants' backdoor attempt to request a stay. *See* Opp. 8. The only issue before the Supreme Court in *Baltimore* is the scope of appellate jurisdiction over a remand order. As framed by the petitioners, the question presented involves none of the merits issues before this Court: "Whether 28 U.S.C. 1447(d) permits a court of appeals to review any issue encompassed in a district

1

## II.   DEFENDANTS' NEW JURISDICTIONAL ALLEGATIONS ARE IMPERMISSIBLE AND UNTIMELY.

In violation of 28 U.S.C. §§ 1446(b)(1) and 1653, Defendants improperly seek to amend their Notice of Removal ("Notice") by attaching two expert reports and 27 exhibits to their Opposition, which total 775 pages. Section 1446(b)(1) allows a removing defendant to add new bases for jurisdiction to a removal notice, but only within thirty days of receiving the initial pleading. Thereafter, a removal notice may be amended "solely to clarify 'defective' allegations of jurisdiction previously made," *Barrow Dev. Co. v. Fulton Ins. Co.*, 418 F.2d 316, 317 (9th Cir. 1969), and only with leave of court, *see* 28 U.S.C. § 1653. Defendants' new purported evidence

_____

court's order remanding a removed case to state court where the removing defendant premised removal in part on the federal-officer removal statute, 28 U.S.C. 1442, or the civil rights removal statute, 28 U.S.C. 1443." Petition for a Writ of Certiorari at I, *BP p.l.c., et al., v. Mayor & City Council of Baltimore*, No. 19-1189 (U.S. Mar. 31, 2020). Although the petitioners invited the Supreme Court to address whether "claims alleging injury based on interstate emissions necessarily arise under federal common law," Petitioners' Brief at 37, *id.*, that argument is not properly before the Supreme Court, *see* Supreme Court Rule 14.1(a) ("Only the questions set out in the petition . . . will be considered by the Court."). Even if the Supreme Court overrules the lower court, it will likely hold to its practice of declining to reach issues not addressed by the court of appeal below. *See, e.g.*, *Ret. Plans Comm. of IBM v. Jander*, 140 S. Ct. 592, 595 (2020). Additionally, any argument that the petition for certiorari in *Oakland* justifies a stay should be rejected for the same reasons this Court set forth in the *Honolulu* case: "There is not a strong likelihood of . . . reversal; Defendants in this case will not be 'irreparably injured absent a stay'; a further stay will, however, 'substantially injure' Plaintiff by unnecessarily prolonging these proceedings for an indeterminate amount of time; and there is 'always a public interest' in the 'prompt' resolution of a dispute." *See* Order Lifting Stay, *City & Cty. of Honolulu v. Sunoco LP*, No. 20-cv-00163 (D. Haw. Aug. 21, 2020) (ECF No. 111) (quoting *Nken v. Holder*, 556 U.S. 418, 434, 436 (2009)).

goes beyond clarifying "defective" allegations, and instead impermissibly introduces totally new jurisdictional allegations.

Amendment under § 1653 is limited to "remedy[ing] inadequate jurisdictional allegations, but not defective jurisdictional facts." *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832 (1989). Courts thus routinely deny attempts to substantively amend removal notices via opposition to a motion to remand. *See, e.g.*, *Ross v. Hawaii Nurses' Ass'n Office & Prof'l Employees Int'l Union Local 50*, 290 F. Supp. 3d 1136, 1146–47 (D. Haw. 2018) (Seabright, C.J.) (denying consideration of complete preemption based on Labor Management Relations Act, where removal notice only referred to Labor-Management Reporting and Disclosure Act).[4]

Defendants' conduct violates §§ 1446 and 1653. They have introduced "a materially expanded evidentiary record" in support of new allegations, Opp. 1, in an attempt to distinguish their Notice from the notice of removal rejected by the district court and Ninth Circuit in *San Mateo I* and *San Mateo II*. *See id.* at 4, 9, 27, 44–48 & nn.10, 15. Defendants never sought leave to amend their Notice, however, and instead "load[ed] the opposition memorandum with previously undisclosed"

---

[4] *See also Hester v. Horowitz*, No. CV 17-00014 LEK-KSC, 2017 WL 1536401, at *3–4 (D. Haw. Apr. 28, 2017) (declining to consider diversity argument on motion for reconsideration where defendant's notice cited only federal question jurisdiction); *Pioneer Asset Inv. Ltd. v. Arlie & Co.*, No. CV 15-00387-ACK, 2015 WL 9665667, at *4 (D. Haw. Dec. 14, 2015) (denying late amendment to cure failure to show all defendants joined in or consented to diversity removal).

jurisdictional allegations. *See Hemphill v. Transfresh Corp.*, No. C-98-0899-VRW, 1998 WL 320840, at \*4 (N.D. Cal. June 11, 1998) (denying amendment to assert removal jurisdiction on basis not stated in removal notice). The new evidence plainly "add[s] allegations of substance" to the Notice, and is therefore improper. *See Barrow Dev. Co.*, 418 F.2d at 317. Even if the new exhibits and arguments arising therefrom could be fairly characterized as "clarifying" "defective" jurisdictional allegations, the Court should exercise its discretion pursuant to § 1653 and deny Defendants' attempt to force the County "to use [its] reply memorand[um] to oppose the entirely new bases for jurisdiction." *Hemphill*, 1998 WL 320840, at \*4.

The cases Defendants cite in support of their improper amendment are distinguishable, and Defendants' discussion of them is misleading. *See* Opp. 17, n.9. The defendant in *Dejong v. Prod. Assocs., Inc.*, No. CV 14-02357 MMM DTBX, 2015 WL 1285282, at \*3 (C.D. Cal. Mar. 19, 2015), removed on diversity grounds and the plaintiff sought remand, arguing the notice did not contain evidence supporting its citizenship allegations. The court held it could consider evidence introduced later because "supplementing allegations in the notice of removal with evidence *demonstrating the parties' citizenship* [is] permissible." *Id.* (emphasis added); *see also Luehrs v. Utah Home Fire Ins. Co.*, 450 F.2d 452, 454 (9th Cir. 1971) (allowing amendment to cure defective allegation that plaintiff was "citizen" rather than "resident" of state). The Ninth Circuit in *Singer v. State Farm Mut. Auto*

*Ins. Co.*, 116 F.3d 373, 376–77 (9th Cir. 1997), also a diversity case, held that the district court had discretion to consider the plaintiff's "formal judicial admission . . . that the amount in controversy exceed[ed] $50,000" even though that admission occurred after removal. Finally, *McMann v. Air & Liquid Sys. Corp.*, No. 2:14-CV-00281-RSM, 2014 WL 1794694 (W.D. Wash. 2014), did not cite or discuss § 1653, and it is unclear whether any party addressed it. It provides no guidance here.

Together, Defendants' cases stand at most for the rule that amendment under § 1653 "may correct an imperfect statement of citizenship, state the previously articulated grounds more fully, or clarify the jurisdictional amount." 14C Wright & Miller, Fed. Prac. & Proc. § 3733 (4th ed.) (collecting cases). They are fully consistent with the corollary that amendment "may not add completely new grounds for removal or furnish missing allegations, even if the court rejects the first proffered basis of removal." *Id.* The Court should disregard the new evidence and allegations.

## III. THIS CASE SHOULD BE REMANDED BECAUSE THERE IS NO SUBJECT-MATTER JURISDICTION.

### A. There Is No Outer Continental Shelf Lands Act Jurisdiction.

There is no OCSLA jurisdiction because the tortious activity here does not involve "operations" or physical injuries on the outer continental shelf ("OCS"), and the County's claims did not "arise out of" and are not "connected with" Defendants'

offshore activities, even under a broad reading of OCSLA's removal provision.[5] *See* Mot. 19–22; *Boulder I*, 405 F. Supp. 3d at 978 (collecting cases); *In re Deepwater Horizon*, 745 F.3d 157, 163 (5th Cir. 2014). Every court to consider Defendants' argument in an analogous case has rejected it.[6] This Court should do the same.

Again, Defendants cannot show that the "activities that caused the [County's alleged] injury constituted an 'operation' 'conducted on the OCS.'" *See Deepwater Horizon*, 745 F.3d at 163; *see also Plains Gas Sols., LLC v. Tenn. Gas Pipeline Co., LLC*, 46 F. Supp. 3d 701, 704–05 (S.D. Tex. 2014). Defendants suggest they meet the first prong of this test simply because they "have significant operations on the OCS." *See* Opp. 11. But "for jurisdiction to lie, a case must arise directly out of OCS operations." *Boulder I*, 405 F. Supp. 3d at 978; *see also Par. of Plaquemines v. Total Petrochem. & Refining USA, Inc.*, 64 F. Supp. 3d 872, 895 (E.D. La. 2014) (holding "[Section] 1349 expressly tethers OCSLA jurisdiction to an operation on the OCS"

---

[5] The cases Defendants cite for the proposition that OCSLA's jurisdictional grant is broad, *see* Opp. 10, actually demonstrate that jurisdiction generally only applies to claims arising directly from facilities *on* the OCS. *See EP Operating Ltd. P'ship v. Placid Oil Co.*, 26 F.3d 563, 569 (5th Cir. 1994) (action to determine ownership rights in offshore equipment); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1225 (5th Cir. 1985) (contract dispute involving construction of offshore platform). Each court also emphasized "'the purpose of the [OCSLA] was to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the [OCS].'" *Laredo*, 754 F.2d at 1228 & n.8 (quoting *Rodrigue v. Aetna Cas. & Sur. Co.*, 395 U.S. 352, 355 (1969)); *EP Operating Ltd. P'ship*, 26 F.3d at 566.

[6] *See Boulder I*, 405 F. Supp. 3d at 978–79; *Rhode Island I*, 393 F. Supp. 3d at 151–52; *Baltimore I*, 388 F. Supp. 3d at 566–67; *San Mateo I*, 294 F. Supp. 3d at 938–39.

and finding no OCSLA jurisdiction where injurious conduct occurred in state waters, even though it "involved pipelines that ultimately stretch to the OCS"). Here, fossil fuel production is simply the delivery mechanism of the County's injury. The source of the tort (and the target of the remedy) is Defendants' campaign to deceive the public about the dangers of fossil fuels, which in turn inflated the market for Defendants' products and harmed the County and its citizens. *E.g.*, Compl. ¶ 12; *cf. Baltimore II*, 952 F.3d at 467; *Rhode Island II*, 979 F.3d at 60. Defendants' deceptive conduct is not an operation on the OCS, and therefore OCSLA jurisdiction does not apply. *See Boulder I*, 405 F. Supp. 3d at 978–79 (finding no "direct connection" to an "operation" on the OCS); *Baltimore I*, 388 F. Supp. 3d at 566–67.

Nor does this case "arise[] out of, or in connection with" an OCS operation, which occurs when (1) the plaintiff "would not have been injured 'but for'" the operation, *Recar v. CNG Producing Co.*, 853 F.2d 367, 369 (5th Cir. 1988), and (2) granting relief "threatens to impair the total recovery of the federally-owned minerals" from the OCS, *EP Operating Ltd. P'ship*, 26 F.3d at 570.[7] Here,

---

[7] Defendants' assertion that the phrase "in connection with" as used in 43 U.S.C. § 1349(b)(1) "means there is no causal requirement at all," *see* Opp. 10 n.4, is absurd. Congress did not intend OCSLA to confer federal jurisdiction over every state-law complaint involving fossil fuel companies, and reading it so broadly is nonsensical. *See, e.g.*, *Maracich v. Spears*, 570 U.S. 48, 59–60 (2013) ("The phrase 'in connection with' is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere,'" and where it appears, "a limiting principle consistent with the structure of the statute and its other provisions" is necessary.).

Defendants do not argue that the County would not have suffered its injuries *but for* Defendants' activities on the OCS—failing the first subpart of the Fifth Circuit's test. *See, e.g.*, *Deepwater Horizon*, 745 F.3d at 163. Instead, Defendants argue that OCSLA jurisdiction applies because their purportedly "significant production on the OCS" simply "*contributed to* global greenhouse gas emissions that caused Plaintiff's alleged injuries." Opp. 12 (emphasis added). But every court to consider this argument has rejected it, *see* Mot. 21 n.11, and Defendants fail to distinguish those persuasive authorities. "[E]ven if some of the . . . injuries stemmed from operations on the [OCS], the defendants have not shown that the plaintiffs' causes of action would not have accrued *but for* the defendants' activities on the shelf." *San Mateo I*, 294 F. Supp. 3d at 938–39. Moreover, an "argument that the 'but-for' test extends jurisdiction to any claim that would not exist but for offshore production lends itself to absurd results." *Plains Gas Sols.*, 46 F. Supp. 3d at 705.

Defendants also fail to show that relief here threatens to impair recovery from the OCS; their Opposition largely repeats the Notice, which was already addressed in the County's Motion. Again, *Haynes v. Haas* did not hold that the only remedy for abatement of prospective injuries is an injunction to stop the source of the nuisance. 146 Haw. 452 (2020). *Haynes* simply "adopt[ed] Restatement § 821C, which allows an individual to sue for damages under a public nuisance theory if they have suffered a harm different than that of the public." *Id.* at 460-61. Far from

enjoining global fossil fuel production, the County seeks abatement of the nuisance "in and near the County" only, such as by mitigating local flooding. Compl. Part VII; *see, e.g.*, *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 169 (Cal. Ct. App. 2017) (upholding remedy in action to abate lead paint public nuisance by removing paint from public buildings), *cert. denied*, 139 S. Ct. 377 (2018); *see also Oklahoma v. Purdue Pharma LP*, No. CJ-2017-816, 2019 WL 4019929, at *12, *15 (Okla. Dist. Ct. Aug. 26, 2019) (finding defendants created a public nuisance with their misleading marketing and promotion of opioids and ordering defendants to fund abatement). Such relief would not "threate[n] to impair the total recovery of the federally-owned minerals" from the OCS. *EP Operating Ltd. P'ship*, 26 F.3d at 570.

Nor is there a basis to find that payment for local injuries would impermissibly interfere with overall recovery of OCS minerals, or with Defendants' business generally. *See Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1008 (9th Cir. 2013) ("It is certainly not impossible for an airline both to comply with federal regulations and to pay damages in state tort suits."). Defendants' theory would confer OCSLA jurisdiction for *any* claim that imposes damages on companies that operate on the OCS, no matter how remote those operations are from that plaintiff's injury. The remedies sought here would not regulate OCS activities, s*ee, e.g.*, *Pharm. Research & Mfrs. of Am. v. Concannon*, 249 F.3d 66, 82 (1st Cir. 2001); *Freedom Holdings,*

*Inc. v. Spitzer*, 357 F.3d 205, 220 (2d Cir. 2004), nor impede OCSLA's objectives, as OCSLA is *not* intended to maximize profits for companies that violate state law.[8]

## B. There Is No Federal Officer Removal Jurisdiction.

Defendants cannot salvage their flawed assertion of federal-officer removal jurisdiction. The Ninth Circuit already squarely rejected many of the arguments advanced here, and the logic of *San Mateo II* forecloses Defendants' remaining grounds for federal officer removal. That holds true even if the Court considers the hundreds of pages of untimely allegations and evidence that Defendants impermissibly seek to shoehorn into the record. Try as they might, Defendants cannot paper over the gaping hole in their theory of federal officer removal: the failure to identify a single act that (1) Defendants took "pursuant to a federal officer's directions" and (2) "is causally connected with [the City's] claims." *San Mateo II*, 960 F.3d at 598.

### 1. Defendants Were Not "Acting Under" a Federal Officer.

Defendants search far and wide for evidence of an "acting-under" relationship, seeking a hook for federal officer jurisdiction in everything from old

---

[8] Defendants' arguments concerning the effect of damages awards, Opp. 15, though couched in relation to OCSLA jurisdiction, raise federal defenses that cannot provide grounds for removal—namely, claims of extraterritorial regulation in violation of the dormant Commerce Clause and conflict preemption. *See Vaden v. Discover Bank*, 556 U.S. 49, 60 (2009) ("[f]ederal jurisdiction cannot be predicated on an actual or anticipated defense" based in federal law).

World War II policies to commercial mineral leases on the OCS. Their search was in vain, however, because none of the identified relationships involve the requisite level of "subjection, guidance, or control" by a federal officer. *Id.* at 599.

### a. A Purported General Federal Policy Interest in Supporting the Fossil Fuel Industry Cannot Satisfy the "Acting Under" Requirement.

While Defendants argue they performed an "essential government function" by "adequate energy sources," Opp. 22, they offer no evidence or argument showing that they engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior," as required to justify removal, *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 152 (2007). Defendants were not acting as the government's agent. Rather, their evidence merely shows that the federal government pursued policies to encourage domestic production of fossil fuels. That Defendants may have complied with or benefitted from these policies does not establish they were acting under a federal officer.

Federal energy policy in the 1910-40s is irrelevant to the County's claims for misconduct that occurred decades later. Opp. 23–24. In any event, Defendants' evidence regarding early twentieth century federal energy policy does not establish that Defendants were acting under a federal officer. While the federal government may have pursued policies to incentivize and encourage domestic oil production during World War I and World War II, that does not mean the government delegated

federal authority to Defendants, or that Defendants assisted federal officers in carrying out basic government tasks. *Par. of Cameron v. Auster Oil & Gas Inc.*, 420 F. Supp. 3d 532, 543–44 (W.D. La. 2019) (finding that operations under WWII-era production directives showed compliance with a regulatory scheme, not the "special relationship" supporting federal officer removal), *aff'd sub nom. Par. of Plaquemines v. Chevron USA, Inc.*, 969 F.3d 502 (5th Cir. 2020).

Defendants' arguments regarding federal energy policy from the 1970s to the present fare no better. Defendants' evidence merely shows there was demand for Defendants' products, and federal policies attempted to facilitate Defendants' efforts to meet that demand through a variety of means, including incentives to increase production; deregulation; and opening the OCS for exploration, development, and leasing. Opp. Exs. 7–14. In *San Mateo II*, the Ninth Circuit held that Defendants were not acting under a federal officer by virtue of government leases granting them rights to explore and produce oil and gas on the OCS in exchange for royalties. 960 F.3d at 602–03. If such leases cannot support federal officer removal, then neither can federal policies that merely encouraged the "development of OCS oil and gas resources." Opp. Ex. 7 at 27262. Likewise, presidential proclamations concerning domestic energy production, s*ee* Opp. Exs. 6, 15, have no bearing on whether Defendants were assisting a federal officer to perform a basic governmental function.

Defendants' reliance on *Goncalves By & Through Goncalves v. Rady Children's Hospital San Diego*, 865 F.3d 1237 (9th Cir. 2017), is misplaced. *See* Opp. 22.[9] There, a private insurer removed a subrogation claim on the grounds that it was administering an insurance policy on behalf of the Office of Personnel Management ("OPM"). *Goncalves*, 865 F.3d at 1245–47. The Ninth Circuit concluded the insurer was acting under a federal officer since OPM delegated to the private insurer the authority to pursue subrogation claims on behalf of the government, and but for the actions of the private insurer, OPM would have needed to pursue the claim itself. *Id.* at 1246–47. Nothing in *Goncalves* suggests that a private entity "acts under" when its business is nationally important. And unlike in *Goncalves*, Defendants offer no evidence that the federal government delegated the authority to fulfill basic governmental tasks on its behalf.

### b. Defendants' Mineral Leases Provide No Basis for Federal Officer Removal.

Defendants' effort to evade the Ninth Circuit's rejection of OCS leasing as a basis for federal officer jurisdiction is long and fruitless. They cite no supporting case law because there is none. Instead, they point to regulations and statutes

---

[9] Defendants also cite *Thompson v. Crane Co.*, No. 11-00638-LEK, 2012 WL 1344453, at *19 (D. Haw. Apr. 17, 2012), for the proposition that "cases involving private contractors implicate the same uniquely federal interests as cases involving federal employees." But that language concerns whether the defendant had shown a colorable federal defense, not whether it was acting under a federal superior. *See id.* at *17–19. The case says nothing about the acting under requirement.

governing OCS lessees' conduct, hortatory Presidential policy statements, and never-enacted bills that supposedly would have nationalized OCS production. None of this shows that Defendants acted under a federal officer through the OCS leasing program.

Defendants cite their faulty and untimely expert opinion that OCS leases are "not merely commercial transactions." Declaration of Richard Tyler Priest, ECF No. 96-1 ("Priest Decl.") ¶ 7(1). But *San Mateo II* forecloses that line of argument, holding that the exact same OCS leases cannot support federal officer jurisdiction because they "do not require that lessees act on behalf of the federal government, under its close direction, or to fulfill basic governmental duties." 960 F.3d at 602–03. Defendants say that *San Mateo II* does not control because the Ninth Circuit only looked at "the OCS leases, *by themselves*," and that the broader context shows that Defendants acted as government agents on the OCS. *See* Opp. 45. Yet Defendants offer nothing outside of the four corners of the leases except requirements imposed by statute or regulation, and standard petroleum engineering practices.

Defendants rely on Dr. Priest to argue that, before the 1970s, "[t]he C.F.R. left substantial discretion to [the Interior Department] in implementing the regulations" that govern OCS lessees, Priest Decl. ¶ 23; the U.S. Geological Survey "periodically issued 'OCS orders,' which were directions and clarifications to all operators on how to meet the requirements in the C.F.R.," *id.* ¶ 24; and "[e]ven with the specific

stipulations under the OCS orders, the regional supervisor still had to make adaptive and discretionary decisions" about applying the regulations, *id.* ¶ 25. But this is a straightforward relationship between regulated industry and regulator: a statute delegates rulemaking authority to an agency, and the agency promulgates and enforces rules. Indeed, the crux of Dr. Priest's opinion and Defendants' argument is that "[t]he initial [C.F.R.], finalized in May 1954, went well beyond those that governed the average federally regulated entity at that time . . . ." *Id.* ¶ 19. But, of course, "[m]ere compliance with the law, even if the laws are highly detailed, and thus leave an entity highly regulated, does not show that the entity is acting under a federal officer." *San Mateo II*, 960 F.3d at 603 (cleaned up). Doctor riest's opinion all but concedes that Defendants' arguments fail.[10]

Defendants next argue that several never-enacted bills to amend OCSLA would have created "a national oil company," and therefore when Congress made totally different amendments to OCSLA in 1978 and opened the OCS to private lessees, it probably considered those lessees to be performing "essential tasks" on behalf of the government—even though the government has never actually

---

[10] Defendants' citation to speeches by President Nixon and President Obama, *see* Opp. 41–42, 44–45, are not probative of any relevant issue. Doctor Priest states that some text in President Obama's speech announcing certain expanded offshore oil and gas exploration shows that the OCS "filled a vital need . . . to make the nation energy independent." Priest Decl. ¶ 78. Even if true, that statement means at most that OCS production is economically important. It says nothing about whether lessees are agents of the government.

performed those tasks itself. *See* Opp. 42–44. None of that is correct. Again, the 1975 bill would have created an *exploration* program within the Interior Department to "*measure* promptly the extent of the publicly owned oil and gas resources on the OCS." Ex. 9 at 4664; Mot. 36 n.24. The bill's purpose was to ensure "that bids for production rights on federally explored tracts are truly representative of the value of the resources," not to create a federal oil extraction and production operation. Ex. 9 at 4665. Doctor Priest's assertion that the bill "[i]n essence . . . called for the creation of a national oil company" is simply wrong. *See* Priest Decl. ¶ 52.

The same is true of the other 1975 bill to create "a quasi-public corporation" called "Ampower." Opp. 43 (quoting Opp. Ex. 18). The bill's cosponsors opined that "[w]e literally cannot afford to indiscriminately lease . . . millions of acres of offshore reserves or naval reserves *without knowledge of the value and exact location of our best reserves*, and *without specific plans to promote oil company competition*." Opp. Ex. 18 at 9275–76 (emphasis added). The express purpose of both bills was not to nationalize OCS oil and gas production, but to ensure maximum return on the government's sale of production rights to private lessees.

Defendants' final citation is even weaker. They argue that in 1974, the Senate held hearings on a bill that would have "formally established a Federal Oil and Gas Corporation" ("FOGCO"). Opp. 43. Doctor Priest notes that under the bill FOGCO could "not be granted more than 20 percent of [OCS oil and gas development] rights

offered for sale or lease," Priest Decl. ¶ 53, leaving unsaid that 80% would be leased to private developers, as they are today. Defendants do not explain whether any other action was taken on the bill, and it plainly never became law. Doctor Priest says that the proposal "met strong opposition from various quarters of the private sector," but that "*some of the principles that motivated it* . . . found their way into policy." *Id*. (emphasis added). This sheds no light on the relationship between lessees and the government. Defendants' "new" evidence is indistinguishable from what was rejected by the court in *San Mateo II*. It must be rejected here as well.

### c. Defendants' Transactions with the Military Provide No Basis for Federal Officer Removal Jurisdiction.

The County does not allege misconduct during the Second World War ("WWII") or the Korean War and disclaims injures arising from provision of fossil fuel products, including specialized jet fuels, to the military. Setting aside again that their new evidence should be disregarded, that evidence in no way demonstrates the "delegation" of federal duties necessary to warrant federal officer removal. *Watson*, 551 U.S. at 157; *see also San Mateo II*, 960 F.3d at 599. Rather, Defendants' Opposition largely recites their Notice on the materiality, or lack thereof, of Defendants' transactions with the military—which was thoroughly addressed in the County's motion. To the extent Defendants offer new arguments and evidence concerning those transactions, they fail to satisfy the "acting under" standard.

Defendants' characterization of PAW directives and their compliance therewith do not "demonstrate[] the subjection, guidance, or control required to show that they were acting under a federal office." *Par. of Cameron*, 420 F. Supp. 3d at 543–44. In *Parish of Cameron*, as here, the defendants sought removal under § 1442 by "characteriz[ing] the U.S. oil and gas industry as essentially an agent of the federal government during [WWII]," and asserting that "the industry's activities were tightly controlled to support the country's war efforts." *Id.* at 543. The court remanded because, as here, the defendants did not show "that PAW and other federal agencies directed Defendants' activities or that they mandated how Defendants were to comply with federal regulations and directives." *Id.* at 544. Thus, the mere fact that the government set production quotas and otherwise influenced production demonstrate "little more than a regulated industry complying with . . . a federal regulatory regime," which cannot support federal officer removal. *Id.*[11]

Defendants' evidence of "acting under" during the Korean War is equally deficient. The suggestion that any Defendant was "directed" to expand production

---

[11] Defendants' "new" exhibit on this point merely substitutes excerpts from an exhibit to the Notice, which shows that the PAW and oil industry were cooperative partners in satisfying wartime oil demand. *Compare* Opp. Ex. 16 at 1, *with* Ex. 10 at 1; *see also* Mot. 30–31. It does not show an "unusually close" relationship or risk of state-court prejudice to justify removal. *See San Mateo II*, 960 F.3d at 599–600. Defendants' new evidence concerning the "Inch" pipelines fares no better, because it does not rebut the fact that the entity that built and operated the pipeline is not a defendant and therefore immaterial to the "acting under" analysis. *See* Opp. Ex. 17; *see also* Mot. 31.

during the Korean War is belied by the mechanism by which Defendants say the government executed that "directive:" by "calling on"—asking—the oil industry to drill new wells. Opp. 32; Declaration of Dr. Mark R. Wilson, ECF No. 96-2 ("Wilson Decl.") ¶ 28. And Defendants offer no evidence that any Defendant even responded to that request, let alone that they acted under a federal officer in doing so.

Similarly, Defendants offer no evidence of the actual relationship between the government and the lone defendant identified as having operated a government-owned, contractor-operated ("GOCO") facility to establish "acting under," relying instead on generalizations across industries and operators.[12] *See* Opp. 29–30. But the "arrangements" between GOCO operators and the government were highly "complex" given the unique circumstances at each site. Wilson Decl. ¶ 19. Without evidence that that relationship was "*unusually* close," Defendants offer nothing more

---

[12] This flaw is representative of the Wilson Declaration generally, which relies almost entirely on generalizations about the "oil industry" and overwhelmingly fails to identify specific oil companies and how they purportedly "acted under" federal officers as would satisfy Defendants' burden. *See San Mateo II*, 960 F.3d at 603 (defendants' burden to establish elements of federal officer removal). For instance, more than half of the references to a Defendant or a Defendant's predecessor are in a single paragraph establishing that certain oil companies have won government contracts, Wilson Decl. ¶ 34, which is insufficient on its own to establish federal officer removal jurisdiction. *See Cabalce v. Thomas E. Blanchard & Assocs., Inc.*, 797 F.3d 720, 729 (9th Cir. 2015) (denying federal-officer jurisdiction in case against government contractor). Moreover, the Wilson Declaration says nothing about whether any defendant "acted under" a federal officer in carrying out the deception campaign at the heart of the County's claims, and therefore provides no support for Defendants' nexus arguments.

than the type of "arm's-length business arrangement" that does not support federal officer jurisdiction under *San Mateo II*.[13] 960 F.3d at 599, 600 (emphasis added).

Finally, Defendants' mischaracterization of the County's objection to their CERCLA case citations also fails. *See* Opp. 28 n.11. Those cases are inapposite because they (1) concern conduct that is temporally, substantively, and expressly outside the bounds of the County's complaint, Compl. ¶ 14 (disclaiming injuries arising from supplying fossil fuels to the federal government) & Parts V.C–G (describing timing of Defendants' misconduct); (2) rely on highly specialized findings of fact that do not control the instant matter, *see M/V Am. Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) ("[A] court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a

---

[13] The same is true of the government's purported reliance on oil companies to supply specialty fuels. Opp. 33–34 (citing Wilson Decl. ¶ 40). Defendants' evidence indicates the Defendants were simply satisfying routine obligations as government contractors, Wilson Decl. ¶ 40, which again does not establish federal officer removal jurisdiction, *see Cabalce*, 797 F.3d at 729. Defendants' citation to *AIG Europe (UK) Ltd. v. McDonnell Douglas Corp.*, No. CV 02-8703-GAF, 2003 WL 257702 at *4 (C.D. Cal. Jan. 28, 2003), for the proposition that the government's "monitoring performance and dictating specifications is sufficient to permit removal," is wrong. That case has been overruled by the Ninth Circuit. In *Riggs v. Airbus Helicopters, Inc.*, 939 F.3d 981, 984–89 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 161 (2020), the court squarely held that the statute involved in both cases contemplates "a relationship based on compliance rather than assistance to federal officers," and thus the defendant aircraft manufacturer "was not acting under a federal officer although federal regulations gave [it] authority" to certify its aircraft's compliance with FAA regulations. *Id*. at 989. *AIG Europe* is no longer good law.

20

cause then before it"); and (3) reach conclusions in order to allocate liability for a CERCLA cleanup, a purpose that shares no policy considerations with this Court's evaluation of its removal jurisdiction under § 1442, *compare San Mateo II*, 960 F.3d at 598–99 (describing policies underlying federal officer removal), *with Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001) (describing CERCLA's statutory purposes).

### d. Chevron's Business at the Elk Hills Reserve Does Not Give Rise to Federal Officer Removal.

Defendants' Notice detailed the terms of the Unit Plan Contract ("UPC") between the Navy and Standard Oil (Chevron's predecessor) that governed joint operation of the Elk Hills Reserve. *See* NOR ¶¶ 71–77. In their Opposition, however, Defendants pivot away from the UPC, acknowledging—as they must—that "[t]he Ninth Circuit viewed [this contract] as merely an 'arm's-length' agreement" that did not give rise to an acting-under relationship. Opp. 46 (quoting *San Mateo II*, 960 F.3d at 602). Now, Defendants focus almost exclusively on a "separate[]" contractual arrangement (the so-called Operating Agreement) whereby the Navy hired Standard as an independent contractor to operate the Reserve. *Id.* 46–48. As with the UPC, though, this run-of-the-mill business relationship between the government and a private contractor falls short of the "unusually close" relationship that federal-officer removal demands. *San Mateo II*, 960 F.3d at 599, 603.

Defendants read too much into the Navy's "cho[ice] to operate the reserve through a contractor rather than with its own personnel." Opp. 46 (emphasis omitted). The government routinely contracts with private entities to procure goods and services, and as the Ninth Circuit has made clear, such contractors do not automatically satisfy the acting-under standard. *See Cabalce*, 797 F.3d at 729 (denying federal-officer jurisdiction in case against government contractor); *San Mateo II*, 960 F.3d at 600 ("[A] government contractor may meet the criteria for 'acting under' an officer under certain circumstances."); *Fidelitad, Inc. v. Insitu, Inc.*, 904 F.3d 1095, 1100 (9th Cir. 2018) (same).[14]

---

[14] Defendants cite a handful of cases where government contractors met the requirements for federal officer removal. Opp. 19 –20. If anything, though, the facts of those cases underscore the absence of federal "subjection, guidance, or control" in this case. *San Mateo II*, 960 F.3d at 599. In *Kruse v. Actuant Corp.*, for example, the Air Force "reviewed," "inspected," and "exerted direct control over" over the design, manufacture, selection, and supply of the asbestos-containing aircraft components that allegedly caused the plaintiff's malignant mesothelioma. No. 219-cv-09540-ODW(RAOx), 2020 WL 3287883, at *6 (C.D. Cal. June 18, 2020) In *Ward v. 84 Lumber Co.*, another asbestos case, the Navy exercised "direct and detailed control over the design" of certain, allegedly defective valves, including by (1) "dictat[ing] that [the] valves had to conform to precise military specification," (2) "monitor[ing] [the defendant's] compliance with those specifications," and (3) requiring the defendants "to supply drawings and plans with an 'incredible level of detail.'" No. CV 12-10490 JGB(PLAx), 2013 WL 12415465, at *6 (C.D. Cal. Mar. 11, 2013). And in *Doe I*, an out-of-circuit decision by the Western District of Pennsylvania, the plaintiff's privacy claims challenged "the design and functionality" of a healthcare website that the federal government had paid the defendant to develop in order to "implement[]" a federal program for electronic health records "in accordance with the program's criteria." *Doe I v. UPMC*, No. 2:20-CV-359, 2020 WL 4381675, at *6 (W.D. Pa. July 31, 2020), *motion to certify*

In *Cabalce*, for example, this Circuit affirmed remand of a case in which a defendant caused an explosion while performing "its contractual duties to handle, store, and destroy . . . fireworks" on behalf of the government. 797 F.3d at 728; *see also id.* at 723–25. The court acknowledged that the contract duties were defined "in general terms," *id.* at 728; required the defendant to destroy the fireworks "as prescribed and directed by [the government]," *id.* at 724; and mandated that "all destructions must be coordinated and approved by [the government]," *id.* (brackets omitted). But "the requisite federal control or supervision" was not present because the contract did not specify how the defendant was to dispose of the fireworks, "relying [instead] on the [defendant's] expertise" to develop a safe plan for doing so. *Id.* at 728 (quotations omitted).

The same reasoning applies to the Operating Agreement, which identifies certain tasks that Standard voluntarily agreed to perform as an independent contractor. *See* Ex. 32 § IV(a), (e). While the agreement defines the company's contractual duties "in general terms," it does not supply any "*detailed specifications*" for operating the reserve. *Cabalce*, 797 F.3d at 728, 730 (quotations omitted) (emphasis in original). In fact, the Operating Agreement expressly directs *Standard*

---

*appeal denied*, No. 2:20-CV-359, 2020 WL 5742685 (W.D. Pa. Sept. 25, 2020). Here, by contrast, Defendants identify no comparable instances of a federal officer's "close direction" of their proffered transactions with the military, let alone misconduct targeted in the County's Complaint. *San Mateo II*, 960 F.3d at 599.

*Oil*—not the Navy—to "furnish . . . a set of field operating procedures that are commensurate with the State of California laws and good oil field practice." Ex. 32 § IV(f).[15]

In any event, nothing in the record suggests that the Operating Agreement is anything more than "an arm's-length business arrangement with the Navy," just as the Ninth Circuit held the UPC to be. *San Mateo II*, 960 F.3d at 602. Defendants acknowledge as much, noting that the Navy selected the operator by means of "competitive bidding." NOR ¶ 78. Accordingly, neither Standard nor Chevron were acting under a federal officer when they operated the Elk Hills Reserve.

### e. Defendants' Contributions into the Strategic Petroleum Reserve Were Not Made at Government Direction.

Defendants' reliance on the Strategic Petroleum Reserve ("SPR") is equally unavailing. First, Defendants highlight their participation in the SPR's royalty-in-kind program for lessees of mineral rights on the OCS. *See* Opp. 49; *see also* Ex. 36. Under the program, lessees contributed oil to the SPR in lieu of making financial payments for their oil leases. *See* Opp. Ex. 20 at 17–18 (describing program). *San Mateo II*, however, rejected OCS leases as a basis for removal, reasoning that "'the willingness to lease federal property or mineral rights to a private entity for the

---

[15] As additional evidence of federal-officer control, Defendants include a 1974 letter directing Standard to determine whether the reserve could produce 400,000 barrels per day. *See* Opp. 48. That letter, however, merely invokes the terms of the Operating Agreement, which do not establish "acting under." Opp. Ex. 2, at Ex. A, 1.

entity's own commercial purposes, without more' cannot be 'characterized as the type of assistance that is required' to show that the private entity is 'acting under' a federal officer." 960 F.3d at 603 (quoting *Baltimore II*, 952 F.3d at 465). Defendants do not—and cannot—explain why making *in-kind* royalty payments pursuant to those leases constitutes "acting under," when making *cash* payments does not.

Similarly, federal-officer jurisdiction cannot rest on Defendants' contracts to deliver in-kind royalties to the SPR, or to lease and operate SPR infrastructure. As detailed in Defendants' exhibits, the government awarded SPR-delivery contracts through "a bidding competition," Opp. Ex. 20 at 17, and it leased SPR pipelines and terminals simply to raise revenue. Opp. Ex. 21 at 31; Opp. Ex. 22 at 34. These contractual relationships therefore amount to nothing more than "an arm's length business arrangement with the federal government." *San Mateo II*, 960 F.3d at 600.

Nor does Defendants' purported involvement in emergency "drawdown[s]" of the SPR establish "acting under." Opp. 49. Defendants highlight lease terms that required SPR infrastructure lessees to act as "a sales and distribution point in the event of a drawdown." *Id.* (emphasis omitted). But those lease obligations "largely track legal requirements" found in 42 U.S.C. § 6241. *See San Mateo II*, 960 F.3d at 603 (rejecting OCS lease terms on similar grounds). And as the Ninth Circuit explained, mere "compliance with the law, even if the laws are highly detailed, and

thus leave an entity highly regulated, does not show that the entity is acting under a federal officer." *Id.* (quotations omitted).

## 2. There Is No Causal Connection Between Defendants' Acts and the County's Claims.

While Defendants' proffer "may have the flavor of federal officer involvement in the [their] business, . . . that mirage only lasts until one remembers what [the County] is alleging in its lawsuit:" that Defendants failed to warn of the known risks of fossil fuel combustion, misled the public regarding those risks, promoted their products' unlimited use, and engaged in a multi-decadal disinformation campaign to prop up the market for their products—as every court to consider the issue has held.[16] *Rhode Island II*, 979 F.3d at 59–60. "[The County's] claim is simple: the oil companies knew what fossil fuels were doing to the environment and continued to sell them anyway, all while misleading consumers about the true impact of the products." *Id.* at 54. Defendants offer no evidence that they acted under a federal officer while engaging in this misconduct. While the Court may credit the factual allegations in a removal petition, it need not and should not

---

[16] *See* Mot. 43–46; *Baltimore II*, 952 F.3d at 466–68; *Boulder I*, 405 F. Supp. 3d at 976–77; *Rhode Island I*, 393 F. Supp. 3d at 152; *San Mateo I*, 294 F. Supp. 3d at 939; *see also Washington v. Monsanto Co.*, 274 F. Supp. 3d 1125, 1131 (W.D. Wash. 2017), *aff'd*, 738 F. App'x 554 (9th Cir. 2018); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 488 F.3d 112, 131 (2d Cir. 2007) (federal officer removal improper in product liability case where purported federal directives "say nothing" about deceptive marketing).

blindly adopt Defendants' baseless legal conclusions concerning the relationship between the alleged misconduct and the actions of federal officers, especially where, as here, those actions are "not plausibly related to" the conduct in the Complaint. *See Massachusetts*, 462 F. Supp. 3d at 47 (rejecting Exxon's "overreading" of the complaint because "[a] fair reading of the complaint tells a far different story").

Additionally, the Court should reject Defendants' arguments because the County disclaimed injuries arising from Defendants' provision of fossil fuels to the federal government. Compl. ¶ 14. In such cases, "remand clearly is appropriate, because [the defendant] cannot prove a causal nexus between its government contracts and [plaintiff's] claims." *Fisher v. Asbestos Corp.*, No. 2:14-CV-02338-WGY, 2014 WL 3752020, at *3 (C.D. Cal. July 30, 2014) (collecting cases). Indeed, to "deny remand [in such a] case would affirm [defendant's] right to assert a defense against a claim that does not exist, an absurd result." *Id*. The County's disclaimer here is effective.[17]

---

[17] Defendants' argument that the County's disclaimer is ineffective, Opp. 53 n.16, fails because, like many of Defendants' arguments, it mischaracterizes the County's injuries. Defendants' cited cases are also inapposite, because they address waivers that were not sufficiently comprehensive. *Reaser v. Allis Chambers Corp.*, No. CV 08-1296-SVW, 2008 WL 8911521, at *6 (C.D. Cal. June 23, 2008) (rejecting disclaimer that purportedly waived claims arising from the defendants' acts under federal officers, but not did not obviate litigation of government contractor defense in state court); *Ballenger v. Agco Corp.*, No. C 06–2271 CW, 2007 WL 1813821, at *2 & n.2 (N.D. Cal. June 22, 2007) (finding disclaimer ineffective when it waived federal claims but did not waive "any claims arising out of work done on U.S. Navy vessels").

In any event, many of the acts that Defendants purportedly took under color of federal office predate the misconduct at the core of the County's claims, namely: a campaign, accelerating in the 1980s and continuing to this day, to conceal and misrepresent the dangers of fossil fuel products while simultaneously promoting their unrestrained sale and use. *See Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 946 (E.D.N.Y. 1992) ("Critical under the [federal officer removal] statute is 'to what extent defendants acted under federal direction' at the time they were engaged in the conduct now being sued upon."); *cf. Coleman v. Trans Bay Cable, LLC*, No. 19-CV-02825-YGR, 2019 WL 3817822, at *4 (N.D. Cal. Aug. 14, 2019) (in federal enclave context, "jurisdictional inquiry . . . must focus on this same period of time"). For example, Defendants describe: (1) the United States' efforts to obtain oil and gas during the Korean War, the two World Wars, and even earlier events, Opp. 23–24, 27–33; (2) Standard Oil's operation of the petroleum reserve at Elk Hills, beginning in 1944, *id.* at 45–48; and (3) pipeline construction during World War II, *id.* at 31. But the Court should disregard this distant historical conduct both because it was disclaimed, and has no bearing on their decades-later campaign of deception.

Even if all the acts Defendants purportedly took at the direction of a federal officer occurred within the relevant period, *none* have anything to do with the acts complained of by the County. Defendants argue there is a causal connection between the County's claims and the federal government's policy choices to allow significant

production of oil and gas. Opp. 51. However, the County does not challenge those policy choices or Defendants' production and extraction activities. The source of the tort (and the target of the remedy) is Defendants' decades-long campaign to deceive consumers and the public about the dangers of fossil fuels, which—in turn—inflated the market for Defendants' products and harmed the County and its citizens. Accordingly, courts have consistently rejected Defendants' attempts to distort the allegations of similar complaints. *Baltimore II*, 952 F.3d at 467 ("When read as a whole, the Complaint clearly seeks to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign."); *Rhode Island II*, 979 F.3d at 59–60 (distinguishing defendants' government contracts from the plaintiff's allegations concerning defendants' failure to warn and campaign of deception).

Defendants further argue that there is a nexus because their alleged misrepresentations and failure to warn were proximate causes of their increased production and sale of oil and gas, which proximately caused the County's injuries. Opp. 52. But the relevant inquiry is whether the defendants' "challenged acts occurred *because of* what they were asked to do by the Government." *Goncalves*, 865 F.3d at 1245. Defendants present no evidence that their misrepresentations and omissions were in any way caused by their purported acts under a federal officer, including their sale of specialized fuels to the military, their production of oil and

gas under federal mineral leases, their activities at Elk Hills, and their involvement with the SPR. The Fourth Circuit rejected a virtually identical argument in *Baltimore II*, reasoning that references to fossil fuel production the plaintiff's complaint "only serve to tell a broader story about how the unrestrained production and use of Defendants' fossil fuel products contribute to greenhouse gas pollution. Although this story is necessary to establish the avenue of Baltimore's climate change-related injuries, it is not the source of tort liability." 952 F.3d at 467.

Defendants' assertion that they satisfy the "for or relating to" standard adopted in other circuits is also unavailing. As an initial matter, the Ninth Circuit has declined to adopt this standard. *See* Mot. 44 (citing *Ulleseit v. Bayer HealthCare Pharm. Inc.*, 826 F. App'x 627, 629 n.2 (9th Cir. 2020), *Goncalves*, 865 F.3d at 1245). Moreover, Defendants' nexus showing falls short even under the more relaxed "for or relating to" standard. *See, e.g.*, *Baltimore II*, 952 F.3d at 466–67 (discussing "relaxed reading" of nexus prong). In *Baltimore II*, the court recognized that a similar complaint "clearly [sought] to challenge the promotion and sale of fossil fuel products without warning and abetted by a sophisticated disinformation campaign." *Id.* at 467. Thus, "the relationship between Baltimore's claims and any federal authority over a portion of certain Defendants' production and sale of fossil fuel products [wa]s too tenuous to support removal under § 1442." *Id.* at 468. *See also Massachusetts*, 2020 WL 2769681, at *11–12 ("ExxonMobil's marketing and sale

tactics were not plausibly 'relat[ed] to' the drilling and production activities supposedly done under the direction of the federal government.").

Put simply: Defendants fail to identify a single instance where the government exercised control over the misrepresentations and failure to warn that give rise to the County's suit. And that omission is fatal to Defendants' assertion of federal officer jurisdiction, as other courts routinely find in cases involving failure to warn or deceptive marketing. *See, e.g.*, *In re MTBE*, 488 F.3d at 131 (federal officer removal improper where regulations "say nothing" about marketing and other misconduct).[18]

### C. There Is No Enclave Jurisdiction.

Defendants' argument that enclave jurisdiction exists because "a portion of Defendants' production and refining" occurred on enclaves, Opp. 55, fails because the County's Complaint "disclaims injuries arising on federal property," Compl. ¶ 14; *see also* Mot. 48–49. Nor does jurisdiction attach because some relevant *conduct* as opposed to *injuries* occurred on enclaves, Opp. 56 n.18.

---

[18] *See also Meyers v. Chesterton*, No. CIV.A 15-292, 2015 WL 2452346, at *6 (E.D. La. May 20, 2015) (rejecting federal officer removal because "nothing about the Navy's oversight prevented the Defendants from complying with any state law duty to warn"), *vacated as moot sub nom. Meyers v. CBS Corp.*, No. 15-30528, 2015 WL 13504685 (5th Cir. Oct. 28, 2015); *Faulk v. Owens-Corning Fiberglass Corp.*, 48 F. Supp. 2d 653, 662 (E.D. Tex. 1999) (remanding where defendant failed to "tether" production of military avgas to failure to warn claims); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 428 F. Supp. 2d 1014, 1017–18 (D. Minn. 2006) (remanding design defect case where FDA did not exercise control over design, manufacture, or sale of defibrillators at issue).

Jurisdiction does not attach where most of the alleged misconduct occurred outside the enclave. "[C]laims arise on federal enclaves, and thus fall within federal question jurisdiction, when all or most of the pertinent events occurred there." *Baltimore I*, 388 F. Supp. 3d at 565 (collecting cases); *Coleman*, 2019 WL 3817822, at *3. Here, Defendants' campaign of deception and failure to warn overwhelmingly occurred outside of any discrete federal enclave.[19] *See New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1146 (D.N.M. 2020) (holding "partial occurrence on a federal enclave is insufficient to invoke federal jurisdiction" where federal enclave waterways "ma[de] up only a small fraction" of contaminated waterbodies at issue).[20]

Moreover, where tortious activities "allegedly occur partially inside and partially outside the boundaries of an enclave," defendants bear a "higher burden" of proof regarding federal jurisdiction because "the state's interest increases proportionally, while the federal interest decreases." *Ballard*, 2016 WL 6216194, at *3. Here, Defendants' assertion that they "maintained production operations on

---

[19] Defendants' reliance on *Corley v. Long-Lewis, Inc.*, 688 F. Supp. 2d 1315 (N.D. Ala. 2010), is inapposite for reasons already explained, *see* Mot. 51–52.

[20] *See also Ballard v. Ameron Int'l Corp.*, No. 16-CV-06074-JSC, 2016 WL 6216194, at *3 (N.D. Cal. Oct. 25, 2016) (finding that the defendant failed to carry burden to establish enclave jurisdiction in asbestos claim where exposure on enclave was "a small portion of the total exposure"); *San Mateo I*, 294 F. Supp. 3d at 939 (remanding where "federal land was not the 'locus in which the claim arose.'") (citation omitted); *Baltimore I*, 388 F. Supp. 3d at 565.

federal enclaves and sold fossil fuels on military bases and other federal enclaves," Opp. 55, does not meet their burden, and would have the perverse effect of federalizing any claim against a company that sells products on military bases. Such an absurd result finds no authority in the jurisprudence and cannot be countenanced here. *See Boulder I*, 405 F. Supp. 3d at 974. Enclave jurisdiction is not proper.

### D. Defendants' Attacks on the Merits of the County's Claims Are Misguided.

Whether Defendants misled the public about the dangers of climate change is a question of fact that goes to the merits of the County's claims. Defendants do not dispute this characterization of the issue. *See* Opp. 58 n.20. And they have nowhere to hide from the Ninth Circuit's clear command that, on a motion to remand, "a court must leave the resolution of material factual disputes to the trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim." *Leite v. Crane Co.*, 749 F.3d 1117, 1122 n.3 (9th Cir. 2014). This Court must disregard Defendants' attacks on the plausibility of the Complaint.

At any rate, those attacks fail on their own terms. At most, Defendants' evidence shows that there was public debate over the causes and effects of climate change, and that some actors (other than Defendants) contributed accurate information to that debate. Their evidence, however, says nothing about whether Defendants' deception campaign succeeded in discrediting climate-change science, warping the public's understanding of global warming, and unlawfully inflating the

market for their fossil-fuel products. And as analogous cases confirm, Defendants cannot dodge liability simply by showing that the dangers of their products were known to some narrow segment of the population. *See, e.g.*, *ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th at 65, 91–93 (lead-paint litigation); *Purdue Pharma L.P.*, 2019 WL 9241510, at *8–9, 12, 14 (opioid litigation); *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 26, 35–36 (D.D.C. 2006) (tobacco litigation).

## IV.  CONCLUSION

This Court lacks jurisdiction here and should grant the Motion to Remand.


DATED: January 20, 2021    Respectfully Submitted,

**MOANA M. LUTEY**
Corporation Counsel

By:  */s/ Moana M. Lutey*
RICHELLE M. THOMSON
KEOLA R. WHITTAKER
Deputies Corporation Counsel

By:  */s/ Victor M. Sher*
VICTOR M. SHER (pro hac vice)
MATTHEW K. EDLING (pro hac vice)
CORRIE J. YACKULIC (pro hac vice forthcoming)
TIMOTHY R. SLOANE (pro hac vice forthcoming)
Sher Edling LLP

Attorneys for Plaintiff
COUNTY OF MAUI